# Exhibit D
## *Motion for Leave to File Second Amended Complaint*

## IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**DONNA R. SPURLING**,

    Plaintiff,

    vs.

**METROPOLITAN LIFE INSURANCE COMPANY, A/K/A METROPOLITAN INSURANCE COMPANY**, *et al*.,

    Defendants.

**IN RE:  ASBESTOS PERSONAL INJURY LITIGATION MASS LITIGATION PANEL**

**Civil Action No.: 03-C-9600 KAN**
**The Honorable Ronald E. Wilson**

**Civil Action No.: 24-C-26 KAN**

## DONNA SPURLING'S MOTION FOR LEAVE TO FILE
## SECOND AMENDED COMPLAINT

    **AND NOW** comes the Plaintiff, Donna R. Spurling, by counsel, Michael P. Robb, Esquire, and Travis A. Prince, Esquire, and Bailey & Glasser, LLP, pursuant to West Virginia Rule of Civil Procedure 15, and hereby moves to amend her First Amended Complaint in this action. In support of this motion, Plaintiff states as follows:

    1.    Pursuant to Rule 15 of the West Virginia Rules of Civil Procedure, Plaintiff moves this Court to allow her to amend her First Amended Complaint. Good cause exists to allow her leave to amend to respond to Defendant Fairmont State University Board of Governors' bait-and-switch.

    2.    After providing Defendant Fairmont State University Board of Governors (hereinafter "FSUBOG") with notice of her claims against it, Plaintiff amended her Complaint to add FSUBOG as a defendant. After that amendment, FSUBOG's counsel engaged in in-person and email negotiations with Plaintiff's counsel. During those negotiations, FSUBOG offered Plaintiff

a substantial settlement offer (rightfully so, it exposed her to asbestos, which led to her lung cancer diagnosis).

3.      Then, in the midst of those negotiations, FSUBOG reneged, hired new counsel, and asserted for the first time after months of negotiations that it was protected by sovereign immunity. It is not. Ms. Spurling asks this Court for leave to amend so that she can allege facts and claims that definitively defeat FSUBOG's sovereign immunity claims.

4.      Furthermore, Plaintiff seeks leave of this Court to add the West Virginia Board of Risk and Insurance Management ("BRIM") as a party-defendant for claims that have arisen during the pendency of this litigation.

## **BACKGROUND**

5.      On January 12, 2024, Ms. Spurling filed this action. On the same day, Plaintiff mailed FSUBOG and the West Virginia Attorney General's Office with her Notice of Claim, via certified mail, return receipt requested, as required by W. Va. Code § 55-17-3.

6.      On February 16, 2024, Ms. Spurling moved to amend her Complaint to add FSUBOG. On March 7, 2024, the Court granted her Motion and Ms. Spurling filed her Amended Complaint (which is still the operative version of the Complaint).

7.      After Ms. Spurling filed the Amended Complaint, FSUBOG's counsel, Jeffery Lilly, reached out to Plaintiff's counsel to discuss the case. On May 22, 2024, Ms. Spurling's counsel met with attorney Lilly in person in Fairmont, WV, gave FSUBOG a demand, and agreed to give FSUBOG until July 22, 2024, to respond to Ms. Spurling's Complaint.

8.      On July 11, 2024, FSUBOG, through Mr. Lilly, offered Ms. Spurling $600,000.00 to resolve her claims against FSUBOG. Plaintiff countered at $700,000.00, and on July 19, 2024,

FSUBOG increased its offer to $650,000.00. Plaintiff's counsel promptly responded on July 19, 2024, and offered to resolve the matter for $675,000.00.

9.      On July 23, 2024, FSUBOG withdrew its offers to resolve the claim and asked Ms. Spurling to provide information regarding her claim, including the date of her lung cancer diagnosis, the amount of her medical expenses, the amount of her future medical expenses, and her life expectancy.

10.     On July 24, 2024, Plaintiff provided a 189-page document including all of the information FSUBOG requested. On July 25, 2024, Plaintiff requested the deposition of David Goldberg, a member of both the Fairmont State University Board of Governors as well as the acting CEO of Mon General Hospital (a co-defendant in this case).

11.     On July 26, 2024, Jeffery Lilly informed Plaintiff's counsel that he was fired by FSUBOG and FSUBOG retained Steptoe & Johnson.

12.     On July 29, 2024, FSUBOG filed a motion to dismiss on sovereign immunity grounds, contending <u>for the very first time</u> that it had no insurance that covered Ms. Spurling's claims.

13.     In its Motion to Dismiss, FSUBOG contends that dismissal is warranted because Plaintiff did not specifically allege insurance coverage and because an AIG letter dated **January 26, 2024**, indicated that Fairmont State University did not have insurance coverage.

14.     At no point during the parties' months of negotiations did FSUBOG contend that it was protected by sovereign immunity. Now, faced with a dramatic about-face from FSUBOG, Plaintiff asks this Court for leave to amend so that she may allege facts and claims showing that FSUBOG's sovereign immunity defense is meritless. *See* Proposed Second Amended Complaint, attached hereto as **<u>Exhibit 1</u>**.

## ARGUMENT

15.     This Court should grant leave to amend so that she can assert facts and claims showing FSUBOG's sovereign immunity defense is meritless, and to add BRIM as a defendant in this matter.

16.     West Virginia Rule of Civil Procedure 15(a) is clear: "[L]eave [to amend] shall be freely given when justice so requires." Under this liberal standard, "motions to amend should always be granted under Rule 15 when: (1) the amendment permits the presentation of the merits of the action; (2) the adverse party is not prejudiced by the sudden assertion of the subject of the amendment; and (3) the adverse party can be given ample opportunity to meet the issue." Syl. Pt. 5, *Brooks v. Isinghood*, 584 S.E.2d 531, 535 (W. Va. 2003). All three of those criteria are easily met in this case.

17.     *First*, amendment in this case allows this Court to reach the merits of this action. For months, FSUBOG negotiated as though it had insurance coverage and sovereign immunity did not apply. Now, based solely on a denial of coverage letter that defendant had *prior* to negotiations, FSUBOG asks this Court to dismiss the case.

18.     Plaintiff's amendment alleges what she believed all along, FSUBOG has applicable coverage and it is not immune to litigation stemming from its deliberate choice to expose its students to asbestos. FSUBOG apparently believed it as well—it offered to pay Ms. Spurling $650,000.00 for its role in causing her to develop lung cancer before reneging on months of negotiations. Further adding BRIM as a defendant will additionally allow the Court to reach the merits of this action, both on the issue of insurance and the new claims discussed below.

19.     Thus, granting Plaintiff leave to amend her Complaint and proceed with discovery on the insurance coverage issue ensures that the merits of this matter are properly resolved.

20. Regardless of insurance coverage, Plaintiff's amendment adds several new claims, alleging that FSUBOG and BRIM violated federal law, which <u>are not</u> shielded by sovereign immunity.

21. First, Ms. Spurling alleges that FSUBOG and BRIM violated the Equal Protection clause by failing to procure insurance for its students and procuring insurance for employees. *See* **Exhibit 1** at ¶¶ 250-261.

22. In the course of researching FSUBOG's sovereign immunity claim, Ms. Spurling discovered that <u>employees</u> of West Virginia state entities *are* protected by the state's insurance policies. *Id.* Specifically, in *Hall v. West Virginia Board of Regents*, No. 89-C-508 (Monongalia County Circuit Court), the West Virginia Board of Regents conceded that it had an insurance policy that covered a deceased employee's mesothelioma diagnosis caused by asbestos. *Id.* The fact that the State of West Virginia protects certain citizens, specifically state employees, from the asbestos it exposed them to while denying that protection to others (such as students) violates the Equal Protection Clause. *Id.*

23. Ms. Spurling is also amending to add claims for violations of substantive and procedural due process. *See* **Exhibit 1** at ¶¶ 158-209. Since 1984, the State of West Virginia knew that a vast majority of state buildings were contaminated with friable asbestos-containing products. *Id.* Indeed, 330 of 400 state buildings surveyed in 1984 were contaminated with asbestos, including many at Fairmont State. *Id.*

24. Based on this, in 1986, the State initiated a lawsuit against asbestos manufacturers for funds to abate asbestos contained in state buildings. *Id.* Despite this, FSUBOG affirmatively chose to retain the asbestos-containing products in its campus buildings. *Id.*

25.     What's worse—it continued deliberately exposing its students and employees to that asbestos and, if FSUBOG is to be believed, FSUBOG and BRIM deliberately failed to procure insurance coverage for its asbestos-tainted buildings. *Id.* Those actions violate Ms. Spurling's due process rights and amount to a state-created danger that is not protected by sovereign immunity. *Id*.

26.     Furthermore, Plaintiff is additionally seeking leave to amend to add claims for violations of Title II of the Americans with Disabilities Act ("ADA"). *See* **Exhibit 1** at ¶¶ 210-249. FSUBOG and BRIM have discriminated against students who develop cancer as a result of their exposures to the asbestos contaminating the campus buildings. *Id*.

27.     FSUBOG and BRIM have been aware of the hazards posed by the asbestos-containing products in the campus buildings since 1984. However, rather than procuring liability insurance to protect against this known risk, FSUBOG and BRIM procured insurance with Absolute Asbestos Exclusions to ensure that any student who develops cancer as a result of exposure to friable asbestos present in their buildings will not have the benefit of liability insurance thereby denying them meaningful access to the Courts. *Id*.

28.     By intentionally discriminating against students on the basis of their disability, asbestos-related lung cancer, and failing to make any reasonable accommodations, the FSUBOG and BRIM have violated Title II of the ADA. *Id*.

29.     *Second*, FSUBOG is not prejudiced by this amendment. For months, it acted as though it was not protected by sovereign immunity. Now, after its bait-and-switch, Plaintiff should be given leave to amend facts showing that sovereign immunity does not apply. That is especially true because the parties have conducted no discovery, there is no trial date, and there are no looming deadlines. Amendment this early in a case does not prejudice FSUBOG.

30.     BRIM is not prejudiced either. It has been aware of this matter since at least January 26, 2024, when it was carbon copied the AIG denial of coverage letter. Further, the claims Plaintiff sets forth against it are within the applicable statute of limitations and no discovery has been conducted. Further, a Notice of Claim pursuant to W. Va. Code § 55-17-3 is being sent via certified mail, return receipt requested, upon filing this Motion to ensure that BRIM is on notice of the claims and will not be prejudiced by adding it so early in this matter.

31.     *Third*, Fairmont State and BRIM will have ample opportunity to meet the new issues raised by Ms. Spurling. As mentioned above, this case is in its early stages, and both Plaintiff and FSUBOG have yet to conduct discovery. Any new issues raised by Plaintiff's amendments can be fairly met in discovery.

32.     At the very least, discovery in this case is warranted to respond to FSUBOG's bait-and-switch. For months, it led Ms. Spurling, a woman diagnosed with lung cancer caused by asbestos in FSUBOG's (among other entities') facilities, to believe that it would take responsibility for its actions. After months of negotiation and offers of hundreds of thousands of dollars, FSUBOG's reneged on its negotiations with Ms. Spurling and asserted—for the very first time—that it could not be sued due to sovereign immunity. Now, Plaintiff should be given leave to amend to combat FSUBOG's new, bad-faith tactics.

## CONCLUSION

33.     For the reasons stated above, Ms. Spurling asks this Court for leave to file her Second Amended Complaint.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court grant Plaintiff's Motion for Leave to file Plaintiff's Second Amended Complaint in Civil Action.

Respectfully submitted,

BAILEY & GLASSER, LLP

*Michael P. Robb, Esquire*
Michael P. Robb, Esquire
BAILEY & GLASSER, LLP
180 Swinderman Road, Suite 100
Wexford, PA 15090
T: (412) 430-0391
F: (412) 259-0115
E-Mail: mrobb@BaileyGlasser.com


/s/ Travis A. Prince, Esquire
Travis A. Prince, Esquire
BAILEY & GLASSER, LLP
94 Long Street, Suite 200
Westover, WV 26501
T: (304) 594-0087
F: (304) 594-9709
E-Mail: tprince@BaileyGlasser.com

*ATTORNEYS FOR PLAINTIFF*

## IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

| | |
|---|---|
| **DONNA R. SPURLING,**<br><br>Plaintiff,<br><br>vs.<br><br>**METROPOLITAN LIFE INSURANCE COMPANY, A/K/A METROPOLITAN INSURANCE COMPANY;**<br><br>**MONONGALIA COUNTY GENERAL HOSPITAL COMPANY D/B/A MON GENERAL HOSPITAL;**<br><br>**UNITED HOSPITAL CENTER, INC.;**<br><br>**WEST VIRGINIA UNITED HEALTH SYSTEM, INC. D/B/A WEST VIRGINIA UNIVERSITY HEALTH SYSTEM;** and<br><br>**FAIRMONT STATE UNIVERSITY BOARD OF GOVERNORS,**<br><br>**WEST VIRGINIA BOARD OF RISK AND INSURANCE MANAGEMENT,**<br><br>Defendants. | **IN RE:**<br>**ASBESTOS PERSONAL INJURY LITIGATION**<br>**MASS LITIGATION PANEL**<br><br>Civil Action No.: **03-C-9600 KAN**<br>**The Honorable Ronald E. Wilson**<br><br>Civil Action No.: **24-C-26 KAN**<br><br>**PLAINTIFF'S SECOND AMENDED COMPLAINT IN CIVIL ACTION**<br><br>FILED ON BEHALF OF PLAINTIFF<br><br>Counsel of Record for This Party:<br><br>Michael P. Robb, Esquire<br>WV Bar #10734<br><br>Travis A. Prince, Esquire<br>WV Bar #11704<br><br>BAILEY & GLASSER, LLP<br>180 Swinderman Road<br>Suite 100<br>Wexford, PA 15090<br>E-mail: mrobb@baileyglasser.com<br><br>T. (412) 430-0391<br>F: (412) 259-0115 |



## SECOND AMENDED COMPLAINT

Plaintiff Donna R. Spurling brings this cause of action against Defendants for the injuries and damages sustained by her as a result of the conduct of Defendants named herein and in support would show unto the Court and Jury the following:

### I.    PREFACE

1) Donna R. Spurling (hereinafter sometimes "Plaintiff") has incurable lung cancer that will ultimately cause her death.  This cause of action arises out of her exposure to asbestos-containing products at facilities owned and operated by Defendants.

2) This case is unique and alarming.  Ms. Spurling was exposed to asbestos-containing materials during her education and training as a nursing student in college buildings and hospitals – places the general public assumes are safe from deadly airborne toxins like asbestos fibers. Unfortunately, this is not correct.

3) The evidence in this case will show that Ms. Spurling was exposed to asbestos-containing materials at Fairmont State University beginning in 1998 and continuing through the fall of 2004.  Her exposure began fourteen (14) years after a survey confirmed several buildings on campus contained asbestos, and twelve (12) years after the State of West Virginia filed a lawsuit on the university's behalf to recover money remove asbestos.   In 1996, approximately $20,000,000.00, was recovered to remove the asbestos from various state buildings including several at Fairmont State University where Plaintiff later enrolled.   Sadly, Fairmont State University deliberately and recklessly chose to allow the asbestos-contaminated products to remain in its buildings, knowingly exposed Plaintiff to the same, and now seeks to avoid liability. The law is clear, "[s]tate actors may not disclaim liability when they themselves throw others to the lions."[1]

---

[1]  *Pinder v. Johnson, PFC,* 54 F.3d 1169, 1177 (4th Cir. 1995).

4) The evidence in this case also will show that the Board tasked with securing insurance coverage for West Virginia's universities was fully aware of the magnitude of asbestos-containing materials in West Virginia's public buildings in 1987, eleven (11) years before Ms. Spurling stepped on Fairmont State University's campus.  Armed not only with encyclopedic knowledge of the health risks for current and future students and faculty at our beloved public universities but also with $20,000,000.00 in abatement funds, the Board did the unthinkable. It knowingly and intentionally turned a blind eye and opted not to purchase insurance, leaving West Virginia's students like Ms. Spurling to slowly die without assistance.

5) Finally, the evidence in this case will show that Ms. Spurling's exposure to asbestos-containing materials occurred during her training as a student nurse at local well-respected hospitals that portray themselves as pillars of healing and comfort in our communities. The appearance of caring and compassion is nothing but a veneer to cover a priority of profits over people.  For decades the defendant hospitals have knowingly exposed nurses, students, patients, visitors, and even lung cancer patients, to buildings and rooms that comprise deadly asbestos-containing materials.

## II.    FACTUAL ALLEGATIONS

6) Plaintiff is a citizen and resident of the state of West Virginia.  Donna Spurling's social security number is ▮▮▮▮▮▮▮▮▮, and her date of birth is ▮▮▮▮▮▮.  Donna Spurling, a lifelong non-smoker, was diagnosed with lung cancer in February 2022.

7) Venue and jurisdiction are proper as Plaintiff was exposed to asbestos in the State of West Virginia and said exposures were a substantial contributing factor in her development of lung cancer.  In addition, the injuries and causes of action alleged herein are due in part to actions and

events hereinafter described occurring in West Virginia, as a result of the Defendant corporations doing business in the State of West Virginia, and as a result of actions elsewhere.

8) Defendant, **Metropolitan Life Insurance Company, A/K/A Metropolitan Insurance Company,** is a corporation incorporated under the laws of the state of New York, having its principal place of business located in New York and is qualified to do business in the State of West Virginia.

9) Defendant, **Monongalia County General Hospital Company, D/B/A Mon General Hospital,** is a corporation incorporated under the laws of the state of West Virginia, having its principal place of business located in West Virginia.

10)    Defendant, **West Virginia University Hospitals, Inc. D/B/A Fairmont Medical Center, A Campus of J.W. Ruby Memorial Hospital,** is a corporation incorporated under the laws of the state of West Virginia, having its principal place of business located in West Virginia.

11)    Defendant, **West Virginia United Health System, Inc. D/B/A West Virginia University Health System,** is a corporation incorporated under the laws of the State of West Virginia, having its principal place of business in West Virginia.

12)    Defendant**, United Hospital Center, Inc.,** is a corporation incorporated under the laws of the State of New York, having its principal place of business located in New York, New York.

13)    Defendant **West Virginia Board of Risk and Insurance Management** is a state entity that is responsible for securing adequate insurance coverage for liabilities of state agencies including universities pursuant to W.Va. Code Section 29-12-5, *et seq*.

14)    Fairmont State University is a public institution of higher education owned and operated by the State of West Virginia, having its principal campus in Fairmont, West Virginia.

15)    The business and educational affairs of Fairmont State University are under the control, supervision, and management of its twelve-member governing body, Defendant, **Fairmont State University Board of Governors**, located in Fairmont, West Virginia

16)    Written notice of Plaintiff's claims herein was provided via certified mail, return receipt requested, to Defendant, **Fairmont State University Board of Governors**, and West Virginia Attorney General, Patrick Morrisey, Esquire, on January 12, 2024.  Furthermore, a copy of the Motion for leave to file the Second Amended Complaint and all exhibits has been further provided to West Virginia Attorney General, Patrick Morrisey, Esquire, on the date of its filing.

17)    Plaintiff, Donna R. Spurling (formerly Donna Rae Jones) was a nursing student at Fairmont State University (Fairmont, WV) from 1998 through 2004. Plaintiff also took summer classes at Pierpont Community College in Clarksburg, WV in the year 2002.  While a nursing student at Fairmont State University, Donna R. Spurling was sent to various hospitals and medical facilities as part of her Fairmont State University nursing education program and her nursing rotation schedule was coordinated by and at the sole direction of Fairmont State University. During her nursing rotation Plaintiff travelled to the following locations where she was exposed to asbestos-containing building materials on a regular and continuous basis:

> **Mon General Hospital – Morgantown, WV**
> **Chestnut Ridge Center – Morgantown, WV**
> **Fairmont Medical Center – Fairmont, WV**
> **United Hospital Center – Clarksburg, WV**

18)    Plaintiff also was exposed to and caused to inhale asbestos dust and fibers in various campus buildings at Fairmont State University on a regular and frequent basis.

19)    Since at least 1984, Defendant **Fairmont State University Board of Governors** has been aware that buildings on its campus posed a serious health hazard to its students and

employees due to their severe asbestos contamination that would become increasingly hazardous with time.

20)    In 1984, the State of West Virginia conducted a survey of over 400 hundred buildings that found approximately 330 buildings, including buildings located at Fairmont State University, contained asbestos or asbestos-containing products (hereinafter "1984 Survey").

21)    Based in part on the 1984 Survey results, the State of West Virginia, through its Attorney General Charles Brown, filed a complaint against several manufacturers, suppliers, and/or sellers of asbestos-containing products **on July 17, 1986.** This case is captioned: *State of West Virginia v. AAER, et al.,* Civil Action 86-C-458, Mon. Cty. Cir. Ct.  (hereinafter referred to as "*State v. AAER*").  See attached **EXHIBIT "A"**.

22)    In the *State v. AAER* litigation, the State of West Virginia claimed in paragraphs 85 and 86 of its original complaint that the presence of asbestos in hospitals, colleges, and universities created a hazardous condition causing injury to persons and property.

```
    85.  The defendants listed above, in paragraphs 6
through 82, and/or their predecessors and successors in
interest, made contracts to be performed in whole or in part
in the State of West Virginia and/or manufactured, sold,
offered for sale, supplied or placed in the stream of
commerce defective and hazardous products causing injury to
persons and property within this State, and as described
below, committed tortious acts in the State of West
Virginia.

    86.  Plaintiff, State of West Virginia has, constructed
and/or renovated hundreds of public buildings and facilities
in the State of West Virginia.  These public buildings and
facilities owned by plaintiff include hospitals, schools,
colleges, universities, nursing homes, facilities for the
mentally retarded, institutions for the mentally ill,
government office buildings, and numerous other types of
public buildings and facilities.
```

6

23)     The colleges and universities which the State of West Virginia, through its Attorney General, claimed were contaminated with asbestos-containing materials are as follows:

a)  Fairmont State College (now Fairmont State University);

b)  West Virginia University;

c)  West Liberty State College;

d)  West Virginia School of Osteopathic Medicine;

e)  Marshall University;

f)  Potomac State College;

g)  Bluefield State College (now Bluefield State University);

h)  Concord College (now Concord University);

i)  West Virginia Northern Community College;

j)  West Virginia State College;

k)  West Virginia Technical College;

l)  West Virginia School for the Deaf and Blind;

m) Glenville State College (now Glenville State University);

n)  Shepherd College (now Shepherd University);

o)  Southern West Virginia Community College;

p)  Greenbrier College;

q)  Parkersburg Community College;

24)     With respect to the buildings at Fairmont State University, the lawsuit identified the following buildings as being heavily contaminated with friable/airborne asbestos:

a)  Administration Building;

b)  Cafeteria/Dining Hall;

    c)  Colebank Building;

    d)  Feaster Center;

    e)  Language/Commerce Building (Currently Jaynes Hall);

    f)  Library;

    g)  Morrow Hall;

    h)  Old Maintenance Building;

    i)  Pence Hall Dormitory;

    j)  Physical Plant;

    k)  President's Residence;

    l)  Prichard Hall Dormitory[2];

    m) Science Building (Currently Hunt Haught Hall);

    n)  Turley Center; and

    o)  Fine and Applied Arts Building (Currently Wallman Hall).

25)    The Plaintiff took classes in and/or was present in most of these buildings during the six (6) years she was enrolled at Fairmont State University from 1998 to 2004.

26)    In *State v. AAER*, the State of West Virginia filed claims against seventy-six (76) asbestos-containing building product manufacturers that the State previously paid to install said products in hundreds of its buildings statewide.

27)    In *State v. AAER*, the State of West Virginia claimed numerous types of asbestos-containing building materials were present in its buildings which are or will become friable, airborne, and thus deadly:

---

[2] Asbestos-contaminated Prichard Hall is the location of Middle College, a program that will house fifty (50) foster teens from across West Virginia. See, https://www.timeswv.com/news/local_news/middle-college-days-away-from-selecting-first-official-cohort-of-students/article_70b81f2e-4f85-11ef-9175-cf0ad85167a3.html

> 89.  At the time these public buildings and facilities
> were constructed and/or renovated, large portions of the
> interior framework, structural members, ceilings, walls,
> pipes, ducts and heating and ventilation equipment were
> sprayed, wrapped and/or otherwise covered with defendants'
> asbestos and asbestos containing products.  These products
> were used for fireproofing, acoustical and thermal insu-
> lation, and/or decorative purposes.  These asbestos products
> are or will become friable, i.e., easily crumbled, pulverized,
> reduced to powder, or otherwise equally damaged, thereby
> releasing microscopic asbestos fibers into the air.

28)    In the *State v. AAER*, the State claimed that students and others used these
contaminated facilities on almost a daily basis:

> 88.  In many of the public buildings and facilities of
> the State of West Virginia, students, patients, teachers,
> and other state employees, as well as members of the general
> public, have used and continue to use these public buildings
> and facilities on almost a daily basis.

29)    In the *State v. AAER* litigation, the State of West Virginia claimed that the presence
of friable asbestos building materials created an unreasonable risk of harm to the persons using the
contaminated buildings and facilities.

> 96.  The activities engaged in by defendants, as iden-
> tified in paragraphs 6 through 82 above, created and creates
> an unreasonable risk of harm to the persons using
> plaintiff's buildings and facilities and were done pursuant
> to a common plan, concert of action, and considered course
> of conduct.

30)    In the *State v. AAER* litigation, the State of West Virginia further claimed that the
asbestos building materials inside its buildings caused damage to its buildings and **created a
present and __foreseeable__ health hazard to individuals who use its public buildings.**

>    118. Although defendants knew or should have known of
>    the dangers associated with the uses of asbestos and
>    asbestos-containing products in public buildings, they, in
>    breach of their legal duties, negligently and recklessly
>    mined, manufactured, distributed, sold and placed in the
>    stream of commerce asbestos and asbestos-containing
>    products, thereby creating an unreasonable risk of harm to
>    plaintiff, causing damage to plaintiff's property, and
>    creating a present and foreseeable health hazard to
>    individuals who use plaintiff's public buildings.

31)    In the *State v. AAER* litigation, the State of West Virginia further claimed that the presence of asbestos in its buildings created a public nuisance which unreasonably interfered with and deprived the State and members of the public who used these facilities of the safe use of the buildings.

>    122. Defendants, acting individually and collectively,
>    have caused a serious health hazard to be created in the
>    public buildings and facilities of the State of West
>    Virginia. This risk is a direct result of the wrongful acts
>    of defendants as set forth herein, and amounts to a public
>    nuisance which has damaged plaintiff by unreasonably inter-
>    fering with and depriving plaintiff and the members of the
>    public who use these facilities of the safe and uninhibited
>    use and enjoyment of these facilities.

32)    The State in *State v. AAER* claimed in its Complaint filed in 1986 – twelve (12) years before Plaintiff enrolled at Fairmont State University – that the discharge and release of asbestos particles into the air inside its buildings constituted **statutory air pollution** and should be **<u>immediately</u>** abated.

10

```
     123.  The discharge or release of asbestos particles into
the air from defendants' asbestos-containing products in
plaintiff's buildings constitutes statutory air pollution as
defined by W. Va. Code § 16-20-1, et seq.  Defendants' have
thus created a nuisance per se which should be immediately
abated.
```

33)    The State in *State v. AAER* claimed that the public using these buildings have been
exposed to asbestos, asbestos fibers, and/or asbestos particles.

```
     137.  As a direct result of the presence of defendants'
asbestos-containing products in the public buildings and
facilities of the State of West Virginia, the personnel and
the public using these buildings have been exposed to
asbestos, asbestos fibers, and/or asbestos particles.
```

34)    In the *State v. AAER* litigation, the State of West Virginia further claimed that the
State has been and would continue to be subject to legal claims for personal injuries and death
caused by exposure to asbestos in their buildings.

```
     138.  As a direct result of the conduct of the
defendants, the plaintiff has been and will continue to be
subjected to legal claims brought by persons seeking damages
for personal injuries and death allegedly caused by exposure
to asbestos, asbestos fibers, or asbestos particles in
plaintiff's buildings which contain the asbestos-containing
products of defendants.
```

35)    The State in *State v. AAER* sought $100,000,000.00 in compensatory damages for
property damage sustained to its buildings by the presence of deadly asbestos containing products.
The State further sought punitive damages in addition to complete indemnification from expenses
and liability associated with future students' injuries caused by exposure to the asbestos-containing
products inside its buildings.

11

A.  Judgment be entered against defendants, listed in paragraphs 6 through 81 above, jointly and severally, or according to their share of the market, for compensatory damages in the amount of 100 million dollars;

B.  Judgment be entered against defendants, jointly and severally, or according to their share of the market, for punitive damages in an amount that is fair and just under the circumstances;

C.  The Court issue a declaration that plaintiff, as well as its officials, employees, and agents, is entitled and will be entitled to full and complete indemnification by the defendants, for all claims and actions of any nature seeking compensatory and/or punitive damages resulting from any disease or injury alleged to have been caused in whole or in part by exposure to asbestos in plaintiff's buildings and facilities by any past, present or future employee, occupant or visitor to the plaintiff's buildings or facilities brought against plaintiff;

36)    The original complaint in *State v. AAER* was signed by Charles G. Brown, the West Virginia Attorney General, and Daniel Vannoy, Assistant Attorney General:

*Charles G Brown*
CHARLES G. BROWN
ATTORNEY GENERAL

*Daniel W. Vannoy*
DANIEL W. VANNOY
ASSISTANT ATTORNEY GENERAL
State Capitol, Room 26-E
Charleston, West Virginia
25305

Counsel for Plaintiff

37)    Defendant **West Virginia Board of Risk and Insurance Management** is required to secure adequate, economical, and sound insurance coverage on all state property, activities, and responsibilities.  *See* W.Va. Code § 29-12-1.

12

38)    During the course of *State v. AAER*, on January 29, 1987, Assistant Attorney General Daniel W. Vannoy and Special Assistant Attorney General Lawrence A. Moloney prepared a Legal Liability Memorandum to Attorney General Charles Brown regarding the presence of dangerous asbestos in public buildings and the need for insurance.  See **EXHIBIT "B"**.

39)    The Legal Liability Memorandum states that when inhaled, asbestos fibers "embed themselves in the lungs where they tend to remain for life" and "over a long period of time, create in irreversible and untreatable condition known as 'asbestosis'" that can lead to **lung cancer**.  *Id.*

> **DANGER:**
>
> Asbestos materials contain tiny fibers which eventually "break off" from the parent material and migrate freely through the air or water.  When inhaled, these microscopic fibers embed themselves in the lungs where they tend to remain for life.  Unfortunately, once in the lungs these fibers, over a long period of time, create an irreversible and untreatable condition known as "asbestosis."  Asbestosis in turn leads to a form of lung cancer called mesothelioma.  Because asbestos is considered a long-latency toxin, 20 years or more can lapse between exposure to the fibers and the onset of clinical illness.  Although the danger to casual occupants (past and current) of asbestos-laden buildings is high, the danger to workers is much higher because of the fairly constant erosion of the asbestos-fiber bond and the ever-present danger of particles in the normal room air.

40)    The attorneys representing the State of West Virginia correctly warned that "[t]here is a clear and present danger to the citizens of West Virginia, regardless of whether they are state employees or visitors to a state building, a patient in a state hospital, or a **student in a state school.** The potential liability of the state shall continue to increase on a daily basis unless and until all asbestos contaminants are removed or rendered harmless." *Id.* (emphasis added).

> Statute of limitations restrictions mandate that this massive litigation be undertaken now.  However, we cannot wait for a judgment in favor of the State to begin asbestos removal or abatement.  There is a clear and present danger to the citizens of West Virginia, regardless of whether they are state employees or visitors to a state building, a patient in a state hospital, or a student in a state school.  The potential liability of the state shall continue to increase on a daily basis unless and until all asbestos contaminants are removed or rendered harmless.

41)    The Legal Liability Memorandum further warned that it is "probable that the owners of asbestos-infected buildings, owners like the State of West Virginia, also could be held liable" for asbestos-related claims.  *Id.*  Concerned about West Virginia's liability for asbestos in its public buildings, West Virginia Assistant Attorney Generals Mr. Vannoy and Mr. Maloney contacted Robert Corey, the Administrator for Defendant **West Virginia Board of Risk and Insurance Management** (BRIM).  Mr. Corey held this position with BRIM from 1975 to 1992. *Id.*

42)    The Legal Liability Memorandum states that Mr. Corey advised "the state does not maintain insurance coverage against exposure to toxic substances such as asbestos."  *Id.*

> Robert Corey, of the Insurance & Risk Management Board, informs this office that the state does not maintain insurance coverage against exposures to toxic substances such as asbestos; see addendum I for a sample of the exclusions language from such coverage under the insurance policies maintained by the State. In insurance terms, the State is going "bear" which means the taxpayers will have to pay any recoveries against the State resulting form exposures to asbestos in our buildings. As long as there is asbestos in State buildings, the potential for the state's liability continues and increases.

43)    Defendant **West Virginia Board of Risk and Insurance Management** was directly made aware of the scope of asbestos in West Virginia's public buildings but flatly declined to purchase insurance to protect West Virginians and the State of West Virginia against these known risks.  *Id.*

44)    In response to Defendant **West Virginia Board of Risk and Insurance Management's** refusal to procure insurance to protect West Virginians, Mr. Vannoy and Mr. Maloney, attorneys acting on behalf of the State of West Virginia, documented a now ominous warning:

> The first landmark asbestos case was in 1973. Since that
> time, there have been approximately 30,000 additional personal
> injury cases filed and, by the year 2010, this figure is expected
> to exceed 200,000. Since several courts have found that the
> "dangers" of asbestos were known to the manufacturers as early as
> the 1930's, it is probable that most of these suits will be
> successful. Many courts have also found asbestos-related claims
> to fall under the "strict liability theory", it therefore is also
> probable that the owners of asbestos-infected buildings, owners
> like the State of West Virginia, could be also held liable.

45)     Despite being made fully aware of the health risks associated with asbestos exposure for students at state schools laden with asbestos containing products, Defendant **West Virginia Board of Risk and Insurance Management** intentionally selected improper, cheap, and inadequate insurance that specifically excluded college and university students in the State of West Virginia that were injured by asbestos exposure in public buildings.

46)     On February 23, 1987, Charlie Brown, then-Attorney General for the State of West Virginia, spoke openly of the dangers of deadly asbestos in West Virginia's public buildings. He starkly warned: **"This is no fairy tale! The State of West Virginia must abate, encapsulate and remove asbestos-containing products from the State's buildings to ensure that users of the State's buildings are no longer subject to unthinkable risks of health hazards."** *See* Feb. 23, 1987, Ltr. from Charlie Brown to Members of West Virginia Legislature attached hereto as **EXHIBIT "C"**.

> This is no fairy tale! The State of West Virginia must
> abate, encapsulate and remove asbestos-containing products from
> the State's buildings to ensure that users of the State's build-
> ings are no longer subject to unreasonable risks of health
> hazards. Since 1984, at the earliest, the State of West Virginia
> has been aware of the inherent and clear dangers posed by asbestos-
> containing products. To ignore these clear and present dangers
> of asbestos-containing products in the State's buildings shall
> subject the State to millions of dollars in damages resulting
> from exposures to asbestos in the State's buildings. To abate,
> encapsulate and remove asbestos-containing products from the
> State's buildings, the State shall be required to expend, over
> the next 10 to 15 years, sums of money estimated in amounts
> between $100 to $400 Million.

47)     Attorney General Brown warned the Legislature "[t]o ignore these clear and present dangers of asbestos-containing products in the State's buildings shall subject the State to millions of dollars in damages resulting from exposures to asbestos in the State's buildings." *Id.*

48)     Attorney General Brown described the asbestos located in over 330 of the State's approximately 400 buildings as being "in constant states of erosion, releasing tiny fibers in the air" that "when inhaled, embed themselves in the lungs of users of the State's buildings and potentially create an irreversible/untreatable condition known as 'asbestosis'" which in turn can lead to lung cancer.

> Asbestos-containing products have been identified in over 330 of the State's approximately 400 buildings. These products are in constant states of erosion, releasing tiny asbestos fibers in the air. These fibers, when inhaled, embed themselves in the lungs of users of the State's buildings and potentially create an irreversible/untreatable condition known as "asbestosis" which in turn leads to "mesothelioma" (a form of lung cancer).

49)     In September 1991, the State of West Virginia through an act of the Legislature created an asbestos special revenue account for the purpose of receiving state appropriations used to pay expenses incurred in the *State v. AAER* litigation.  See, W.Va. Code § 5-6-5a. The fund was also authorized to receive settlement proceeds obtained in the *State v. AAER* litigation.  The terms of the special revenue fund specifically state that **no portion of its proceeds are to be used to compensate for personal injury, workers compensation, or other disability**.

> (d) Disbursements from the special revenue account shall be authorized by the secretary of the Department of Administration or his designee. Moneys in the special revenue account shall not be available for the payment of any personal injury claims, workers' compensation claims or other types of disability claims. Payment from the special revenue account may be made for any expense incurred by the Attorney General prior to the effective date of this section, including any expense incurred in prior fiscal years, if the expense is directly related to the litigation of matters pertaining to asbestos and asbestos containing materials in which the state is involved.

50)     Upon information and belief, the Legislature excluded personal injury claims, workers compensation claims, and other types of disability claims from the special revenue fund

due to its expectation that Defendant **West Virginia Board of Risk and Insurance Management** would acquire adequate insurance coverage for these claims in accordance with its statutory directive to secure reasonably broad protection against loss, damage, or liability as set forth in W.Va. Code 29-12-5(a)(2).  In fact, Defendant **West Virginia Board of Risk and Insurance Management** did acquire workers compensation insurance coverage for state employees exposed and injured by asbestos, however, deliberately brokered and secured inadequate insurance which excluded from coverage non-employees, students, and members of the public who were exposed to and injured by the same asbestos-containing materials in state buildings.  The hypocrisy of BRIM's deliberate decision to exclude students from having the benefit of insurance while simultaneously insuring employees exposed to the same carcinogens in the same buildings is inconsistent with its statutory directive, unfair, shocking to the conscience, and without logic.

51)     Despite Attorney General Brown's warnings, despite knowledge of the 1984 Survey, and despite the fact that its asbestos-containing buildings served as a partial basis for a $100 million lawsuit filed by the State of West Virginia in 1986, Defendant **Fairmont State University Board of Governors** has only performed a small number of piecemeal asbestos abatement projects, none of which completely removed the asbestos-containing materials from its contaminated buildings.

52)     Defendant **Fairmont State University Board of Governors'** affirmative decision to allow friable and deadly asbestos-containing materials to remain inside its campus buildings occupied by unsuspecting and uninformed students and members of the public constitutes a past, present, and future reckless indifference to the health, safety, and well-being of its students, employees, and general public.

53)    After receiving Plaintiff's notice of claim and Amended Complaint in January 2024, **Fairmont State University Board of Governors** retained the services of a familiar face, Jeffery Lilly, Esq. with Rose, Padden, Petty, Taylor, & Lilly, LC.

54)    Mr. Lilly is very well acquainted with the scope and extent of asbestos contamination at Fairmont State University as his law firm, Rose, Padden, Petty, Taylor, & Lilly, LC, represented Eagle-Pitcher Industries, Inc., in *State v. AAER* and defended it against claims of asbestos contamination made by the State of West Virginia that concerned, in part, damages incurred by Fairmont State University.  In fact, Kenneth W. Dillon, Director of the Physical Plant at Fairmont State University, was deposed and **testified in depth regarding the asbestos contamination of Fairmont State University at Mr. Lilly's law office**:

> Please take notice that on Thursday, August 31, 1989, commencing at 10:00 a.m. at the law offices of Rose, Padden & Petty, L.C., 201 Walnut Street, 2nd Floor, Morgantown, West Virginia 26507-1618, defendant National Gypsum Company, pursuant to Rule 30 of the West Virginia Rules of Civil Procedure, will take the deposition of Kenneth W. Dillon, Director of Physical Plant, Fairmont State College, Fairmont, West Virginia 26554-2491.

55)    In this matter, on July 11, 2024, Defendant **Fairmont State University Board of Governors**, through its counsel, Jeffery Lilly¸ Esq., initially offered Ms. Spurling $600,000 to which Plaintiff countered with a demand of $700,000 as reflected in the below email correspondence, also attached as **EXHIBIT "D"**:



56)     In response, on July 19, 2024, Defendant **Fairmont State University Board of Governors**, through its counsel, Jeffery Lilly¸ Esq., increased its offer to $650,000 as reflected in the below email correspondence and attached hereto as **EXHIBIT "E"**:



57)     On July 19, 2024, Plaintiff subsequently forwarded a settlement demand of $675,000 to Mr. Lilly as reflected in the below email exchange and attached hereto as **EXHIBIT "F"**:



58)     On July 23, 2024, Mr. Lilly, as counsel for Fairmont State University, advised that all settlement offers were withdrawn, however, it was not terminating settlement negotiations. Instead, Mr. Lilly indicated his client had additional questions regarding Plaintiff's diagnosis and life expectancy as reflected in the email correspondence below and attached as **EXHIBIT "G"**.



59)     On July 24, 2024, in response to Mr. Lilly's request for additional information, counsel for Plaintiff forwarded a 189-page memorandum addressing each of his questions posed the day prior, as reflected in the below email exchange and attached hereto as **EXHIBIT "H"**:



60)    On July 26, 2024, Mr. Lilly responded by advising that his employment as counsel for Fairmont State University had been terminated and it had retained new counsel at Steptoe & Johnson, PLLC, to which he forwarded Plaintiff's 189-page memorandum that contained confidential health care information, the majority of which protected by HIPPA. See below as well as **EXHIBIT "I"**.    It should be noted that Steptoe & Johnson, PLLC, did not notice their appearance in this matter until several days after receipt of Plaintiff's confidential health care information.

** Remainder of page intentionally blank **

22



Hi, Mickey and Travis!

I hope all is well with both of you. This email will confirm the voicemail I just left for Mickey. After meeting with the folks at Fairmont State earlier today, effective immediately, Steptoe and Johnson will now be representing Fairmont State University in the Donna Spurling matter and I will no longer be representing Fairmont State University in the Donna Spurling matter. The lawyers from Steptoe and Johnson will soon file a Notice of Appearance on behalf of FSU. I have provided to FSU's General Counsel the package that you graciously compiled and emailed to me relating to Donna Spurling's diagnosis, treatment, past and future medical expenses, prognosis and medical records as well as your request for dates for the deposition of David Goldberg as a member of the FSU Board of Governors and your request for dates for a walk through of the FSU campus for the purpose of identifying the buildings in which Donna Spurling attended classes.

It was truly a pleasure meeting you and Travis and working with you in this matter. Hopefully our paths will cross again someday soon. Perhaps at Woody's. Thanks again and have a great day!

Jeff

Jeffery W. Lilly, Esquire
Rose Padden Petty Taylor & Lilly, L.C.
Attorneys at Law
P.O. Box 1307
Fairmont, WV 26555-1307
Phone: 304-363-4260
Fax: 304-363-4284
jlilly@rpptl.com

61)    By turning to Steptoe & Johnson, PLLC, Defendant **Fairmont State University Board of Governors** also hired a firm that is equally well-versed in the asbestos contamination at Fairmont State University.   In *State v. AAER, et al.*, Steptoe & Johnson, PLLC, represented and defended W.R. Grace, Co. and Air-O-Therm Application Co. Inc., against claims by the State of West Virginia that it contaminated Fairmont State University, among other buildings, with deadly asbestos-containing materials.

62)    In fact, Frank E. Simmerman, Esq., of Steptoe & Johnson, PLLC, served as lead defense liaison counsel for all asbestos defendant manufacturers that were alleged to have contaminated Fairmont State University's buildings and other public buildings with the deadly asbestos-containing products that contributed to Plaintiff's lung cancer.

63)    Upon information and belief, Defendant **Fairmont State University Board of Governors** has never contacted Defendant **West Virginia Board of Risk and Insurance**

**Management** to request proper insurance coverage for countless students injured by asbestos-containing products in its buildings.

64)     In so doing, Defendant **Fairmont State University Board of Governors** and Defendant **West Virginia Board of Risk and Insurance Management** have decided to push all risk associated with asbestos exposure and development of incurable cancer to the students and community while attempting to avoid any and all responsibility or liability for their conduct.

65)     Due to the unmitigated presence of asbestos-containing materials on campus that are known to break down and cause microscopic asbestos fibers to be circulated throughout by the HVAC systems of campus buildings, Fairmont State University in its current form is not a safe environment for students, faculty, staff, or the general public.

66)     Defendant **Fairmont State University Board of Governors** has publicly contended that all former, current, and future students that develop disabilities such as asbestosis, lung cancer, and mesothelioma, due to exposure to asbestos-containing products it knowingly and intentionally has allowed to remain in place for decades have **no** cause of action against it.

67)     Defendant **Fairmont State University Board of Governors** knowingly and purposefully fails to inform or warn its former or current students of the asbestos-containing material in buildings on campus, and the health risks associated with exposures to the asbestos-containing material allows to remain.

68)     For decades, Defendant **Fairmont State University Board of Governors** has knowingly exposed countless students, staff, visitors, and employees to asbestos-containing materials on campus without any warning or notice.

69)     To date, all requests to Defendant **Fairmont State University Board of Governors** to conduct testing of building materials, HVAC systems/filters, and air monitoring for the presence of deadly asbestos fibers have been denied.

70)     Ms. Spurling's injuries, incurable lung cancer, and damages were directly and proximately caused by in part by these policies and customs.

71)     Asbestos-containing material was present at Defendant **Monongalia County General Hospital Company, d/b/a Mon General Hospital,** while Plaintiff worked as a student nurse and is still present.

72)     Defendant **Monongalia County General Hospital Company, d/b/a Mon General Hospital** employs physicians that specialize in treating lung cancer in its Lung Cancer Screening Center while asbestos-containing products are present in hallways, rooms, and stairwells of its facility.

73)     Defendant **Monongalia County General Hospital Company, d/b/a Mon General** knowingly and purposefully does not inform or warn any former or current patients or employees of the asbestos-containing material in its hospital or the health risks associated with exposures to the asbestos-containing material it refuses to remove.

74)     To date, all requests to Defendant **Monongalia County General Hospital Company, d/b/a Mon General** to conduct testing of building materials, HVAC systems/filters, and air monitoring for the presence of deadly asbestos fibers have been denied.

75)     Plaintiff has requested the deposition of Defendant **Monongalia County General Hospital Company, d/b/a Mon General's** Chief Executive Officer, David Goldberg. Mr. Goldberg also serves as a voting member of Defendant **Fairmont State University's Board of**

**Governors** and Plaintiff has requested his deposition in that capacity as well.  Plaintiff has not received dates for either deposition.

76)    Asbestos-containing material was present at Defendant **United Hospital Center, Inc.,** while Plaintiff worked as a student nurse and is still present.

77)    Defendant **United Hospital Center, Inc.,** knowingly and purposefully does not inform or warn any former or current patients or employees of the asbestos-containing material in its hospital or the health risks associated with exposures to the asbestos-containing material it refuses to remove.

78)    Asbestos-containing material was present at Defendant **West Virginia University Hospitals, Inc. d/b/a Fairmont Medical Center, a campus of J.W. Ruby Memorial Hospital,** while Plaintiff worked as a student nurse and is still present.

79)    Defendant **West Virginia University Hospitals, Inc. d/b/a Fairmont Medical Center, a campus of J.W. Ruby Memorial Hospital,** knowingly and purposefully does not inform or warn any former or current patients or employees of the asbestos-containing material in its hospital or the health risks associated with exposures to the asbestos-containing material it refuses to remove.

80)    Asbestos-containing material was present at Defendant **West Virginia United Health System, Inc. d/b/a West Virginia University Health System,** while Plaintiff worked as a student nurse and is still present.

81)    Defendant **West Virginia United Health System, Inc. d/b/a West Virginia University Health System,** knowingly and purposefully does not inform or warn any former or current patients or employees of the asbestos-containing material in its hospital or the health risks associated with exposures to the asbestos-containing material it refuses to remove.

82)    As alleged more specifically herein, Plaintiff was exposed to and did inhale dust and asbestos fibers, which caused health conditions resulting in Plaintiff's impairment.

83)    Plaintiff was diagnosed with lung cancer in February 2022.  Plaintiff was unaware of and could not discover the nature or cause of her lung cancer before February 2022.

84)    By the early 1930's, the danger of asbestos dust to result in a potentially fatal lung disease called asbestosis was recognized in medical and scientific circles. In the 1940's, the cancer risk from breathing asbestos dust was receiving increasing attention, and most of those medical writings concluded that there was an excessive rate of lung cancer among asbestosis victims seen at autopsy. Indeed, the suspicion that asbestos could cause cancer of the lung was considered a probable relationship by 1942, and was generally accepted by 1949, with epidemiological studies in the mid-1950's leaving little room for doubt. The index of suspicion relating asbestos exposure to the rare tumors called mesotheliomas was high by 1953 and by 1960 the full extent of the relationship was being revealed.

85)    This medical literature was widely known, commented on, easily accessible, and available to Defendants in this case. This medical information was in such quantity and of such a nature as to constitute clear knowledge that asbestos was a hazardous product to those exposed to it.

## COUNT ONE
### (Negligence of Premises Owner Defendants)

86)    Plaintiff repeats the allegations of all preceding paragraphs of this Complaint, as if repeated herein verbatim.

87)    Plaintiff adopts and incorporates by reference the previous paragraphs, where relevant, as if fully set forth verbatim herein.

27

88)    The Defendant premises owners, as owners and operators of the medical facilities and universities described above, each owed Plaintiff, Donna R. Spurling, a business invitee, the duty to provide her with a reasonably safe place to work and a duty to exercise reasonable care in protecting her from asbestos hazards present at defendants' facilities.  The Defendant premises owners each have breached their respective duties in the following manners:

(a)    The Defendants specified or contracted for the use of asbestos products, and failed to restrict the use of asbestos products in their facilities even after the Defendants knew or should have known of the dangers associated with exposure to airborne asbestos fibers;

(b)    The Defendants each knew, or with the exercise of reasonable care should have known, of the dangers associated with exposure to airborne asbestos fibers and fiber fallout which delaminated and/or released from aging asbestos-containing building materials including those in mechanical and boiler rooms where HVAC and multi-unit air handling equipment were present and drawing in asbestos-contaminated building air into said systems which distributed asbestos fibers throughout the facilities;

(c)    The Defendants failed to take reasonable precautions or exercise due care to warn Plaintiff of the dangers and harms to which she was exposed while working, attending classes, and/or was present in close proximity to asbestos insulations, asbestos ceilings, asbestos floor tile, asbestos ductwork and other craftsman whose work activities created airborne asbestos fibers;

(d)    The Defendants failed to provide Plaintiff with protective equipment and clothing to guard and protect her from inhalation of asbestos fibers;

(e)    The design, construction, maintenance, installation, placement or continued placement by failure to remove or render harmless asbestos products in the Defendants'

28

facilities as identified above created an unreasonable risk of harm to Plaintiff, who was directed to work on Defendants' premises during her nursing school rotation tasks;

(f)     The Defendants failed to provide adequate inspection and supervision with regard to the activities of their employees and contractors and subcontractors involved in the use, disturbance or tear out of asbestos as aforesaid, after they had actual or constructive notice of the existence of unsafe working conditions on their premises arising from said asbestos products;

(g)     The Defendants violated applicable statutes and regulations controlling the conduct where the exposures occurred, including the provisions of West Virginia Law dealing with safety and welfare of employees, particularly Sections 21-3-1; 21-3-2; 21-3-7; 21-3-18; and other applicable laws and regulations;

(h)     The Defendants did fail to inform Plaintiff of what would be safe and sufficient wearing apparel and safety equipment for persons who were exposed to their products or on their premises or in the vicinity of their workers.

(i)     The Defendants did fail to take reasonable precautions to warn Plaintiff, Donna R. Spurling of the dangers to which she was being exposed.

89)     Plaintiff Donna R. Spurling was exposed to asbestos and as a result breathed or ingested asbestos dust which was released from said asbestos containing products and developed asbestos related disease. The Defendants and each of them by their agents, servants, and employees were negligent in that it was foreseeable that the presence of aging asbestos products would result in exposure to Plaintiff.

90)     As a direct and proximate result of the acts and omissions, both jointly and severally, of the Defendant corporations described herein, Plaintiff has suffered, and will in the

future suffer: damages for medical treatment, medications, and other unknown remedial medical measures, great pain of the body and mind, embarrassment and inconvenience, loss of earning capacity, loss of enjoyment of life, and shortening of her life expectancy, lung injury, such that it has or will progress into other severe and disabling diseases of the body, shock and other attendant nervous or emotional disorders, an increased risk of malignancy and other diseases or injury, all of which are or may be permanent in nature, and death. Plaintiff, Donna R. Spurling is furthermore entitled to damages specified in later counts.

91)    As a direct and proximate result of the acts and omissions, both jointly and severally, of the Defendant corporations described herein, Plaintiff has suffered or those on whose behalf this action is brought, have suffered damages: damages for medical treatment, medications and other unknown remedial medical measures, great pain of the body and mind, embarrassment and inconvenience, loss of earning capacity, loss of enjoyment of life, and shortening of her life expectancy, lung injury, such that it has or will progress into other severe and disabling diseases of the body, shock and other attendant nervous or emotional disorders, an increased risk of malignancy and other diseases or injury, all of which are or may be permanent in nature, and death. Plaintiff is furthermore entitled to damages specified in later counts.

WHEREFORE, Plaintiff prays that this Honorable Court enter judgment on her behalf against the Defendants, both jointly and severally, for an amount that is above this Court's jurisdictional minimum, as provided by law, and also for the cost of this action and interest to the extent provided for by law.

## COUNT TWO
### (Intentional Tort of Premises Owner Defendants)

92)    Plaintiff repeats the allegations of all preceding paragraphs of this Complaint, as if repeated herein verbatim.

93)    At various times from 1929 to the filing of this lawsuit, Defendants had actual knowledge of the dangers to Donna R. Spurling of asbestos exposure, nevertheless, Defendants deliberately, intentionally and purposefully withheld such information from Donna R. Spurling thus denying her of the knowledge with which to take necessary safety precautions such as periodic x-rays and medical examinations and avoiding further dust exposure, the specifics of Defendants' intentional acts being as follows:

(a)    Failing to warn of the need for monitoring due to asbestos exposure;

(b)    Failing to issue letters or notices to persons who were exposed to asbestos containing products inside their buildings;

(c)    Frustrating the publication of articles on the asbestos health hazards in the literature;

(d)    Rejecting advice of other corporate officials to warn of the hazards of asbestos containing building materials inside their buildings because top management officials were motivated by the possibility of adverse effects on profits and negative public opinion;

(e)    Intentionally failing to adequately warn of the presence of asbestos containing materials inside their buildings;

(f)    Failing to advise Donna R. Spurling of medical findings known to Defendants concerning the dangers of asbestos exposure; and

(g)    Suppressing the dissemination of information to Donna R. Spurling concerning the hazards of asbestos exposure.

94)    The foregoing deliberate, intentional and purposeful acts of Defendants were a direct and proximate cause of Donna R. Spurling's lung cancer, and resultant injuries, disabilities and damages, as set forth more fully below, all of which entitles Plaintiff to compensation and punitive damages.

## COUNT THREE
### (Misrepresentations of Premises Owner Defendants)

95)     Plaintiff repeats the allegations of all preceding paragraphs of this Complaint, as if repeated herein verbatim.

96)     Defendants before, during, and after Donna R. Spurling's exposure to their asbestos-containing building materials falsely represented facts, including the dangers of asbestos exposure to her, while Defendants had actual knowledge of said dangers of asbestos. Defendants knew of the falsity of their representations and/or made the representations in reckless disregard of their truth or falsity.

97)     The foregoing representations were material conditions precedent to Donna R. Spurling's continued exposure to asbestos-containing products and Defendants intended that Donna R. Spurling act upon the representations by continuing her exposure to the asbestos products present in the buildings and rooms she performed her educational rotation tasks. Donna R. Spurling was ignorant of the falsity of Defendants' representations and rightfully relied upon the representations, and plaintiff was injured and damaged as hereinafter stated.

## COUNT FOUR
### (As to Premises Owner:  Monongalia County General Hospital
### d/b/a Mon General Hospital)

98)     Plaintiff repeats the allegations of all preceding paragraphs of this Complaint as if repeated herein verbatim.

99)     Subsequent and prior to the time defendant **Monongalia County General Hospital d/b/a Mon General Hospital** caused asbestos products to be used, placed and or allowed to be damaged and/or allowed to delaminate and fallout at its facility (**Mon General Hospital – Morgantown, WV**) when it knew or in the exercise of ordinary care, should have known, the

asbestos is deleterious, carcinogenic, and harmful to persons who were exposed to those asbestos products.

100)    Nevertheless, defendant **Monongalia County General Hospital d/b/a Mon General Hospital**, negligently and recklessly failed and refused to warn and advise Plaintiff of the dangerous characteristics thereof, and the dangers to the health and welfare of persons coming in contact with and breathing products.

101)    Plaintiff suffered severe injuries, disability and damages due to her exposure to asbestos products used at facilities owned and operated and controlled by defendant, **Monongalia County General Hospital d/b/a Mon General Hospital.**

102)    Asbestos fibers, once inhaled, cause repeated and continuing injury.

103)    Defendant, **Monongalia County General Hospital d/b/a Mon General Hospital**, negligently exposed Plaintiff to asbestos on a jobsite owned, operated and controlled by **Monongalia County General Hospital d/b/a Mon General Hospital** and as a proximate result thereof caused Plaintiff's exposure to asbestos and her resulting lung cancer. Defendant **Monongalia County General Hospital d/b/a Mon General Hospital** knew of and or should have known of the hazards of asbestos at all times relevant to this action.  Defendant **Monongalia County General Hospital d/b/a Mon General Hospital** was negligent in one or more of the following respects below:

(a)  In failing to timely and adequately warn their workers, including business invitees, of the dangerous characteristics and serious health hazards associated with exposure to asbestos, asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products;

(b)  In failing to provide plaintiff with information as to what would be reasonably safe and sufficient wearing apparel and proper protective equipment and appliances, if in truth there were any, to protect workers and their families from being harmed and disabled by exposure to asbestos, asbestos-containing products, and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products;

(c)  In failing to take reasonable precautions or exercise reasonable care to stop asbestos containing building materials from releasing asbestos fibers into the common areas, HVAC systems and other areas where Plaintiff was performing her tasks.

(d)  In failing to maintain a reasonably safe workplace for its employees and business invitees, such as Plaintiff, including change rooms, lockers and/or laundry facilities; and

(e)  In failing to comply with Federal and State regulations governing the use and handling of asbestos materials, including but not limited to the Walsh-Healey Act.

WHEREFORE, Plaintiff prays that this Honorable Court enter judgment on her behalf against Defendant **Monongalia County General Hospital d/b/a Mon General Hospital** in an amount deemed just and proper by the jury to adequately compensate Plaintiff for her damages in an amount deemed just by the jury, with interest and cost of suit.

<u>**COUNT FIVE**</u>
**(As to Premises Owner: West Virginia United Health System, Inc.
d/b/a/ West Virginia University Health System)**

104)  Plaintiff repeats the allegations of all preceding paragraphs of this Complaint as if repeated herein verbatim.

105)  Subsequent and prior to the time defendant **West Virginia United Health System, Inc., d/b/a West Virginia University Health System,** caused asbestos products to be used, placed and or allowed to be damaged and/or allowed to delaminate and fallout at its facility (WVU

34

Medicine – UHC Clarksburg, WV) when it knew or in the exercise of ordinary care, should have known, the asbestos is deleterious, carcinogenic, and harmful to persons who were exposed to those asbestos products.

106)    Nevertheless, defendant, **West Virginia United Health System, Inc., d/b/a West Virginia University Health System,** negligently and recklessly failed and refused to warn and advise Plaintiff of the dangerous characteristics thereof, and the dangers to the health and welfare of persons coming in contact with and breathing products.

107)    Plaintiff suffered severe injuries, disability and damages due to her exposure to asbestos products used at facilities owned and operated and controlled by defendant, **West Virginia United Health System, Inc., d/b/a West Virginia University Health System.**

108)    Asbestos fibers, once inhaled, cause repeated and continuing injury.

109)    Defendant, **West Virginia United Health System, Inc., d/b/a West Virginia University Health System**, negligently exposed Plaintiff to asbestos on a jobsite owned, operated and controlled by **West Virginia United Health System, Inc., d/b/a West Virginia University Health System** and as a proximate result thereof caused Plaintiff's exposure to asbestos and her resulting lung cancer. Defendant **West Virginia United Health System, Inc., d/b/a West Virginia University Health System** knew of and or should have known of the hazards of asbestos at all times relevant to this action.  Defendant **West Virginia United Health System, Inc., d/b/a West Virginia University Health System** was negligent in one or more of the following respects below:

(a)    In failing to timely and adequately warn their workers, including business invitees, of the dangerous characteristics and serious health hazards associated with exposure to

asbestos, asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products;

(b)      In failing to provide Plaintiff with information as to what would be reasonably safe and sufficient wearing apparel and proper protective equipment and appliances, if in truth there were any, to protect workers and their families from being harmed and disabled by exposure to asbestos, asbestos-containing products, and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products;

(c)      In failing to take reasonable precautions or exercise reasonable care to stop asbestos containing building materials from releasing asbestos fibers into the common areas, HVAC systems and other areas where Plaintiff was performing her tasks.

(d)      In failing to maintain a reasonably safe workplace for its employees and business invitees, such as Plaintiff, including change rooms, lockers and/or laundry facilities; and

(e)      In failing to comply with Federal and State regulations governing the use and handling of asbestos materials, including but not limited to the Walsh-Healey Act.

WHEREFORE, Plaintiff prays that this Honorable Court enter judgment on her behalf against Defendant **West Virginia United Health System, Inc., d/b/a West Virginia University Health System** in an amount deemed just and proper by the jury to adequately compensate Plaintiff for Plaintiff's damages in an amount deemed just by the jury, with interest and cost of suit.

## <u>COUNT SIX</u>
### (As to Premises Owner: United Hospital Center, Inc.)

110)      Plaintiff repeats the allegations of all preceding paragraphs of this Complaint as if repeated herein verbatim.

111)    Subsequent and prior to the time defendant **United Hospital Center, Inc.,** caused asbestos products to be used, placed and or allowed to be damaged and/or allowed to delaminate and fallout at its facility (**WVU Medicine – UHC Clarksburg, WV**) when it knew or in the exercise of ordinary care, should have known, the asbestos is deleterious, carcinogenic, and harmful to persons who were exposed to those asbestos products.

112)    Nevertheless, defendant, **United Hospital Center, Inc.**, negligently and recklessly failed and refused to warn and advise Plaintiff of the dangerous characteristics thereof, and the dangers to the health and welfare of persons coming in contact with and breathing products.

113)    Plaintiff suffered severe injuries, disability and damages due to her exposure to asbestos products used at facilities owned and operated and controlled by defendant, **United Hospital Center, Inc.**

114)    Asbestos fibers, once inhaled, cause repeated and continuing injury.

115)    Defendant, **United Hospital Center, Inc.**, negligently exposed Plaintiff to asbestos on a jobsite owned, operated and controlled by **United Hospital Center, Inc.** and as a proximate result thereof caused Plaintiff's exposure to asbestos and her resulting lung cancer. Defendant **United Hospital Center, Inc.** knew of and or should have known of the hazards of asbestos at all times relevant to this action. Defendant **United Hospital Center, Inc.** was negligent in one or more of the following respects below:

(a)    In failing to timely and adequately warn their workers, including business invitees, of the dangerous characteristics and serious health hazards associated with exposure to asbestos, asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products;

(b)     In failing to provide Plaintiff with information as to what would be reasonably safe and sufficient wearing apparel and proper protective equipment and appliances, if in truth there were any, to protect workers and their families from being harmed and disabled by exposure to asbestos, asbestos-containing products, and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products;

(c)     In failing to take reasonable precautions or exercise reasonable care to stop asbestos containing building materials from releasing asbestos fibers into the common areas, HVAC systems and other areas where Plaintiff was performing her tasks;

(d)     In failing to maintain a reasonably safe workplace for its employees and business invitees, such as Plaintiff, including change rooms, lockers and/or laundry facilities; and

(e)     In failing to comply with Federal and State regulations governing the use and handling of asbestos materials, including but not limited to the Walsh-Healey Act.

WHEREFORE, Plaintiff prays that this Honorable Court enter judgment on her behalf against Defendant **United Hospital Center, Inc.** in an amount deemed just and proper by the jury to adequately compensate Plaintiff for Plaintiff's damages in an amount deemed just by the jury, with interest and cost of suit.

## COUNT SEVEN
### (As to Premises Owner: Fairmont State University Board of Governors)

116)    Plaintiff repeats the allegations of all preceding paragraphs of this Complaint as if repeated herein verbatim.

117)    Subsequent and prior to the time defendant **Fairmont State University Board of Governors**, caused asbestos products to be used, placed and or allowed to be damaged and/or allowed to delaminate and fallout at its facility (**Fairmont State University – Fairmont, WV**)

when it knew or in the exercise of ordinary care, should have known, the asbestos is deleterious, carcinogenic, and harmful to persons who were exposed to those asbestos products.

118)    Nevertheless, defendant, **Fairmont State University Board of Governors**, negligently and recklessly failed and refused to warn and advise Plaintiff of the dangerous characteristics thereof, and the dangers to the health and welfare of persons coming in contact with and breathing products.

119)    Plaintiff suffered severe injuries, disability and damages due to her exposure to asbestos products used at facilities owned and operated and controlled by defendant, **Fairmont State University Board of Governors**.

120)    Asbestos fibers, once inhaled, cause repeated and continuing injury.

121)    Defendant, **Fairmont State University Board of Governors**, negligently exposed Plaintiff to asbestos in its Fairmont State University, Fairmont, WV campus owned, operated and controlled by **Fairmont State University Board of Governors** and as a proximate result thereof caused Plaintiff's exposure to asbestos and her resulting lung cancer. Defendant **Fairmont State University Board of Governors** knew of and or should have known of the hazards of asbestos at all times relevant to this action.  Defendant **Fairmont State University Board of Governors** was negligent in one or more of the following respects below:

(a)    In failing to timely and adequately warn their students, including business invitees, of the dangerous characteristics and serious health hazards associated with exposure to asbestos, asbestos-containing products and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products;

(b)    In failing to provide Plaintiff with information as to what would be reasonably safe and sufficient wearing apparel and proper protective equipment and appliances, if in truth

there were any, to protect students and their families from being harmed and disabled by exposure to asbestos, asbestos-containing products, and/or machinery requiring or calling for the use of asbestos and/or asbestos-containing products;

(c)    In failing to take reasonable precautions or exercise reasonable care to stop asbestos containing building materials from releasing asbestos fibers into the common areas, HVAC systems and other areas where Plaintiff was living, studying, and attending class;

(d)    In failing to maintain a reasonably safe campus for its students and business invitees, such as Plaintiff, including classrooms, dormitories, cafeterias, and/or laundry facilities; and

(e)    In failing to comply with Federal and State regulations governing the use and handling of asbestos materials, including but not limited to the Walsh-Healey Act.

WHEREFORE, Plaintiff prays that this Honorable Court enter judgment on her behalf against Defendant **Fairmont State University Board of Governors** in an amount deemed just and proper by the jury, under and up to the limits of Defendant's liability insurance coverage, to adequately compensate Plaintiff for Plaintiff's damages in an amount deemed just by the jury, with interest and cost of suit.

## **COUNT EIGHT**
### **(Negligence Against Metropolitan Life)**

122)    In or about the year 1930, and at various times prior and subsequent thereto, up to and including the present time, defendant Metropolitan Life Insurance Company undertook and assumed a duty to provide the asbestos industry, the scientific community and company users of asbestos with information, inspections, instructions, supervision, recommendations, assistance, notices, reports, methods, findings, cautions, warnings, advice, designs, equipment, safeguards, guidance and services to properly, adequately and reasonably provide safe working conditions, all

allegedly to preserve and protect the life, health and safety of individuals exposed to asbestos, including Plaintiff, and particularly to protect her from the dangerous and defective properties of asbestos, asbestos products and compounds and/or other dangerous substances at or about the workplace.

123)    Plaintiff avers that various employers and their employees, including Plaintiff, scientists, and others similarly situated, were dependent upon the undertakings of Metropolitan to preserve and protect the life, health and safety of individuals, including Plaintiff, by not assisting the said companies in selling dangerous products.

124)    Metropolitan, by its active and passive negligence, failed to exercise the standard of care and skill it was obliged to exercise by reason of its aforesaid undertakings and assumption of duty, thereby causing, creating or permitting dangerous conditions and exposure to dangerous and defective substances; and thereby failing to properly safeguard Plaintiff and all others similarly situated.

125)    As a result of the aforesaid negligence of the defendant Metropolitan, Plaintiff, Donna R. Spurling, was injured.

## <u>COUNT NINE</u>
**(Fraudulent Concealment and/or Fraudulent Misrepresentation
Against Metropolitan Life)**

126)    Plaintiff repeats the allegations of all preceding paragraphs of this Complaint, as if repeated herein verbatim.

127)    For a number of years, Metropolitan provided insurance coverage for various manufacturers of asbestos-containing products.

128)    For a number of years, Dr. A.J. Lanza served as assistant medical director of Metropolitan.

129)    At all times relevant, the activities of Dr. Lanza hereinafter described were undertaken as a servant, agent, or employee of Metropolitan:

(a) Beginning in approximately 1934, Metropolitan Life Insurance Company and certain asbestos producers and manufacturers including Johns-Manville Corporation and Raybestos Manhattan, through their agents, Vandiver Brown, attorney J.C. Hobart, Sumner Simpson and J. Rohrbach, suggested to Dr. Anthony Lanza, as agent of Metropolitan Life Insurance Company, that Lanza publish a study on asbestos in which Lanza would affirmatively misrepresent material facts about asbestos exposure and concerning the seriousness of the disease processes, asbestosis and related diseases. This was accomplished through intentional deletion of Lanza's feeling of asbestosis as "fatal" and through other selective editing that affirmatively misrepresented asbestos as causing diseases less serious than they really were known to be. As a result, Lanza's study was published in the medical literature in this misleading fashion in 1935. This fraudulent misrepresentation and fraudulent nondisclosure was motivated in part by a desire to influence proposed legislation to regulate asbestos exposure and to provide a defense in disputes involving Metropolitan as insurer.

(b) In 1936, American Brake Block Corporation, Asbestos Manufacturing Company, Gatke Corporation, Johns-Manville Corporation, Keasbey & Mattison Company, Raybestos-Manhattan, Russell Manufacturing, Union Asbestos and Rubber Company, and United Gypsum Company, entered into an agreement with the Saranac Laboratories. Under this agreement, these companies acquired the power to decide what information Saranac Laboratories could publish about asbestos disease and could also control in what form such publications were to occur. This agreement gave these companies power to affirmatively misrepresent the results of the work at Saranac, and also gave these conspirators power to suppress material facts included in any study. On numerous occasions thereafter, these companies together with Metropolitan, exercised their power to prevent Saranac scientists from disclosing material scientific data, resulting in numerous misstatements of fact being made at scientific meetings.

42

(c) On November 11, 1948, representatives of the following companies met at the headquarters of Johns-Manville Corporation: American Brake Block Division of American Brake and Shoe Foundry, Gatke Corporation, Keasbey & Mattison Company, Raybestos-Manhattan, Inc., Thermoid Company, Union Asbestos and Rubber Company, United States Gypsum Company and Metropolitan. U.S. Gypsum did not send a representative to the meeting, but instead authorized Vandiver Brown of Johns-Manville to represent its interest at the meeting and to act on its behalf.

(d) At this November 11, 1948, meeting, these companies and Metropolitan decided to exert their influence to materially alter and misrepresent material facts about the substance of research previously started by Dr. Leroy Gardner at the Saranac Laboratories. Dr. Gardner's research involved the carcinogenicity of asbestos in mice and also included an evaluation of the health effects of asbestos on humans with a critical review of the then existing standards of dust exposure for asbestos and asbestos products.

(e) At this meeting, these companies and Metropolitan and subsequently their agent, Dr. Vorwald, intentionally and affirmatively determined that Dr. Gardner's work should be edited to delete material facts about the cancer-causing propensity of asbestos and the health effects of asbestos on humans and to delete the critique of the dust standards. This was published, as altered, in the scientific literature. These companies and Metropolitan thereby fraudulently misrepresented the risks of asbestos exposure to the public, in general, scientists, and persons exposed to asbestos such as the plaintiffs.

(f) As a direct result of the actions as described above, Dr. Gardner's edited work was published in the Journal of Industrial Hygiene, AMA Archives of Industrial Hygiene and Occupational Health in 1951 in a form that stressed those portions of Dr. Gardner's work that Metropolitan wished stressed, but which omitted references to human asbestosis and cancer, thereby fraudulently and affirmatively misrepresenting the extent of risks. Metropolitan and the companies it joined with

affirmatively and deliberately disseminated this misleading publication.

(g) Such action constituted a material affirmative misrepresentation of material facts involving Dr. Gardner's work and resulted in creating an appearance that inhalation of asbestos was less of a health problem than Dr. Gardner's unedited work indicated.

(h) In 1955, Johns-Manville, for itself and on behalf of Metropolitan, through their agent Kenneth Smith, caused to be published in the <u>AMA Archives of Industrial Health</u>, an article entitled "Pulmonary Disability In Asbestos Workers". This published study materially altered the results of an earlier study in 1949 concerning the same set of workers. This alteration of Dr. Smith's study constituted a fraudulent and material representation about the extent of the risk associated with asbestos inhalation.

(i) In 1955, the National Cancer Institute held a meeting at which Johns-Manville, individually and as an agent for Metropolitan and A. Vorwald, as their- agent, affirmatively misrepresented that there were no existing animal studies concerning the relationship between asbestos exposure and cancer, when, in fact, Metropolitan was in secret possession of several studies which demonstrated that positive evidence did exist.

(j) Metropolitan approved and ratified and furthered the previous acts of Johns-Manville, Raybestos-Manhattan, Inc. and A.J. Lanza.

130)    The acts of Metropolitan as described above, constitute a fraudulent concealment and/or a fraudulent misrepresentation which proximately caused injury to Plaintiff in the following manner:

(a)  Metropolitan intended the publication of false and misleading reports and/or the nondisclosure of documented reports of health hazards of asbestos, in order to:

(i)  Maintain a favorable atmosphere for the continued sale and distribution of asbestos and asbestos-related products;

44

(ii)  Assist in the continued pecuniary gain through the control and reduction of claims;

(iii)  Influence proposed legislation to regulate asbestos exposure; and

(iv)  Provide a defense in lawsuits brought for injury resulting from asbestos disease.

(b)  Metropolitan intended reliance upon the published reports regarding the safety of asbestos and asbestos-related products.

(c)  Plaintiff suffered injury as a direct and proximate result of the acts alleged herein.

131)  Metropolitan has, as previously stated, altered, influenced, and created significant portions of medical literature which are false and misleading statements concerning the dangers of asbestos exposure and disease. In so doing, Metropolitan, and its aforesaid agents, provided a body of medical literature which, when relied upon by persons investigating such literature, would have led to a false impression of the dangers of asbestos exposure.

Additionally, the publication of such literature acted to inhibit the development of the literature and effectively delayed the dissemination of accurate knowledge of the dangers. Metropolitan owed a duty to Plaintiff, and the public as a whole, when contributing to the medical literature to do so in good faith and with the reasonable care expected of any professional contributing to such literature; Metropolitan's failure to do so is willful and wanton negligence and a separate intentional tort creating a duty to compensate Plaintiff for injuries sustained as approximate contributing result of the actions of Metropolitan Life Insurance Company.

132)  As a direct and proximately result of the fraudulent concealment and/or fraudulent representation by Metropolitan and its agents, Plaintiff suffered the diseases, injuries and damages set forth in the foregoing paragraphs.

**COUNT TEN**
**(Aiding and Abetting Against Metropolitan Life Insurance Company)**

133)    Plaintiff repeats the allegations of all preceding paragraphs of this Complaint, as if repeated herein verbatim.

134)    Defendant **Metropolitan Life Insurance Company**, individually and in concert with American Brake Block Corporation, Asbestos Manufacturing Company, Gatke Corporation, Johns-Manville Corporation, Keasbey & Mattison Company, Raybestos-Manhattan, Inc., Russell Manufacturing, Union Asbestos and Rubber Company, United Gypsum Company, Thermoid Company, and others, knowingly agreed and conspired among themselves to engage in a course of conduct that was reasonably likely to result in injury to Plaintiff.

135)    Defendant **Metropolitan Life Insurance Company** knew or should have known that the perversion of the scientific and medical literature as aforesaid would cause the harmful effects of asbestos exposure and would cause Plaintiff injury.

136)    Defendant **Metropolitan Life Insurance Company** gave substantial assistance and/or encouragement to the conspirators and this aided and abetted their sale of asbestos products in a defective and dangerous condition and their reduction and control of claims against them.

137)    The actions of Defendant **Metropolitan Life Insurance Company** make it liable to Plaintiff pursuant to Section 876 of the Restatement of Torts (Second) since Defendant **Metropolitan Life Insurance Company** has acted in concert with others to cause harm to Plaintiff.

138)    As a direct and proximate result of the actions of Defendant **Metropolitan Life Insurance Company**, Plaintiff suffered and will continue to suffer serious bodily injury; endured

and will continue to endure great pain and suffering and mental anguish; incurred and will continue to incur medical expenses; lost earnings and earning capacity; and was otherwise damaged.

**COUNT ELEVEN**
**(Misrepresentation Against Metropolitan Life Insurance Company)**

139)    Plaintiff repeats the allegations of all preceding paragraphs of this Complaint, as if repeated herein verbatim.

140)    The actions of Defendant **Metropolitan Life Insurance Company** as described above constituted conscious misrepresentation involving risk of physical harm and/or negligent misrepresentation involving risk of physical harm.

141)    Defendant **Metropolitan Life Insurance Company** is liable to Plaintiff for Plaintiff's injury pursuant to Section 310 and 311 of the Restatement of Torts (Second).

142)    As a direct and proximate result of the actions of Defendant, **Metropolitan Life Insurance Company**, Plaintiff suffered serious bodily injury and death; endured and incurred medical expenses; lost earnings and earning capacity; and was otherwise damaged.

**COUNT THELVE**
**(Fraudulent Concealment and Misrepresentation**
**Against Fairmont State Board of Governors)**

143)    Plaintiff repeats the allegations of all preceding paragraphs of this Complaint, as if repeated herein verbatim

144)    Defendant **Fairmont State University Board of Governors** had knowledge that several buildings on its campus contain asbestos-containing materials by virtue of the 1984 asbestos survey conducted by the State of West Virginia and further testing conducted during the *State v. AAER,* filed in 1986.

145)    Defendant **Fairmont State University Board of Governors** has knowledge that asbestos-containing materials are dangerous as asbestos is described by the West Virginia Code to

be a "dangerous toxic substance known to be harmful to the citizens of this state." W.Va. Code § 16-32-1.

146)    Defendant **Fairmont State University Board of Governors** has a duty to warn its students that live in its dorms and attend classes on its campus that its buildings contain friable asbestos-containing materials that can cause asbestos fibers to be airborne.

147)    Defendant **Fairmont State University Board of Governors** has a duty to warn its students regarding the health hazards of asbestos exposure.

148)    Defendant **Fairmont State University Board of Governors** has a duty to warn its students that live in its dorms and attend classes on its campus that it does not maintain insurance coverage for incurable cancer caused by asbestos exposure.

149)    Defendant **Fairmont State University Board of Governors** has a duty to warn its students that live in its dorms and attend classes on its campus that in the event they are diagnosed with cancer due to asbestos exposure Defendant **Fairmont State University Board of Governors** will assert sovereign immunity to avoid being held accountable.

150)    Defendant **Fairmont State University Board of Governors** breached its duty to warn Plaintiff that attending classes on its campus would expose her to asbestos-containing materials that exposure to which can cause incurable cancer.

151)    Defendant **Fairmont State University Board of Governors** breached its duty warn Plaintiff that the asbestos she would be exposed to on its campus could cause serious health hazards like incurable cancer.

152)    Defendant **Fairmont State University Board of Governors** breached its duty to warn Plaintiff that it does not maintain insurance coverage for students that are diagnosed with

incurable cancer following asbestos exposure on its campus and thus it would seek to avoid all liability.

153)    Defendant **Fairmont State University Board of Governors** breached its duty to warn Plaintiff that if she was diagnosed with cancer due to asbestos exposure at Fairmont State University Defendant **Fairmont State University Board of Governors** will contend Plaintiff is not able to pursue any claims against it.

154)    Defendant **Fairmont State University Board of Governors**' failure to warn its students that asbestos is present in its campus buildings is intentional and an effort to mislead and/or defraud its students about the presence of dangerous asbestos on campus.

155)    Defendant **Fairmont State University Board of Governors**' failure to warn its students that it does not maintain insurance coverage necessary for students who develop a latent asbestos related disease and disability such as incurable asbestosis, lung cancer, or mesothelioma caused by asbestos exposure to file a legal claim, is an effort to mislead and/or defraud students about legal remedies available for those diagnosed with lung cancer.

156)    The actions of Defendant **Fairmont State University Board of Governors** as described above constituted fraudulent concealment, conscious misrepresentation involving risk of physical harm and/or negligent misrepresentation involving risk of physical harm.

157)    As a direct and proximate result of the actions of Defendant, **Fairmont State University Board of Governors**, Plaintiff suffered lung cancer, serious bodily injury and disability which leaves her with a shortened life expectancy and will ultimately cause her premature death; endured and incurred medical expenses; lost earnings and earning capacity; and was otherwise damaged.

## COUNT THIRTEEN

**(42 U.S.C. § 1983 – Violation of Substantive Due Process in violation of the 14th Amendment of the United States Constitution by Fairmont State University Board of Governors and West Virginia Board of Risk and Insurance Management)**

158)    Plaintiff repeats the allegations of all preceding paragraphs of this Complaint, as if repeated herein verbatim.

159)    No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property without due process of law. U.S. Const. amend. XIV § 1.

160)    The purpose of the due process clause of the 14th Amendment of the United States Constitution is to protect people from arbitrary, capricious, and reckless actions and conduct of the State.

161)    The 14th Amendment substantive due process right guaranteed by the United States Constitution protects an individual's right to be free from state conduct that deprives an individual of bodily integrity.

162)    The asbestos-containing materials to which Plaintiff was exposed at Fairmont State University were installed at the direction of Defendant **Fairmont State University Board of Governors**.

163)    The arbitrary, capricious, and reckless decision to allow asbestos-containing material to remain in place prior to Plaintiff enrolling at Fairmont State University was made by Defendant **Fairmont State University Board of Governors**.

164)    The purpose of the 1984 Survey was to locate asbestos-containing materials in public buildings and to determine the scope of liability of the State of West Virginia for individuals that that were exposed to asbestos-containing materials and develop incurable deadly cancer.

165)    The 1984 Survey found that West Virginia was facing a nightmare – nearly no one was safe.  Approximately 330 of the 400 public buildings studied contained asbestos or asbestos-containing products.

166)    Many of these buildings were known by Defendant **Fairmont State University Board of Governors** and the State of West Virginia to be located on the campus of Fairmont State University.

167)    As alleged more specifically above, in *State v. AAER*, the State of West Virginia sought monetary relief to cover the costs of inspecting, managing, removing, and replacing asbestos-containing products in its buildings, including those at Fairmont State University. The State of West Virginia argued that the health risks posed by the asbestos would worsen over time due to the deterioration of these products, which would turn friable and release airborne fibers, dust, and particulates.

168)    On behalf of Defendant **Fairmont State University Board of Governors** and others, in *State v. AAER*, the State of West Virginia sought indemnification for "damages **it will pay out for injuries**, not just to State employees, but others as well, including **students**, independent contractors and visitors to State buildings" who will be exposed to asbestos-containing materials in the future. See Cir. Ct. Mon. Cty., 86-C-458, State of W.Va. Mem. In Opp. To Mot. to Dis. at 53 (July 13, 1987) attached hereto as **<u>EXHIBIT "J"</u>**.

169)    The State of West Virginia, accordingly, anticipated and expected to compensate students like Plaintiff who were exposed to asbestos-containing materials on college campuses contracted terminal illnesses.

170)    Nevertheless, Defendant **Fairmont State University Board of Governors** has represented that it chose not to purchase any insurance coverage for any non-employee injured by

51

exposure to asbestos containing products on its campus. See, Def. Fairmont State BOG's Mot. to Dis.

171)    Likewise, as set forth more fully above, Defendant **West Virginia Board of Risk and Insurance Management** chose not to purchase any insurance coverage for any non-employee injured by exposure to asbestos containing products in public buildings, including Fairmont State University.

172)    Despite knowing deadly asbestos containing products are present on its campus Defendant **Fairmont State University Board of Governors** has made zero requests to Defendant **West Virginia Board of Risk and Insurance Management** to acquire insurance necessary to afford due process to its students and alumni that are and will be sickened with incurable cancer due to exposures to asbestos on its campus.

173)    Asbestos products degrade over time and become more friable, or airborne, over time. The danger created by Defendant **Fairmont State University Board of Governors**' reckless decision not to remove its asbestos-containing products increased exponentially from 1984 to the date of Plaintiff's enrollment at Fairmont State University.

174)    Defendant **Fairmont State University Board of Governors** created the danger of asbestos exposure by using asbestos-containing materials in buildings on its campus and increased the danger associated with said materials by refusing to remove it from its buildings.

175)    Defendant **Fairmont State University Board of Governors** seeks to escape liability for poisoning Plaintiff with asbestos-containing products by claiming its collective decision with Defendant **West Virginia Board of Risk and Insurance Management** not to

maintain proper insurance renders it judgment proof.  This is false. The law is clear, "[s]tate actors may not disclaim liability when they themselves throw others to the lions."[3]

176)    Plaintiff has a legitimate claim of entitlement to a property interest in her cause of action against Defendant **Fairmont State University Board of Governors** to recover for injuries caused in part by its failure to remove asbestos-containing products prior to her enrolling as a student on its campus.  In recognition of Plaintiff's legitimate and substantial property interest, on July 19, 2024, Defendant **Fairmont State University Board of Governors,** by counsel, offered Plaintiff $650,000.00 to resolve her claims against the university in this matter.

177)    Defendant **West Virginia Board of Risk and Insurance Management** has general supervision and control over the insurance of state property, activities, and responsibilities.  *See* W.Va. Code § 29-12-5(2).

178)    Defendant **West Virginia Board of Risk and Insurance Management** is required to secure adequate and sound insurance coverage on all state property, activities, and responsibilities.  *See,* W.Va. Code § 29-12-1, *et seq*.

179)    Defendant **West Virginia Board of Risk and Insurance Management** was directly made aware of the scope of asbestos in West Virginia's public buildings but affirmatively and arbitrarily excluded from the acquired insurance coverage all non-employees injured from asbestos exposure.  See **EXHIBIT "B"**.

180)    In response to Defendant **West Virginia Board of Risk and Insurance Management's** refusal to procure insurance to protect West Virginians, Mr. Vannoy and Mr. Maloney, attorneys acting on behalf of the State of West Virginia, documented a now ominous warning:

---

[3] *Pinder v. Johnson, PFC*, 54 F.3d 1169, 1177 (4th Cir. 1995)

In insurance terms, the State is going 'bear' which means **the taxpayers will have to pay any recoveries against the State resulting from exposures to asbestos in our buildings. As long as there is asbestos in State buildings, the potential for the state's liability continues and increases.**  See **EXHIBIT "B"**.

181)   Despite being made fully aware of the health risks associated with asbestos exposure for students at state schools laden with asbestos containing products, Defendants **Fairmont State University Board of Governors** and **West Virginia Board of Risk and Insurance Management** affirmatively decided not to purchase adequate liability insurance to protect the interests of non-employees exposed to asbestos-containing products on its campus.

182)   Defendants **Fairmont State University Board of Governors** and **West Virginia Board of Risk and Insurance Management's** failure to purchase insurance coverage for students exposed to asbestos on public campuses owned by the State of West Virginia was arbitrary, capricious, and made with a reckless indifference to the interests of non-employees.

183)   Where executive action is concerned, a violation of an individual's substantive due process rights exists only when the official action is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.

184)   The reckless decision of Defendant **West Virginia Board of Risk and Insurance Management** not to purchase any insurance coverage for non-employees it knew as early as 1984 were being exposed to deadly asbestos fibers violated its clear statutory directive to maintain adequate insurance coverage.   Furthermore, Defendant **West Virginia Board of Risk and Insurance Management's** failure to acquire necessary insurance coverage in violation of West Virginia Code Section 29-12-1 is particularly egregious, outrageous, and conscious shocking considering the State of West Virginia's contention in *State v. AAER* that it had an obligation to compensate and insure against injuries from future students' exposures to asbestos-containing materials on college campuses.

185) The decisions of Defendants **Fairmont State University Board of Governors** and **West Virginia Board of Risk and Insurance Management** not to purchase insurance coverage for non-employees it knew were being exposed to deadly asbestos fibers at Fairmont State University was arbitrary, capricious, shocking to the conscience of any reasonable person, and clearly violates Plaintiff's right to substantive due process.

186) By knowing the risks of serious injury following exposure to asbestos containing products, the vast extent to which asbestos containing products are present in public college campuses, and still refusing to secure insurance coverage necessary for Plaintiff to plead a cause of action to recover for an incurable deadly disease, Defendants **Fairmont State University Board of Governors** and **West Virginia Board of Risk and Insurance Management** violated Plaintiff's clearly established and well-settled constitutional rights protected by the Fourteenth Amendment to the United States Constitution:

> (a) The right to be free of reckless, deliberately indifferent, and conscience shocking conduct as secured by the Fourteenth Amendment; and
>
> (b) The right to be free from the deprivation of property without substantive due process as secured by the Fourteenth Amendment.

187) As a direct and proximate result of the acts and omissions described herein, Plaintiff has suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

188) Punitive damages are available and are hereby claimed as a matter of federal law pursuant to *Smith v. Wade*, 461 U.S. 30 (1983), and, as such, are not subject to the pleading requirements, limitations, or different standard of proof set forth in W.Va. Code Section 29-12A-7.

189)    Plaintiff is entitled to recovery of costs, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiff prays that this Honorable Court enter judgment on her behalf against Defendants **Fairmont State University Board of Governors** and **West Virginia Board of Risk and Insurance Management** in an amount deemed just and proper by the jury to adequately compensate Plaintiff for Plaintiff's damages with interest and cost of suit.

<u>**COUNT FOURTEEN**</u>
**(42 U.S.C. § 1983 – Violation of Procedural Due Process guaranteed by the 14th Amendment of the United States Constitution by Fairmont State University Board of Governors and West Virginia Board of Risk and Insurance Management)**

190)    Plaintiff hereby adopts and incorporates by reference the foregoing paragraphs, where relevant, as if fully set forth verbatim herein.

191)    Substantive due process asks the question of whether the government's deprivation of a person's life, liberty or property is justified by a sufficient purpose. Procedural due process, by contrast, asks whether the government has followed the proper procedures when it takes away life, liberty or property.

192)    Plaintiff has a legitimate claim of entitlement to a property interest in her cause action against Defendant **Fairmont State University Board of Governors** to recover for injuries caused in part by its failure to remove asbestos containing products prior to her enrolling as a student on its campus.  As set forth above, on July 19, 2024, Defendant **Fairmont State University Board of Governors,** by counsel, offered Plaintiff $650,000.00 to resolve her claims against the university in this matter.  *See* <u>**EXHIBIT "E"**</u>.

193)    Plaintiff's claims against Defendant **Fairmont State University Board of Governors,** as set forth more fully herein, demonstrate a constitutionally cognizable life, liberty, and/or property interest.

194)    The knowing and intentional failure by Defendant **West Virginia Board of Risk and Insurance Management** to acquire insurance coverage necessary to enable Plaintiff to maintain a legal cause of action against Defendant **Fairmont State University Board of Governors,** for exposure to asbestos containing products, as detailed more fully herein, constitutes a deprivation of Plaintiff's property interest by state action.

195)    Defendant **Fairmont State University Board of Governors** contends it does not have sufficient insurance coverage for Plaintiff's claims of injuries caused in part by exposure to asbestos containing products on its campus.  Accordingly, Defendant **Fairmont State University Board of Governors**, citing sovereign immunity as a state entity without sufficient insurance for Plaintiff's injury, has plead that Plaintiff does not have a legal remedy as to it due to Defendant **West Virginia Board of Risk and Insurance Management's** failure to maintain adequate insurance.  *Id.*

196)    If Defendant **Fairmont State University Board of Governors** is correct and Plaintiff does not have a legal remedy as to it due to Defendant **West Virginia Board of Risk and Insurance Management's** knowing and intentional failure to maintain adequate insurance, Defendant **West Virginia Board of Risk and Insurance Management's** conduct has intentionally deprived Plaintiff of the ability to file suit against Defendant **Fairmont State University Board of Governors** and request a jury trial in violation of her procedural due process rights guaranteed by the 14th Amendment to the United States Constitution.

197)    By purposefully failing to maintain adequate insurance necessary to permit Plaintiff to pursue a civil suit to hold **Fairmont State University Board of Governors** accountable for her injuries, Defendant **West Virginia Board of Risk and Insurance Management** has intentionally deprived Plaintiff of the ability to file suit against Defendant **Fairmont State University Board**

**of Governors** and request a jury trial in violation of her procedural due process rights guaranteed by the 14th Amendment to the United States Constitution.

198)    Stated alternatively, the effect of Defendants **West Virginia Board of Risk and Insurance Management** and **Fairmont State University Board of Governors'** scheme of not acquiring proper insurance coverage for non-employees injured by asbestos precludes Plaintiff from all forms of procedural due process, including but not limited notice and an opportunity to be heard in a Court of law on the merits, written discovery and depositions of witnesses, opportunity for confrontation and cross-examination of witnesses, and access to a trial by a jury of her peers. This patent lack of notice and opportunity to be heard constitutes a violation of Plaintiff's Procedural Due Process rights under the 14th Amendment.

199)    More specifically, Plaintiff, due to the reckless decision of Defendants **West Virginia Board of Risk and Insurance Management** and **Fairmont State University Board of Governors** not to purchase proper insurance, has suffered the inability to pursue a civil action against Defendant **Fairmont State University Board of Governors** that the university itself valued at $650,000.

200)    As a direct and proximate result of the acts and omissions described herein, Plaintiff has suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

201)    Punitive damages are available and are hereby claimed as a matter of federal law pursuant to *Smith v. Wade*, 461 U.S. 30 (1983), and, as such, are not subject to the pleading requirements, limitations, or different standard of proof set forth in W.Va. Code Section 29-12A-7.

202)    Plaintiff is entitled to recovery of costs, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988.

WHEREFORE, Plaintiff prays that this Honorable Court enter judgment on her behalf against Defendants **West Virginia Board of Risk and Insurance Management** and **Fairmont State University Board of Governors** in an amount deemed just and proper by the jury to adequately compensate Plaintiff for Plaintiff's damages with interest and cost of suit.

### COUNT FIFTEEN
**(42 U.S.C. § 1983 – Conspiracy to violate Substantive and Procedural Due Process guaranteed by the 14th Amendment of the United States Constitution by Fairmont State University Board of Governors and West Virginia Board of Risk and Insurance Management)**

203)    Plaintiff hereby adopts and incorporates by reference the foregoing paragraphs, where relevant, as if fully set forth verbatim herein.

204)    A civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means.

205)    Defendants **Fairmont State University Board of Governors** and **West Virginia Board of Risk and Insurance Management** have recklessly acted in concert to ensure students at Fairmont State University, like Plaintiff, that are exposed to asbestos on campus and develop lung cancer do not receive procedural or substantive due process.

206)    Defendants **Fairmont State University Board of Governors** and **West Virginia Board of Risk and Insurance Management** conspire by failing to acquire any insurance coverage for non-employees injured by the significant number of asbestos-containing products present throughout the campus of Fairmont State University.  The conspiratorial scheme is simple as it is

malevolent, so long as insurance is not acquired these Defendants believe they cannot be held accountable, no matter how many students become sick and die from the asbestos on campus.

207)    Defendant **Fairmont State University Board of Governors** benefits from this conspiracy by ensuring it has no liability so long as it does not purchase insurance. The result is Fairmont State University has no reason to expend any funds to remove asbestos-containing products from its campus to create a safe environment.

208)    Defendant **West Virginia Board of Risk and Insurance Management** benefits from this conspiracy by avoiding the expense associated with purchasing insurance to cover students and alumni that develop lung cancer following exposure to countless asbestos-containing materials at Fairmont State University and other public colleges and universities.

209)    As a direct and proximate result of the acts and omissions described herein, Plaintiff has suffered compensatory and special damages as defined under West Virginia common law and in an amount to be determined by a jury.

WHEREFORE, Plaintiff prays that this Honorable Court enter judgment on her behalf against Defendants **West Virginia Board of Risk and Insurance Management** and **Fairmont State University Board of Governors** in an amount deemed just and proper by the jury to adequately compensate Plaintiff for Plaintiff's damages with interest and cost of suit.

### COUNT SIXTEEN
**(Violation of Title II of the American with Disabilities Act, 42 U.S.C. §§ 12131–12165, against Defendant Fairmont State University Board of Governors)**

210)    Plaintiff hereby adopts and incorporates by reference the foregoing paragraphs, where relevant, as if fully set forth verbatim herein.

211)    The American with Disabilities Act, 42 U.S.C. §§ 12131–12165, prohibits policies, procedures, discrimination or disparate treatment of a qualified individual on the basis of his or

her disability.  The Act is not limited to protect against physical barriers of access but also prohibits policies, procedures, and customs that discriminate against qualified individuals on the basis of a disability.

212)    Plaintiff is a qualified individual with a disability that meets the essential eligibility requirements for the receipt of services or activities provided by a public entity.

213)    Defendant **Fairmont State University Board of Governors** is a "public entity" within the meaning of 42 U.S.C. § 12131(1).

214)    The Circuit Court of West Virginia is a "public entity" within the meaning of 42 U.S.C. § 12131(1).

215)    Plaintiff, a lifelong non-smoker, was diagnosed with lung cancer following a biopsy on February 7, 2022.  Cancer is a disability pursuant to 28 C.F.R. § 35.108(b)(2). Plaintiff's lung cancer substantially limits her ability to perform the following major life activities: walking, breathing, speaking, working, caring for oneself, performing manual tasks, normal cell growth, and the operation of her respiratory system. 28 C.F.R. § 35.108(c)(1).

216)    Plaintiff's disability substantially limits her ability to perform the abovementioned major life activities due to the constant shortness of breath, weakness, and fatigue caused by her lung cancer.

217)    Plaintiff developed lung cancer from inhaling asbestos fibers, dust, and particulates while attending classes and being present on the campus of Fairmont State University and was further exposed to asbestos while working as a student nurse in various hospital buildings as required to complete the nursing program at Fairmont State University.

218)    The existence of proper insurance coverage is a benefit that affords injured parties the ability to file a civil action and satisfy due process requirements in the Circuit Courts of West

Virginia against a state entity, such as Defendant **Fairmont State University Board of Governors**.

219)    However, Defendant **Fairmont State University Board of Governors** contends it chose not to purchase or acquire insurance coverage for Plaintiff's disability that was caused, in part, by exposure to asbestos-containing materials on its campus.

220)    Defendant **Fairmont State University Board of Governors** next conveniently contends that without said insurance coverage for Plaintiff's disability, Plaintiff is not able to file a civil action against it.  Defendant **Fairmont State University Board of Governors** openly believes it can discriminate against students rendered disabled by asbestos on its campus and not be held accountable.

221)    As a result, by knowingly and deliberately acquiring insurance that excludes coverage for Plaintiff's disability and thus preventing her from seeking redress based solely on her disability, Defendant **Fairmont State University Board of Governors** has discriminated against Plaintiff on the basis of her disability and deprived her the benefits and services of a public entity.

222)    Stated alternatively, the intentional and conscious choice of Defendant **Fairmont State University Board of Governors** to maintain liability insurance that specifically excludes coverage for individuals rendered disabled because of its conduct is an actual and constructive denial of access to the Courts by disabled individuals.

223)    As alleged more specifically herein, Defendant **Fairmont State University Board of Governors**' knew its buildings on campus contained asbestos, knew its students would be exposed to asbestos, knew that exposure to asbestos can cause cancer, knew that its insurance coverage excluded asbestos-related disease including cancer, a protected disability, and knew that its exclusion of asbestos-related cancer would have a disparate impact on the ability of all persons

diagnosed with said disability to file a civil claim to seek redress. Nevertheless, Defendant **Fairmont State University Board of Governors** chose to discriminate.

224)    Defendant **Fairmont State University Board of Governors** knew that its decision to exclude from its insurance coverage all individuals rendered disabled by exposure to asbestos on its campus would have an impermissible disparate impact and discriminatory effect on a protected class caused by its decision that at initially appears to be nondiscriminatory.

225)    Plaintiff has been discriminated by a public entity, Defendant **Fairmont State University Board of Governors**, by reason of her disability.

226)    Defendant **Fairmont State University Board of Governors** maintains insurance coverage that permits some individuals access to the Court in pursuit of redress while simultaneously targeting and excluding from its insurance coverage and from accessing the Court individuals rendered disabled by its conduct.

227)    Defendant **Fairmont State University Board of Governors** has failed to make any reasonable accommodations – such as acquiring insurance coverage that does not discriminate against individuals with a protected disability – to correct the unnecessary discriminatory effect of its decision to prevent certain disabled individuals from accessing the benefits and services of a public entity.

228)    Plaintiff seeks injunctive relief against **Fairmont State University Board of Governors** to order it to change its policy, custom, and practice of targeting and excluding certain disabled individuals from its insurance coverage thus preventing meaningful access to the Courts by maintaining insurance that does not target and exclude disabled individuals from coverage such that said individuals will have meaningful access to the Courts.

229)    Plaintiff seeks attorneys' fees, litigation expenses, and costs pursuant to 42 U.S.C. §12205, 28 C.F.R. § 35.175.

## COUNT SEVENTEEN
**(Violation of Title II of the American with Disabilities Act, 42 U.S.C. §§ 12131–12165, against Defendant West Virginia Board of Risk and Insurance Management)**

230)    Plaintiff hereby adopts and incorporates by reference the foregoing paragraphs, where relevant, as if fully set forth verbatim herein.

231)    The American with Disabilities Act, 42 U.S.C. §§ 12131–12165, prohibits policies, procedures, discrimination or disparate treatment of a qualified individual on the basis of his or her disability.  The Act is not limited to protect against physical barriers of access but also prohibits policies, procedures, and customs that discriminate against qualified individuals on the basis of a disability.

232)    Plaintiff is a qualified individual with a disability that meets the essential eligibility requirements for the receipt of services or activities provided by a public entity.

233)    Defendant **West Virginia Board of Risk and Insurance Management** is a "public entity" within the meaning of 42 U.S.C. § 12131(1).

234)    The Circuit Court of West Virginia is a "public entity" within the meaning of 42 U.S.C. § 12131(1).

235)    Plaintiff, a lifelong non-smoker, was diagnosed with lung cancer following a biopsy on February 7, 2022.  Cancer is a disability pursuant to 28 C.F.R. § 35.108(b)(2). Plaintiff's lung cancer substantially limits her ability to perform the following major life activities: walking, breathing, speaking, working, caring for oneself, performing manual tasks, normal cell growth, and the operation of her respiratory system. 28 C.F.R. § 35.108(c)(1).

236)    Plaintiff's disability substantially limits her ability to perform the abovementioned major life activities due to the constant shortness of breath, weakness, and fatigue caused by her lung cancer.

237)    Plaintiff developed lung cancer from inhaling asbestos fibers, dust, and particulates while attending classes and being present on the campus of Fairmont State University and was further exposed to asbestos while working as a student nurse in various hospital buildings as required to complete the nursing program at Fairmont State University.

238)    Upon information and belief, Defendant **West Virginia Board of Risk and Insurance Management**, is an entity responsible for purchasing insurance for public entities such as Defendant **Fairmont State University Board of Governors**, as well as negotiating specific coverages and exclusions.

239)    The existence of liability insurance coverage is a benefit that affords injured parties the ability to file a civil action and satisfy due process requirements in the Circuit Courts of West Virginia against a state entity, such as Defendant **Fairmont State University Board of Governors**.

240)    However, Defendant **West Virginia Board of Risk and Insurance Management** did not to purchase or acquire insurance coverage for Plaintiff's disability that was caused, in part, by exposure to asbestos-containing materials on the campus of Fairmont State University.

241)    As a result, Defendant **Fairmont State University Board of Governors** contends that without said insurance coverage for Plaintiff's disability, Plaintiff is not able to file a civil action against it.

242)    Stated alternatively, the intentional and conscious choice of Defendant **West Virginia Board of Risk and Insurance Management** to maintain insurance coverage that

specifically excludes coverage for individuals rendered disabled as a result of Defendant **Fairmont State University Board of Governors** constitutes an actual and constructive denial of access to the courts by a disabled individual.

243)     As alleged more specifically herein, Defendant **West Virginia Board of Risk and Insurance Management** knew hundreds of state buildings campus contained asbestos, knew students at public universities would be exposed to asbestos, knew that exposure to asbestos can cause cancer, knew that its insurance coverage excluded asbestos related disease including cancer, a protected disability, and knew that its exclusion of asbestos related cancer would have a disparate impact on the ability of all persons diagnosed with said disability to have meaningful access to the courts and an opportunity to be heard.

244)     Defendant **West Virginia Board of Risk and Insurance Management** knew that its decision to exclude from its insurance coverage all individuals rendered disabled by exposure to asbestos on its campus would have an impermissible disparate impact and discriminatory effect on a protected class.

245)     Plaintiff has been discriminated by a public entity, Defendant **West Virginia Board of Risk and Insurance Management** by reason of her disability.

246)     Defendant **West Virginia Board of Risk and Insurance Management** maintains liability insurance coverage that permits certain non-disabled individuals' meaningful access to the court in pursuit of redress while simultaneously targeting and excluding from its insurance coverage and from meaningfully accessing the court certain individuals rendered disabled by conduct of Defendant **Fairmont State University Board of Governors**.

247)     Despite knowingly discriminating against disabled West Virginians like Plaintiff, Defendant **West Virginia Board of Risk and Insurance Management** has failed to make any

reasonable accommodations – such as acquiring insurance coverage that does not discriminate against individuals with a protected disability – to correct the unnecessary discriminatory effect of its decision to prevent certain disabled individuals from accessing the benefits and services of a public entity.

248)    Plaintiff seeks injunctive relief against **West Virginia Board of Risk and Insurance Management** to order it to change its policy, custom, and practice of targeting and excluding certain individuals rendered disabled due to asbestos exposure in public buildings from its insurance coverage thus preventing meaningful access to the Courts, by maintaining insurance that provides meaningful coverage to individuals rendered disabled from asbestos exposure in public buildings.

249)    Plaintiff seeks attorneys' fees, litigation expenses, and costs pursuant to 42 U.S.C. **§**12205, 28 C.F.R. § 35.175.

### COUNT EIGHTEEN
**(42 U.S.C. § 1983 – Violation of Equal Protection Clause of the 14th Amendment of the United States Constitution by Fairmont State University Board of Governors and West Virginia Board of Risk and Insurance Management)**

250)    Plaintiff hereby adopts and incorporates by reference the foregoing paragraphs, where relevant, as if fully set forth verbatim herein.

251)    The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution commands that no state shall "deny to any person within its jurisdiction the equal protection of the laws" U.S. Const. amend. XIV.

252)    Stated alternatively, the Equal Protection Clause requires all persons similarly situated to be treated alike by the government.

253)    Access to the courts has long been considered a fundamental right.

254)    As set forth more fully above, Defendants **Fairmont State University Board of Governors** and **West Virginia Board of Risk and Insurance Management** have conspired to exclude from insurance coverage all non-employees and students injured by the significant number of asbestos-containing products present throughout the campus of Fairmont State University.

255)    However, Defendants **Fairmont State University Board of Governors** and **West Virginia Board of Risk and Insurance Management** do maintain insurance coverage (workman's compensation and deliberate intent) for certain employees that are injured by the significant number of asbestos-containing products present throughout the campus of Fairmont State University.

256)    This is significant. The existence of insurance coverage for an injury permits an injured person to file suit against a state entity and seek compensation for their injuries, while the absence of insurance precludes all access to the courts.  See, Fairmont State Univ. BOG Mot. to Dis.

257)    The result of Defendants **Fairmont State University Board of Governors** and **West Virginia Board of Risk and Insurance Management's** plan and policy regarding asbestos insurance is that individuals – employees and non-employees – that are exposed to the same asbestos fibers in the same buildings that ultimately have the same diagnosis are treated very differently.  One has a legal claim while the other has no claim.

258)    Even worse, the impact of Defendants **Fairmont State University Board of Governors** and **West Virginia Board of Risk and Insurance Management's** scheme treats similarly situated students very differently.  For example, a student employee can file a workers compensation claim and/or deliberate intent claim to be made whole.  However, a student that was not an employee – that was exposed in the same dorm room, classroom, hallway, cafeteria, library,

stairwell, theater, etc. – has no access to the court, no legal recourse, no lawsuit that can be filed, nor any similar ability to heard.

259)    Defendants **Fairmont State University Board of Governors** and **West Virginia Board of Risk and Insurance Management's** scheme is a textbook example of treating similarly situated people differently in violation of the Equal Protection Clause of the 14th Amendment to the United States Constitution.

260)    Plaintiff seeks injunctive relief against **West Virginia Board of Risk and Insurance Management** and **Fairmont State University Board of Governors** to order it to change its policy, custom, and practice of treating similarly situated people differently by acquiring insurance certain individuals rendered disabled due to dangerous conditions at Fairmont State University while excluding from insurance similarly situated individuals injured by the same dangerous condition in violation of the Equal Protection Clause of the 14th Amendment to the United States Constitution.

261)    Plaintiff seeks attorneys' fees, litigation expenses, and costs pursuant to 42 U.S.C. §12205, 28 C.F.R. § 35.175.

## DAMAGES

262)    Plaintiff hereby adopts and incorporates by reference the foregoing paragraphs, where relevant, as if fully set forth verbatim herein.

263)    As a result of the development of lung cancer, Donna R. Spurling suffered and sustained severe illness and injury to her person, which has forced her to obtain medical treatment, and to incur medical expenses by way of physician, hospital, and medication bills.

264) As a direct and proximate result of her aforesaid development of lung cancer, Donna R. Spurling has suffered extreme nervousness and mental anguish as a direct result of her aforesaid development of lung cancer.

265) As a direct and proximate result of her aforesaid development of lung cancer, Donna R. Spurling's enjoyment of life has been greatly impaired and shortened significantly.

266) As a direct and proximate result of the lung cancer diagnosis, Donna R. Spurling and her family members have suffered sorrow, mental anguish, solace, and advice of Donna R. Spurling; loss of services, protection, and care and assistance provided by Donna R. Spurling; and reasonable medical expenses, all to their damage.

267) As a direct and proximate result of her aforesaid development of lung cancer, Donna R. Spurling has suffered severe conscious physical pain and suffering.

268) As a direct and proximate result of her aforesaid development of lung cancer, Plaintiff has suffered lost earnings and net accumulations.

269) With respect to Defendant **Fairmont State University Board of Governors**, to the extent it may be entitled to sovereign immunity, Plaintiff seeks damages under and up to the limits of any applicable insurance policy, if any, with respect to the tort claims Plaintiff pleads against Defendant **Fairmont State University Board of Governors**.

270) Further, with respect to Defendants **Fairmont State University Board of Governors**, and **West Virginia Board of Risk and Insurance Management**, Plaintiff seeks all damages recoverable under the law, including attorney fees, for her claims brought under federal law.

WHEREFORE, Plaintiff demands compensatory damages from all Defendants, jointly and severally, in amounts to be determined by the trier of fact, as well as an award of punitive damages

against all Defendants in amounts to be determined by the trier of fact, in an amount that is above this Court's jurisdictional minimum, as provided by law, and also for the cost of this action. Plaintiff further demands pre-judgment and post judgment interest, as well as such other relief as a judge and jury may deem just.

## JURY DEMAND

PLAINTIFF DEMANDS A TRIAL BY JURY AS TO ALL ISSUES TRIABLE BY A JURY RAISED HEREIN.

Respectfully submitted,

Donna R. Spurling

By Counsel for Plaintiff

*Michael P. Robb, Esquire*
Michael P. Robb, Esquire
WV Bar #10734

*/s/ Travis A. Prince, Esquire*
Travis A. Prince, Esquire
WV Bar #11704

# EXHIBIT "A"

IN THE CIRCUIT COURT OF MONONGALIA COUNTY,
WEST VIRGINIA

STATE OF WEST VIRGINIA,
ex rel. GOVERNOR ARCH A.
MOORE, JR., ON BEHALF OF
AGENCIES, BOARDS AND COMMISSIONS
OF THE STATE OF WEST VIRGINIA,
including:  THE BOARD OF REGENTS;
STATE BUILDING COMMISSION;
DEPARTMENT OF HEALTH; DEPARTMENT
OF HIGHWAYS; DEPARTMENT OF
FINANCE & ADMINISTRATION; BOARD
OF VOCATIONAL EDUCATION, DIVISION
OF VOCATIONAL REHABILITATION;
DEPARTMENT OF EDUCATION; DEPARTMENT
OF COMMERCE; DEPARTMENT OF PUBLIC
SAFETY; DEPARTMENT OF HUMAN SERVICES;
DEPARTMENT OF VETERANS AFFAIRS;
DEPARTMENT OF AGRICULTURE; GEOLOGICAL
AND ECONOMIC SURVEY; ADJUTANT
GENERAL; DEPARTMENT OF CORRECTIONS;
and OTHERS,

         Plaintiff,

v.                  Civil Action No. _86-C-458_
                       JURY TRIAL DEMANDED

AAER SPRAYED INSULATIONS;
ACANDS, INC., individually
and as successor-in-interest
to Armstrong Contracting and
Supply Corporation; A. H.
BENNETT CO.; A. H. FORMAN CO.;
AIR-O-THERM APPLICATION
COMPANY; ARMSTRONG WORLD
INDUSTRIES, INC., individually
and as successor-in-interest
to Armstrong Cork Company;
ASBESTOS CORPORATION, LTD.;
ASBESTOSPRAY CORPORATION;
AZROCK INDUSTRIES, INC.;
BASIC INCORPORATED; BELL
ASBESTOS MINES, LTD.; BES-TEX,
INC.; BRINCO MINING, LTD.; CAPE
ASBESTOS; CAREY-CANADA, INC.;
THE CELOTEX CORPORATION,
individually and as successor-
in-interest to Philip Carey
Manufacturing Company, Philip



Carey Corporation, Briggs
Manufacturing Company and
Panacon Corporation; CERTAINTEED
CORPORATION; COLUMBIA ACOUSTICS
& FIREPROOFING CO.; COMBUSTION
ENGINEERING, INC.; CROWN CORK &
SEAL COMPANY, INC., individually
and as successor-in-interest to
Mundet Company; C. TENNANT & SONS;
DANA CORPORATION; EAGLE-PICHER
INDUSTRIES, INC.; EMPIRE ACE
INSULATION MANUFACTURING CORPORATION;
FIBREBOARD CORPORATION, individually
and as successor-in-interest to
Fibreboard Paper Products Corporation,
Plant Rubber and Asbestos Company and
Pabco; THE FLINTKOTE COMPANY; GAF
CORPORATION, individually and as
successor-in-interest to Ruberoid
Corporation; GARLOCK, INC.; GEORGIA-
PACIFIC CORP.; J. HAMPSHIRE, INC.,
individually and as successor-in-
interest to Hampshire Industries, Inc.;
H. K. PORTER COMPANY, INC., individ-
ually and as successor-in-interest
to Southern Asbestos Company; J.W.
ROBERTS, LTD.; KAISER CEMENT CORP.;
KEENE CORPORATION, individually
and as successor-in-interest to
the Ehret Magnesia Manufacturing
Company, Baldwin-Ehret-Hill, Inc.,
Mundet Company, and Keene Building
Products Corporation; KENTILE FLOORS,
INC; LAC D'AMIANTE Du QUEBEC, LTD.;
LAKE ASBESTOS OF QUEBEC, LTD. LLOYD E.
MITCHELL, INC.; SONNEBORN BUILDING
PRODUCTS, INC.; MAC ARTHUR CORP.;
MARLEY CO.; MCIC, INC.; NATIONAL
GYPSUM CO., individually and as
successor-in-interest to Gold Bond
Building Products Corporation; NICOLET,
INDUSTRIES, INC., individually and as
successor-in-interest to Keasbey &
Mattison Company; NORTH AMERICAN
ASBESTOS CORP.; OWENS-CORNING FIBERGLAS
CORPORATION; OWENS-ILLINOIS; INC.;
PFIZER, INC., individually and as
successor-in-interest to Charles Pfizer
& Company, Inc., Kelley Island Lime &
Transport Company, Gibsanburg Lime
Products Company and Basics, Inc.;
PITTSBURGH CORNING CORPORATION,

individually and as successor-in-
interest to Unarco Industries, Inc.;
PORTER-HAYDEN COMPANY; PPG INDUSTRIES,
INC.; PROKO INDUSTRIES, INC.; RAPID-
AMERICAN CORPORATION; RAYMARK
INDUSTRIES, INC., individually
and as successor-in-interest to
Raybestos-Manhattan, Inc.; ROCK
WOOL INDUSTRIES, INC.; SOUTHERN
TEXTILE CORPORATION; SPRAYED
INSULATION, INC.; SPRAYO-FLAKE
COMPANY; SPRAYON INSULATION &
ACOUSTICS, INC.; SPRAYON RESEARCH
CORP.; STANDARD INSULATIONS, INC.,
individually and as successor-in-
interest to Standard Asbestos
Insulating and Manufacturing Company;
SUPERIOR COMBUSTION INDUSTRIES, INC.;
TURNER ASBESTOS FIBRES, INC.;
TURNER & NEWALL PLC., individually
and as successor-in-interest to
Turner & Newall Ltd.; UNION CARBIDE;
UNIROYAL, INC.; UNITED STATES
GYPSUM CO.; UNITED STATES MINERAL
PRODUCTS COMPANY, INC.; THE WALLACE
AND GALE CO.; WALLACE INSULATION,
INC.; WILKINS INSULATION CO.;
WORBEN CO., INC.; W. R. GRACE CO.;
individually and as successor-in-
interest to Western Mineral
Products Company, Inc. and Zonolite
Corporation; WYOLITE INSULATING
PRODUCTS; YORK BUILDING PRODUCTS CO.,
INC.; AND OTHERS, PRESENTLY UNKNOWN,
(HEREIN THE "JOHN DOE" DEFENDANTS),

      Defendants.

## COMPLAINT

The plaintiff, the State of West Virginia, alleges as
follows:

## INTRODUCTION

1.  As set forth in more detail below, this suit is
brought by the State of West Virginia because of the presence

of hazardous asbestos products in hundreds of state buildings. The presence of the hazards due to these asbestos products has already caused state facilities to be evacuated on an emergency basis; necessitated surveying, testing, and monitoring of the presence and the state of deterioration of the asbestos products; required removal or encapsulation of the asbestos products; and created a fear of physical injury and/or death among state employees and others, including maintenance personnel, leading them to refuse to provide maintenance and other functions to the state. Thus, the danger posed by defendants' asbestos products has to date cost the State of West Virginia well in excess of a million dollars. Additionally, at least one claim of fatal disease caused by contact with asbestos fibers in state facilities has been received by the State of West Virginia.

2. The damage already caused by these asbestos products is just the beginning, however. It is inevitable that these products will become increasingly hazardous with time. The State of West Virginia is thus confronted with the enormous costs involved in further identifying and remedying this hazard, primarily through the removal of the asbestos products from state buildings.

3. This suit is substantially based on the fact that the asbestos manufacturers knew of the hazards associated with their products, and not only failed to warn the purchasers or expected users of these hazardous products, but, in fact, in many cases, intentionally withheld information regarding the dangers of asbestos products. Under these circumstances, based on the legal grounds described below, the asbestos manufacturers are liable for the actual and foreseeable costs associated with remedying the severe hazards caused by their products.

PARTIES

PLAINTIFFS

4.   The plaintiff State of West Virginia is a body
governed by the Constitution of the State of West Virginia
and charged with responsibilities including, but not limited
to, the operation and management of the state-owned buildings
located in West Virginia.

5.   This suit is being brought by the State of West
Virginia on behalf of agencies, boards and commissions of
the State of West Virginia including:  The Board of Regents;
State Building Commission; Department of Health; Department
of Highways; Department of Finance & Administration; Board
of Vocational Education, Division of Vocational
Rehabilitation; Department of Education; Department of
Commerce; Department of Public Safety; Department of Human
Services; Department of Veterans Affairs; Department of
Agriculture; Geological and Economic Survey; Adjutant
General; Department of Corrections; and other agencies,
board, and commissions which occupy state-owned buildings
containing asbestos products.

DEFENDANTS

6.   Defendant AAER Sprayed Insulations, Inc. is a
corporation incorporated under the laws of the State of
Illinois and has conducted and/or does conduct business in
the State of West Virginia.

7.   Defendant, ACANDS, Inc., is a corporation incor-
porated under the laws of the State of Delaware and is
qualified to do business and has conducted and/or does
conduct business in the State of West Virginia.

-5-

8.   Defendant, A. H. Bennett Company, is a corporation incorporated under the laws of the State of Minnesota and has conducted and/or does conduct business in the State of West Virginia.

9.   Defendant, A. H. Forman Co., is a corporation incorporated under the laws of the State of Maryland and has conducted and/or does conduct business in the State of West Virginia.

10.  Defendant, Air-O-Therm Application Company, Inc., is a corporation incorporated under the laws of the State of Illinois and has conducted and/or does conduct business in the State of West Virginia.

11.  Defendant, Armstrong World Industries, Inc., is a corporation incorporated under the laws of the Commonwealth of Pennsylvania and has conducted and/or does conduct business in the State of West Virginia.

12.  Defendant, Asbestos Corporation, Ltd., is a corporation organized under the laws of a foreign country and has conducted and/or does conduct business in the State of West Virginia.

13.  Defendant, Asbestospray Corporation, is a corporation incorporated under the laws of the State of New Jersey and has conducted and/or does conduct business in the State of West Virginia.

14.  Defendant, Azrock Industries, Inc., is a corporation incoporated under the laws of the State of Texas, and has conducted and/or does conduct business in the State of West Virginia.

15.   Defendant, Basic Incorporated, is a corporation incorporated under the laws of the State of Delaware and has conducted and/or does conduct business in the State of West Virginia.

16.   Defendant, Bell Asbestos Mines, Ltd., is a corporation organized under the laws of a foreign country and has conducted and/or does conduct business in the State of West Virginia.

17.   Defendant, Bes-Tex, Inc., has conducted and/or does conduct business in the State of West Virginia.

18.   Defendant, Brinco Mining, Ltd., formerly known as Cassiar Resources, Ltd., is a corporation organized under the laws of a foreign country and has conducted and/or does conduct business in the State of West Virginia.

19.   Defendant, Cape Asbestos, is a corporation organized under the laws of a foreign country and has conducted and/or does conduct business in the State of West Virginia.

20.   Defendant, Carey-Canada, Inc., is a corporation organized under the laws of a foreign country and has conducted and/or does conduct business in the State of West Virginia.

21.   Defendant, The Celotex Corporation, is a corporation incorporated under the laws of the State of Delaware and is qualified to do business and has conducted and/or does conduct business in the State of West Virginia.

22.   Defendant, Certainteed Corporation, is a corporation incorporated under the laws of the State of

-7-

Maryland and has conducted and/or does conduct business in the State of West Virginia.

23.  Defendant, Columbia Acoustics & Fireproofing Co., has conducted and/or does conduct business in the State of West Virginia.

24.  Defendant, Combustion Engineering, Inc., is a corporation incorporated under the laws of the State of Delaware and is qualified to do business and has conducted and/or does conduct business in the State of West Virginia.

25.  Defendant, Crown Cork & Seal Company, Inc. , has conducted and/or does conduct business in the State of West Virginia.

26.  Defendant, C. Tennant & Sons, is a corporation incorporated under the laws of the State of New York and has conducted and/or does conduct business in the State of West Virginia.

27.  Defendant, Dana Corporation, is a corporation incorporated under the laws of the State of Virginia and has conducted and/or does conduct business in the State of West Virginia.

28.  Defendant, Eagle-Picher Industries, Inc., is a corporation incorporated under the laws of the State of Ohio and is qualified to do business and has conducted and/or does conduct business in the State of West Virginia.

29.  Defendant, Empire Ace Insulation Manufacturing Corporation, is a corporation incorporated under the laws of the State of New York and has conducted and/or does conduct business in the State of West Virginia.

-8-

30.   Defendant, Fibreboard Corporation, a subsidiary of Louisiana Pacific Corporation, is a corporation incorporated under the laws of the State of Delaware, and has conducted and/or does conduct business in the State of West Virginia.

31.   Defendant, The Flintkote Company, is a corporation incorporated under the laws of the State of Delaware and has conducted and/or does conduct business in the State of West Virginia.

32.   Defendant, GAF Corporation, is a corporation incorporated under the laws of the State of Delaware and is qualified to do business and has conducted and/or does conduct business in the State of West Virginia.

33.   Defendant, Garlock, Inc., has conducted and/or does conduct business in the State of West Virginia.

34.   Defendant, Georgia-Pacific Corp., is a corporation incorporated under the laws of the State of Georgia. Defendant Georgia-Pacific Corp. is qualified to do business and has conducted and/or does conduct business in the State of West Virginia.  Defendant Georgia-Pacific Corp. has succeeded and assumed all or substantially all of the assets and liabilities of the Best Wall Gypsum Company, a Maryland Corporation, which conducted business in the State of West Virginia.

35.   Defendant, J. Hampshire, Inc., is a corporation incorporated under the laws of the State of Maryland and has conducted and/or does conduct business in the State of West Virginia.

36.   Defendant, H.K. Porter Company, Inc., is a corporation incorporated under the laws of the State of Maryland

and is qualified to do business and has conducted and/or does conduct business in the State of West Virginia.

37.   Defendant, J.W. Roberts, Ltd., is a corporation incorporated under the laws of a foreign country, and has conducted and/or does conduct business in the State of West Virginia.

38.   Defendant, Kaiser Cement Corp., has conducted and/or does conduct business in the State of West Virginia.

39.   Defendant, Keene Corporation, is a corporation incorporated under the laws of the State of New York and is qualified to do business and has conducted and/or does conduct business in the State of West Virginia.

40.   Defendant, Kentile Floors, Inc., is a corporation incorporated under the laws of the State of New York and has conducted and/or does conduct business in the State of West Virginia.

41.   Defendant, Lac D'Amiante Du Quebec, Ltd., is a corporation incorporated under the laws of the State of Delaware and has conducted and/or does conduct business in the State of West Virginia.

42.   Defendant, Lake Asbestos of Quebec, Ltd., is a corporation incorporated under the laws of the State of Delaware and has conducted and/or does conduct business in the State of West Virginia.

43.   Defendant, Lloyd E. Mitchell, Inc., is a corporation incorporated under the laws of the State of Maryland and had conducted and/or does conduct business in the State of West Virginia.

44.  Defendant, Sonneborn Building Products, Inc., has conducted and/or does conduct business in the State of West Virginia.

45.  Defendant, Mac Arthur Corporation, is a corporation incorporated under the laws of the State of Minnesota and has conducted and/or does conduct business in the State of West Virginia.

46.  Defendant, Marley Co., has conducted and/or does conduct business in the State of West Virginia.

47.  Defendant, MCIC, Inc., is a corporation incorporated under the laws of the State of Maryland, and had conducted and/or does conduct business in the State of West Virginia.

48.  Defendant, National Gypsum Co., is a corporation incorporated under the laws of the State of Delaware and has conducted and/or does conduct business in the State of West Virginia.

49.  Defendant, Nicolet Industries, Inc., is a corporation incorporated under the laws of the State of Delaware. Defendant, Nicolet Industries, Inc., has conducted and/or does conduct business in the State of West Virginia. Defendant, Nicolet Industries, Inc., has succeeded and assumed all or substantially all of the assets and liabilities of the Keasbey & Mattison Company, which conducted business in the State of West Virginia.

50.  Defendant, North American Asbestos Corp., has conducted and/or does conduct business in the State of West Virginia.

51.   Defendant, Owens-Corning Fiberglas Corporation, is a corporation incorporated under the laws of the State of Delaware and is qualified to do business and has conducted and/or does conduct business in the State of West Virginia.

52.   Defendant, Owens-Illinois, Inc., is a corporation incorporated under the laws of the State of Ohio and is qualified to do business and has conducted and/or does conduct business in the State of West Virginia.

53.   Defendant, Pfizer Inc., is a corporation incorporated under the laws of the State of Delaware.  Defendant, Pfizer, Inc., has conducted and/or does conduct business in the State of West Virginia.  Defendant, Pfizer, Inc., has succeeded and assumed all or substantially all of the assets and liabilities of the Gibsanburg Lime Products Company, which conducted business in the State of West Virginia.

54.   Defendant, Pittsburgh Corning Corporation, is a corporation incorporated under the laws of the Commonwealth of Pennsylvania and has conducted and/or does conduct business in the State of West Virginia.

55.   Defendant, Porter-Hayden Company, is a corporation incorporated under the laws of the State of Maryland and has conducted and/or does conduct business in the State of West Virginia.

56.   Defendant PPG Industries, Inc., is a corporation reincorporated under the laws of the Commonwealth of Pennsylvania and is qualified to do business and has conducted and/or is conducting business in the State of West Virginia.

57.  Defendant, Proko Industries, Inc., is a corporation incorporated under the laws of the State of Texas and has conducted and/or does conduct business in the State of West Virginia.

58.  Defendant, Rapid-American Corporation, is a corporation incorporated under the laws of the State of Delaware and has conducted and/or does conduct business in the State of West Virginia.

59.  Defendant, Raymark Industries, Inc., successor-in-interest to Raybestos-Manhattan, Inc., is a corporation incorporated under the laws of the State of New Jersey and is qualified to do business and has conducted and/or does conduct business in the State of West Virginia.

60.  Defendant, Rock Wool Industries, Inc., is a corporation incorporated under the laws of the State of Alabama and has conducted and/or does conduct business in the State of West Virginia.

61.  Defendant, Southern Textile Corporation, is a corporation incorporated under the laws of the State of Delaware and has conducted and/or does conduct business in the State of West Virginia.

62.  Defendant, Sprayed Insulation, Inc., has conducted and/or does conduct business in the State of West Virginia.

63.  Defendant, Sprayo-Flake Company, is a corporation incorporated under the laws of the State of Illinois and has conducted and/or does conduct business in the State of West Virginia.

64.  Defendant, Sprayon Insulation & Accoustics, Inc., is a corporation incorporated under the laws of the State of Florida and has conducted and/or does conduct business in the State of West Virginia.

65.  Defendant, Sprayon Research Corp., is a corporation incorporated under the laws of the State of Florida and has conducted and/or does conduct business in the State of West Virginia.

66.  Defendant, Standard Insulations, Inc., is a corporation incorporated under the laws of the State of Missouri and has conducted and/or does conduct business in the State of West Virginia.

67.  Defendant, Superior Combustion Industries, Inc., has conducted and/or does conduct business in the State of West Virginia.

68.  Defendant, Turner Asbestos Fibres, Inc., is a corporation organized under the laws of a foreign country and has conducted and/or does conduct business in the State of West Virginia.

69.  Defendant, Turner & Newall PLC, is a corporation organized under the laws of a foreign country and has conducted and/or does conduct business in the State of West Virginia.

70.  Defendant, Union Carbide Corporation, is a corporation incorporated under the laws of the State of New York and is qualified to do business and has conducted and/or does conduct business in the State of West Virginia.

71.  Defendant, Uniroyal, Inc., is a corporation incorporated under the laws of the State of Connecticut and is qualified to do business and has conducted and/or does conduct business in the State of West Virginia.

72.  Defendant, United States Gypsum Co., is a corporation incorporated under the laws of the State of Illinois and has conducted and/or does conduct business in the State of West Virginia.

73.  Defendant, United States Mineral Products Company, Inc., is a corporation incorporated under the laws of the State of Illinois and has conducted and/or does conduct business in the State of West Virginia.

74.  Defendant, The Wallace and Gale Co., is a corporation incorporated under the laws of the State of Maryland and is qualified to do business and has conducted and/or does conduct business in the State of West Virginia.

75.  Defendant, Wallace Insulation, Inc., is a corporation incorporated under the laws of the State of Maryland and has conducted and/or does conduct business in the State of West Virginia.

76.  Defendant, Wilkin Insulation Co., is a corporation incorporated under the laws of the State of Illinois and has conducted and/or does conduct business in the State of West Virginia.

77.  Defendant, Worben Co., Inc., is a corporation incorporated under the laws of the State of Texas and has conducted and/or does conduct business in the State of West Virginia.

-15-

78.   Defendant, W. R. Grace Co., is a corporation incorporated under the laws of the State of Connecticut and is qualified to do business and has conducted and/or does conduct business in the State of West Virginia.  Defendant, W. R. Grace Co., has succeeded and assumed all or substantially all of the assets and liabilities of the Zonolite Company, which conducted business in the State of West Virginia.

79.   Defendant, Wyolite Insulating Products, has conducted and/or does conduct business in the State of West Virginia.

80.   Defendant, York Building Products Co., Inc., has conducted and/or does conduct business in the State of West Virginia.

81.   The Defendants, John Doe Companies, are business entities whose identities are presently unknown to the plaintiff but who may be described as corporations which at all times relevant herein were and/or are now engaged in the mining, manufacture, sale, distribution and/or otherwise placing in the stream of commerce, asbestos or asbestos-containing products.  These defendants are corporations organized under the laws of the State of West Virginia or the laws of some state of the United States of America or some foreign jurisdiction.  These defendants were and are qualified to do business in the State of West Virginia and/or have conducted and/or do conduct business in the State of West Virginia.  As soon as the identity of these defendants is known to plaintiff, the Complaint will be amended to make them named defendants.

82.   Upon information and belief, all of the business entities responsible for the mining, manufacture, sale,

-16-

distribution, or otherwise placing in the stream of commerce those products containing asbestos used in public buildings and facilities are named as defendants in this action, with the exception of Manville Corporation, Johns-Manville Corporation, Johns-Manville Sales Corporation, Unarco Industries, Inc., or Amatex, and Forty-Eight Insulations, Inc. (hereinafter collectively referred to as "INDUSTRY MEMBERS IN BANKRUPTCY") due to the fact that bankruptcy proceedings initiated by those entities prohibit their being named as defendants.  If plaintiff is permitted in the future to commence an action against these business entities, plaintiff will seek leave of the court to amend this Complaint to designate each of those business entities as named defendants.  Throughout this Complaint, references to the acts or omissions of the defendants include the acts and omissions of the INDUSTRY MEMBERS IN BANKRUPTCY.

83.  At all relevant times, defendants acted through their duly authorized agents, servants, and employees who were then acting in the course and scope of their employment, and in furtherance of the business of said defendants.

84.  The defendants listed above, in paragraphs 6 through 82, and/or their predecessors and successors in interest, and all corporations, companies or other business entities which, at all times material hereto, have and/or are presently engaged in mining, manufacturing, selling, distributing, and/or otherwise placing in the stream of commerce, asbestos or asbestos-containing products for ultimate use in public buildings and facilities.

85.  The defendants listed above, in paragraphs 6 through 82, and/or their predecessors and successors in interest, made contracts to be performed in whole or in part in the State of West Virginia and/or manufactured, sold,

-17-

offered for sale, supplied or placed in the stream of
commerce defective and hazardous products causing injury to
persons and property within this State, and as described
below, committed tortious acts in the State of West
Virginia.

<u>FACTUAL ALLEGATIONS</u>

86.  Plaintiff, State of West Virginia has, constructed
and/or renovated hundreds of public buildings and facilities
in the State of West Virginia.  These public buildings and
facilities owned by plaintiff include hospitals, schools,
colleges, universities, nursing homes, facilities for the
mentally retarded, institutions for the mentally ill,
government office buildings, and numerous other types of
public buildings and facilities.

87.  Some of the public buildings and facilities of the
State of West Virginia house young children, the chronically
disabled, mentally ill or mentally retarded children or
adults, the elderly, and many other citizens on a 24-hour-a-
day basis.  Most of these public buildings and facilities
are open to the general public on a daily basis.

88.  In many of the public buildings and facilities of
the State of West Virginia, students, patients, teachers,
and other state employees, as well as members of the general
public, have used and continue to use these public buildings
and facilities on almost a daily basis.

89.  At the time these public buildings and facilities
were constructed and/or renovated, large portions of the
interior framework, structural members, ceilings, walls,
pipes, ducts and heating and ventilation equipment were
sprayed, wrapped and/or otherwise covered with defendants'

asbestos and asbestos containing products.  These products
were used for fireproofing, acoustical and thermal insu-
lation, and/or decorative purposes.  These asbestos products
are or will become friable, i.e., easily crumbled, pulverized,
reduced to powder, or otherwise equally damaged, thereby
releasing microscopic asbestos fibers into the air.  The
defendants mined, manufactured, sold, distributed and/or
placed into the stream of commerce asbestos and/or asbestos
products knowing and intending that these products would be
used for fireproofing, acoustical and thermal insulation,
and decoration in buildings and facilities in which people
would work, reside or otherwise utilize.

     90.  Upon information and belief, the asbestos and
asbestos-containing products used in the public buildings
and facilities in the State of West Virginia were mined,
manufactured, sold, distributed and/or placed in the stream
of commerce by the defendants.

     91.  Occupational health hazards associated with the
inhalation of asbestos fibers were documented in the early
1900's.  Beginning in the mid-1930's, defendant Raymark
Industries, Inc., successor-in-interest to Raybestos-
Manhattan, Inc., and some other or all members of the
asbestos industry suppressed, concealed and obscured data on
the relationship between asbestos exposure and diseases.
These efforts are reflected in the now public papers of Mr.
Sumner Simpson, who was President of Raybestos-Manhattan,
Inc. during the 1930's, and well as other documents.

     92.  For example, the defendants who were members of
asbestos industry trade associations suppressed, discouraged,
and retarded research and publication concerning the relation-
ship between asbestos and various diseases, and actively
concealed and misrepresented such relationships.

93.  Beginning in the mid-1930's through their funding and control of the studies on the effects of exposure to asbestos, through their control of trade publications, and through other agreements, understandings and joint undertakings, defendants coordinated and assisted each other in the suppression, active concealment and misrepresentation of the relationship between asbestos and various diseases.

94.  Defendants knew, or should have known, of certain studies and data linking asbestos to various diseases and were aware of the acts of suppression, concealment and misrepresentation of the relationship established between asbestos and various diseases but, nonetheless, continued to mine, manufacture, sell, distribute, and place in the stream of commerce asbestos products without any warnings of the potential health hazards presented by their products.

95.  Defendants, including those who entered the asbestos industry subsequent to the consummation of the agreements, understandings and actions of the industry trade association membership described above, adhered to the industry-wide practice of refusing to provide necessary warnings as to the hazards presented by exposure to asbestos, and otherwise misrepresenting the safety of their products.

96.  The activities engaged in by defendants, as identified in paragraphs 6 through 82 above, created and creates an unreasonable risk of harm to the persons using plaintiff's buildings and facilities and were done pursuant to a common plan, concert of action, and considered course of conduct.

97.  At the time of construction and/or renovation of the State's public buildings and facilities, at which time

defendants' products were incorporated into plaintiff's
buildings, plaintiff was not aware of the serious health
risks associated with the asbestos-containing products
mined, manufactured, sold, distributed, and placed in the
stream of commerce by defendants which made such products
unsuitable for their intended use in these buildings.
Plaintiff did not become aware of the hazards casued by the
deteriorating asbestos-containing products in state-owned
buildings until engineering studies were commissioned within
the past two years.

98.    The presence of defendants' asbestos and asbestos
containing products in the public buildings and facilities
of the State of West Virginia constitutes and will continue
to constitute a serious danger to the health and welfare of
all who must enter or occupy these buildings, which are
generally open to the public, and which, in some cases,
house individuals whose weakened physical condition renders
them particularly susceptible to health hazards of all
kinds.  As the defendants' asbestos and asbestos-containing
products become friable, they constititute and will continue
to constitute a serious danger to the health and welfare of
all employees of the State of West Virginia who work in
these buildings on a daily basis, those individuals who are
employed by the State to renovate and remodel these
buildings and those members of the public who find it
necessary to enter state-owned buildings.  This danger is
the result of the fact that asbestos is a known human
carcinogen.  The inhalation of asbestos fibers has been
linked to a number of diseases including asbestosis and
various forms of cancer, all of which are serious or life
threatening.  There is no known safe level of exposure to
asbestos fibers.

99.    As long as the asbestos and asbestos-containing
products remain in the public buildings and facilities of

the State of West Virginia, further deterioration and
erosion of these products will occur, thereby causing the
release of more asbestos fibers and dust into the air.
Further contact with airborne asbestos fibers by persons
using plaintiff's buildings is inevitable not only through
the dissemination of these fibers through the ventilation
systems of the public buildings and facilities, but also
through contact with asbestos products during the normal
maintenance, repair, renovation and ultimate demolition of
these buildings.  In addition, deterioration of the asbestos
products will be exacerbated by contact with water, which
has the effect of making the asbestos product increasingly
friable and therefore even more hazardous.

     100.  Recently, the State of West Virginia has discovered
the existence of the hazards posed by defendants' asbestos
products in its public buildings and facilities.  In 1984,
the State of West Virginia conducted a survey of over 400
buildings of which approximately 330 buildings contained
asbestos or asbestos-containing products.  Substanial costs
were incurred in conducting this survey and in testing and
analyzing the products found in the building for their
asbestos content.  Additionally, the astestos-containing
products themselves were found to be damaged or destroyed.
Among those asbestos-containing products found were spray-on
insulation, ceiling tiles, heater or boiler insulation, pipe
or duct insulation, and asbestos-containing plaster.

     101.  Subsequent to this survey, an asbestos abatement
planning study was conducted on three public buildings in
which detailed information was obtained regarding the state
of deterioration of the asbestos-containing products in
those buildings and the hazards created by the presence of
those asbestos products.  In the course of this study, and

-22-

other studies, serious hazards due to the presence of
asbestos were discovered. For example, ceilings in some
buildings contain asbestos-containing products that have no
protective covering. Further, in some ventilation systems,
fan-driven air streams are directed at deteriorating
asbestos products.

102. Additionally, in the course of recent renovation
projects, the State of West Virginia has discovered
hazardous conditions associated with the asbestos-containing
products in public buildings and facilities.

103. The presence of friable asbestos and
asbestos-containing products in plaintiff's buildings has
directly and proximately caused damage to the State of West
Virginia and its property. The State of West Virginia has
expended substantial sums of public funds, exceeding 1
million dollars, to inspect, identify, test, analyze, remove
or encapsulate asbestos or asbestos-containing products in
public buildings and facilities. As a result of these
remedial activities, the functioning of State government has
been interferred with, and the access of the public to state
buildings has been obstructed.

104. In order to eliminate or alleviate the health
hazard posed by asbestos-containing products in every such
affected public building and facility, the State of West
Virginia inevitably will be required, in some cases by
statute, to expend millions of dollars in public funds over
an extended period of time to inspect, identify, test,
analyze, monitor, encapsulate, enclose, remove and/or
replace property due to contamination and damage caused by
friable asbestos so that employees, occupants and visitors
of those buildings and facilities are adequately protected.
As a result of these remedial activities, the functioning of

the state government will be interfered with, and the access of the public to state buildings will be obstructed.

105.  In fact, in at least one case in 1986, hazards created by contact with asbestos-contained products in a state building necessitated emergency evacuation of a state building by state employees and the general public, causing interference with the function of state government.  The emergency evacuation resulted in substantial damages and costs to the State of West Virginia, exceeding One Hundred Thousand Dollars ($100,000.00), to immediately alleviate the hazards posed by the asbestos-containing products.

106.  In other instances, necessary maintenance, renovation and repair on public buildings became unavailable when personnel refused to enter public facilities due to the hazards posed by asbestos products in these facilities.

107.  The continued presence of defendants' asbestos-containing products in public buildings and facilities in the State of West Virginia poses a substantial health hazard, as defendants' asbestos-containing products become friable, to employees, occupants and visitors and renders some of plaintiff's public buildings and facilities unreasonably dangerous and unsafe.

108.  The State of West Virginia has been, and will continue to be, subject to claims by state employees seeking compensation due to injury and/or death caused by exposure to asbestos products.  Substantial costs have been and will be incurred by the State of West Virginia as the result of these claims.

109.   The presence of defendants' asbestos-containing products in public facilities and buildings has created and will continue to create a fear of injury and death due to contact with asbestos fibers which has and will continue to interfere with the functioning of State government and the access of the general public to their government.

110.   Compensatory damages for the cost of past, present and future asbestos abatement incurred by plaintiff is an inadequate remedy at law and does not afford plaintiff full and complete relief.

CAUSES OF ACTION

COUNT I:   STRICT LIABILITY

111.   Plaintiff repeats and realleges the allegations of paragraphs 1 through 110 as if fully set forth herein.

112.   At the time of the mining, manufacture, sale, distribution, and placing in the stream of commerce asbestos and asbestos-containing products, defendants knew or should have known that these asbestos products were defective and unreasonably dangerous for use in public buildings.  The unreasonable danger presented by the asbestos products existed when it was in the possession and control of the defendants.  The defect or unreasonable danger presented by asbestos-containing products involves, in part, the tendency of defendants' asbestos-containing products to become friable, deteriorate and disintegrate, thus releasing asbestos dust and fibers and injuring or destroying the integrity of the asbestos-containing product itself.  The release of asbestos dust and fibers, in turn, creates a hazard to persons coming into contact with them.

113.  The asbestos and the asbestos-containing products
sold by defendants were expected to and did reach the users
or consumers without substantial change in their original
condition.  The asbestos and asbestos-containing products in
plaintiff's buildings and facilities are defective in that
they are not reasonably safe for their ordinary intended
uses.  They are further defective and dangerous because
defendants failed to provide plaintiff, either directly or
indirectly, with adequate or sufficient warnings regarding
the risks and dangers inherent in exposure to these
products.

114.  The ordinary and foreseeable uses of asbestos and
asbestos-containing products such as fireproofing,
acoustical and thermal insulation, and decorative purposes,
in public buildings and facilities are unreasonably and
inherently dangerous.

115.  As a direct and proximate cause of the unreasonable
dangerousness of defendants' asbestos-containing products
and/or as a direct and proximate result of the failure by
defendants to provide adequate warning of the unreasonable
dangerousness of their asbestos-containing products,
plaintiff has suffered damages as set forth in paragraphs
103 through 110 above.

COUNT II:  NEGLIGENCE

116.  Plaintiff repeats and realleges the allegations of
paragraphs 1 through 115 as if fully set forth herein.

117.  At all times relevant hereto, defendants knew or
should have known that asbestos and asbestos-containing
products were highly dangerous and harmful for their

-26-

ordinary and foreseeable uses and would pose a significant health hazard to individuals using public buildings.

118. Although defendants knew or should have known of the dangers associated with the uses of asbestos and asbestos-containing products in public buildings, they, in breach of their legal duties, negligently and recklessly mined, manufactured, distributed, sold and placed in the stream of commerce asbestos and asbestos-containing products, thereby creating an unreasonable risk of harm to plaintiff, causing damage to plaintiff's property, and creating a present and foreseeable health hazard to individuals who use plaintiff's public buildings.

119. The negligent acts of the defendants include, but are not limited to, the following:

    a. Failure to test or adequately test the asbestos and asbestos-containing products to determine the health effects associated with the use of these products in public buildings;

    b. Failure to represent accurately to consumers, including plaintiff State of West Virginia, either directly or indirectly, that asbestos and asbestos-containing products pose a severe health hazard and cause personal injury to individuals exposed to them. As a result of the false representations of defendants, plaintiff was induced to purchase and utilize such asbestos products;

    c. Failure to warn, or to adequately or sufficiently warn, plaintiff State of West Virginia, either directly or indirectly, of the health hazards associated with asbestos and asbestos-containing

products after such products were installed in plaintiff's public buildings;

d.  Failure to remove or recommend the removal of asbestos and asbestos-containing products from the public buildings and facilities of plaintiff State of West Virginia.

120.  As a direct and proximate result of defendants' negligence, plaintiff has been damaged as set forth in paragraphs 103 through 110 above.

## COUNT III:  NUISANCE

121.  Plaintiff repeats and realleges the allegations of paragraphs 1 through 120 as if fully set forth herein.

122.  Defendants, acting individually and collectively, have caused a serious health hazard to be created in the public buildings and facilities of the State of West Virginia.  This risk is a direct result of the wrongful acts of defendants as set forth herein, and amounts to a public nuisance which has damaged plaintiff by unreasonably interfering with and depriving plaintiff and the members of the public who use these facilities of the safe and uninhibited use and enjoyment of these facilities.

123.  The discharge or release of asbestos particles into the air from defendants' asbestos-containing products in plaintiff's buildings constitutes statutory air pollution as defined by W. Va. Code § 16-20-1, et seq.  Defendants' have thus created a nuisance per se which should be immediately abated.

124.  Plaintiff continues to be willing to allow defendants access, under the supervision of plaintiff, to the State's public buildings and facilities so that defendants may abate the nuisance which they created, and in fact, invites defendants to do so.  Defendants, accordingly, have a legal right to abate the nuisance.

125.  As a direct and proximate result of public nuisance created by defendants, plaintiff has been damaged as set forth in paragraphs 103 through 110 above.

COUNT IV:  BREACH OF WARRANTIES

126.  Plaintiff repeats and realleges the allegations of paragraphs 1 through 125 as if fully set forth herein.

127.  Defendants are merchants with respect to asbestos and asbestos-containing products and expressly and impliedly warranted to plaintiff, through the advertising, marketing, and labeling of their products, that defendants' asbestos and asbestos-containing products were safe for their normal and foreseeable uses, including fireproofing, insulation, and decorative purposes in public buildings, thereby inducing plaintiff to utilize such products.

128.  Defendants breached such warranties to plaintiff in that asbestos and asbestos-containing products are inherently and unreasonable dangerous and unsafe for their ordinary and foreseeable uses as fireproofing, insulation and decoration in public buildings.

129.  Plaintiff, as a foreseeable and intended user of defendants' products, relied upon defendants' representations, skill, expertise and judgment in believing that asbestos and asbestos-containing products would not only perform as

warranted, but were safe and would not cause plaintiff to suffer property damage nor endanger the health of employees, occupants and other persons who would use plaintiff's public buildings and facilities.

130.  As a result of defendants' breach of warranties, plaintiff was directly and materially harmed and injured and has suffered damages as set forth in paragraphs 103 through 110 above.

### COUNT V:  MISREPRESENTATION AND FRAUD

131.  Plaintiff repeats and realleges the allegations of paragraphs 1 through 130 as if fully set forth herein.

132.  The defendants, in mining, manufacturing, distributing, selling and placing in the stream of commerce asbestos and asbestos-containing products, represented that they were safe for their intended uses and would not subject the owner or user of the product to unreasonable dangers or costs incident to their use.

133.  These representations were untrue.

134.  The defendants had an economic interest in making such representations.  In making the representations set forth in paragraph 132, the defendants either actually knew the representations were untrue, or had no knowledge of the truth or falsity of their representations or made the representations under circumstances such that they should have known of the falsity.  Defendants also intended that plaintiff rely on these representations.

135.   The plaintiff State of West Virginia relied on such representations and as a result of this reliance was damaged as set forth in paragraph 103 through 110 above.

## COUNT VI:  INDEMNITY

136.  Plaintiff repeats and realleges the allegations of paragraphs 1 through 135 as if fully set forth herein.

137.  As a direct result of the presence of defendants' asbestos-containing products in the public buildings and facilities of the State of West Virginia, the personnel and the public using these buildings have been exposed to asbestos, asbestos fibers, and/or asbestos particles.  At least one state employee has instituted legal action against the plaintiff to recover compensation for disease and death which allegedly developed as a result of such exposure to asbestos in state-owned buildings. It is reasonably foreseeable that other state employees will initiate legal action against the plaintiff to recover compensation for disease which allegedly developed as a result of exposure to asbestos in state-owned buildings.

138.  As a direct result of the conduct of the defendants, the plaintiff has been and will continue to be subjected to legal claims brought by persons seeking damages for personal injuries and death allegedly caused by exposure to asbestos, asbestos fibers, or asbestos particles in plaintiff's buildings which contain the asbestos-containing products of defendants.

139.  Plaintiff is entitled to a declaratory judgment declaring that defendants are and will be primarily liable for any and all injuries from the presence of defendants' asbestos-containing products in plaintiff's buildings.

-31-

Plaintiff is and will be further entitled to full and complete indemnification, by defendants, for all claims or actions of any nature for the purpose of seeking compensatory or punitive damages resulting from any injury or disease alleged to have been caused in whole or in part by exposure to asbestos in the plaintiff's buildings, brought against plaintiff.

### COUNT VII:  MARKET-SHARE LIABILITY

140.  Plaintiff repeats and realleges the allegations of paragraphs 1 through 139 as if fully set forth herein.

141.  Due to factors beyond plaintiff's control, such as the loss or destruction of defendants' sales records, and the passage of time that makes availability of other pertinent records uncertain, plaintiff may not be able to identify the precise manufacturer of each of the asbestos-containing products in its buildings.

142.  The defendants represent all or a substantial percentage of the suppliers of asbestos and asbestos-containing products in the United States during the time period of plaintiff's purchases of such materials.

143.  The defendants' respective shares of liability for the damages attributable to inspection, testing, encapsulation, removal and replacement of the asbestos and asbestos-containing products whose source cannot be identified should therefore be apportioned according to defendants' approximate market share for these products.  As a direct and proximate result of defendants' tortious and unlawful conduct, plaintiff has been damaged as set forth in paragraphs 103 through 110.

COUNT VIII:  ENTERPRISE LIABILITY

144.  Plaintiff repeats and realleges the allegations of paragraphs 1 through 143 as if fully set forth herein.

145.  The defendants represent all or substantially all of the corporations, companies, or other business entities which mined, manufactured, sold, distributed and/or placed in the stream of commerce the asbestos-containing products used in plaintiff's buildings and facilities.

146.  Defendants followed an industry-wide standard, developed by their industry, of refusing to provide necessary warnings as to the hazards presented by exposure to asbestos and asbestos-containing products.

147.  The industry along with its members and members of the asbestos industry trade assocations, suppressed, discouraged and retarded research and publication concerning the relationship of asbestos to various diseases and, in fact, actively concealed and misrepresented these relation-ships.  As a direct and proximate result of defendants' establishment of and adherence to this industry-wide standard, plaintiff has suffered damages as set forth in paragraphs 103 through 110 above.

COUNT IX:  CONCERT OF ACTION

148.  Plaintiff repeats and realleges the allegations of paragraphs 1 through 147 as if fully set forth herein.

149.  Defendants expressly or tacitly agreed among themselves to market and promote an unreasonably dangerous product, and engaged in a concert of action and a concerted course of conduct with respect to the tortious activities

as described in this Complaint.  These activities were
performed for the benefit of the absestos industry.

150.  Each defendant knew, or had reason to know, that
the conduct of some or all of the other defendants subjected
plaintiff and users and occupants of state-owned public
buildings and facilities to an unreasonable risk of harm and
constituted breaches of clear legal duties.  Defendants gave
substantial encouragement and assistance to some or all of
the other defendants, as described above; declined to
adequately test their asbestos-containing products and
adhered to an industry-wide practice of refusing to provide
adequate warnings regarding the hazards presented by
exposure to asbestos-containing products.

151.  Defendants gave substantial assistance to some or
all of the other defendants, and each defendant's conduct,
separately considered, subjected plaintiff and the users of
plaintiff's buildings to an unreasonable risk of harm, in
breach of defendants' legal duties.

152.  As a direct and proximate result of defendants'
tortious and unlawful concert of action, plaintiff has been
damaged as set forth in paragraphs 103 through 110 above.

### COUNT X:  ALTERNATE LIABILITY

153.  Plaintiff repeats and realleges the allegations of
paragraphs 1 through 152 as if fully set forth herein.

154.  In some instances, analysis of hazardous asbestos-
containing products in plaintiff's buildings and facilities
may identify more than one defendant as a potential
manufacturer of that product.

155.   In the absence of any other evidence, two or more
defendants will have engaged in the tortious conduct
previously described, any one of whom may have caused
plaintiff's damages.  Unde the alternative liability
doctrine, joint and several liability should be imposed on
each of the defendants who have been identifed as potential
manufacturers of asbestos-containing products in plaintiff's
buildings and facilities.

156.   As a direct and proximate result of defendants'
tortious and unlawful conduct, plaintiff has been damaged as
set forth in paragraphs 103 through 110 above.

## COUNT XI:   CONSPIRACY

157.   Plaintiff repeats and realleges the allegations of
paragraphs 1 through 156 as if fully set forth herein.

158.   Defendant Raymark and other defendants have pos-
sessed, since at least 1933, medical and scientific data
which clearly indicate that asbestos and asbestos-containig
products are hazardous to the health and safety of persons
and from which a reasonable person could conclude that these
products pose a health and safety risk to other persons.
Prompted by pecuniary motives, defendants, individually and
in concert with others, including Johns-Manville Corporation
and the editors and publishers of the journal "Asbestos",
failed to warn users of their asbestos-containing products
about the hazards and health risks revealed in this medical
and scientific data.  In fact, defendants conspired to
deprive the public, particularly the users of these products,
of this medical and scientific data, thus depriving them of
the opportunity of free choice as to whether or not to

-35-

expose the persons using and/or inhabiting buildings to the
asbestos and asbestos-containing products manufactured and
sold by defendants.

159.  The acts alleged above were performed pursuant to
an express or tacit agreement among defendant Raymark and
other defendants to suppress knowledge about the dangers of
asbestos and asbestos-containing products, and in furtherance
of a conspiracy to maximize defendants' profits by denying
plaintiff accurate information regarding the health hazards
imposed by asbestos and asbestos-containing products.

160.  As a direct and proximate result of defendants
wrongful conduct, plaintiff has been damaged as set forth in
paragraphs 103 through 110 above.

<u>PRAYER FOR RELIEF</u>

Wherefore, plaintiff State of West Virginia prays that:

A.  Judgment be entered against defendants, listed in
paragraphs 6 through 81 above, jointly and severally, or
according to their share of the market, for compensatory
damages in the amount of 100 million dollars;

B.  Judgment be entered against defendants, jointly and
severally, or according to their share of the market, for
punitive damages in an amount that is fair and just under
the circumstances;

C.  The Court issue a declaration that plaintiff, as
well as its officials, employees, and agents, is entitled
and will be entitled to full and complete indemnification
by the defendants, for all claims and actions of any nature
seeking compensatory and/or punitive damages resulting from

any disease or injury alleged to have been caused in whole or in part by exposure to asbestos in plaintiff's buildings and facilities by any past, present or future employee, occupant or visitor to the plaintiff's buildings or facilities brought against plaintiff;

D.  The following equitable relief be granted:

(1)  The Court issue an injunction requiring all defendants, at their expense, and under time deadlines established by Court order, to perform all necessary asbestos-abatement remedial actions under the supervision of plaintiff State of West Virginia, including, but not limited to the inspection, identification, analysis, containment, encapsulation removal, and replacement of all asbestos and asbestos-containing products in each and every state-owned building and facility in the State of West Virginia;

(2)  The Court issue an injunction requiring all defendants, at their expense, to perform all necessary ongoing maintenance, testing and monitoring of asbestos materials contained within plaintiff's buildings and facilities and to remove same as the need arises;

(3)  The Court issue an injunction requiring all defendants to fund, at their expense, the cost of training programs for state employees responsible for the maintenance of state public buildings and facilities;

E.  Plaintiff recover the cost of this suit, together with reasonable attorneys' fees;

F.   The Court grant such other and further relief as the Court deems just and proper; and

G.   A trial by jury.


Dated this 17th day of July, 1986.


                              STATE OF WEST VIRGINIA,
                              ex rel. GOVERNOR ARCH A.
                              MOORE, JR., et al.,
                              Plaintiffs,

                              By Counsel,


O'CONNER AND HANNAN              *Charles G Brown*
LAWRENCE A. G. MOLONEY          CHARLES G. BROWN
DONALD S. ARBOUR                ATTORNEY GENERAL
MARGARET M. VAN VALKENBURG
3800 IDS Tower
80 South Eighth Street
Minneapolis, MN  55402          *Daniel W. Vannoy*
                                DANIEL W. VANNOY
  Of Counsel to Plaintiff       ASSISTANT ATTORNEY GENERAL
                                State Capitol, Room 26-E
                                Charleston, West Virginia
                                              25305

                                Counsel for Plaintiff


                                FILED July 17 1986

                                *Jean Friend*
                                CIRCUIT CLERK

-38-

State of West Virginia, ex rel -vs- AAER Sprayed Insulation, et al

86-C-458

SERIAL SECTION NO. 56-3-31

# COST BOND

KNOW ALL MEN BY THESE PRESENTS, That we ___The State of West Virginia, ex rel,___

etc. _____

XXX _____ as principal,

and _____ XXXXXXX

are held and firmly bound unto the State of West Virginia in the just and full sum of ___$100.00 (CASH)___ Dollars, the payment whereof, well and truly to be made, we bind ourselves, our heirs, executors and administrators, jointly and severally, firmly by these presents.

Sealed with our seals, and dated this __17th__ day of _____ July _____, 19_86_

The condition of the above obligation is such, that whereas the above bound principal is about to institute suit in the ___Circuit___ Court of ___Monongalia___ County, West Virginia, against ___AAER Sprayed Insula-tion, et al___

non-resident defendant, seeking damages sustained by the plaintiff herein, growing out of _____

_defendants' failure to warn the State of West Virginia, as purchaser and_

_user of their asbestos products in the state owned buildings of the potent-_

_ial hazards associated with their products_

in this State by the defendant to such action, and being required to execute bond contingent to pay costs that may accrue and that may be finally adjudged against___ the plaintiffs ___ in the final ad-judication of the matters involved in such action.

NOW, THEREFORE, upon failure of the plaintiff to prevail in the action that _the plaintiffs_ will reimburse the defendant, or cause him to be reimbursed, the necessary expense incurred by him in and about the defense of this action in this State, as provided by Serial Section No. 56-3-33 of Michie's Code of West Virginia, then this obligation to be void, else to remain in full force and effect.

_Daniel W. Vannoy_ (SEAL)
ATTORNEY FOR THE PLAINTIFFS

_____ (SEAL)

_____ (SEAL)

Signed, sealed and acknowledged before me and approved by me this __17th__ day of __July__ 19_86_.

___Jean Friend___, Clerk, __Monongalia__ County Circuit Court, of West Virginia.

By: _Susan Trowbridge_
Deputy Clerk

# EXHIBIT "B"



ATTACHMENT I



**STATE OF WEST VIRGINIA**
**OFFICE OF THE ATTORNEY GENERAL**
CHARLESTON 25305

**CHARLIE BROWN**
ATTORNEY GENERAL

<u>MEMORANDUM</u>                                        **January 29, 1987**

TO:     CHARLES G. BROWN
        ATTORNEY GENERAL

FROM:   DANIEL W. VANNOY
        ASSISTANT ATTORNEY GENERAL

        LAWRENCE A. MOLONEY
        SPECIAL ASSISTANT ATTORNEY GENERAL

RE:     <u>ASBESTOS ABATEMENT, AN OVERVIEW</u>

<u>BACKGROUND</u>

        For dozens of years, asbestos was the darling of the building
and manufacturing industries. Because of its adhesive, insulating
and fire-retardant properties, it was used in virtually every
type of construction or remodeling materials from pipe cement to
wall/ceiling materials to floor tiles to roofing. It was used
extensively in public buildings such as schools, hospitals, and
offices, as well as in private property of every description.

        In West Virginia alone it is believed that in excess of 300
public buildings belonging to the state contain asbestos products.
At the time of construction of these buildings, based on informa-
tion received from the manufacturers, asbestos was believed to be
"state of the art." Subsequent knowledge has shown it to be a
dangerous and potentially deadly material.

<u>DANGER:</u>

        Asbestos materials contain tiny fibers which eventually
"break off" from the parent material and migrate freely through
the air or water. When inhaled, these microscopic fibers embed
themselves in the lungs where they tend to remain for life.
Unfortunately, once in the lungs these fibers, over a long period
of time, create an irreversible and untreatable condition known



EXHIBIT

B

Page 2

as "asbestosis." Asbestosis in turn leads to a form of lung
cancer called mesothelioma. Because asbestos is considered a
long-latency toxin, 20 years or more can lapse between exposure
to the fibers and the onset of clinical illness. Although the
danger to casual occupants (past and current) of asbestos-laden
buildings is high, the danger to workers is much higher because
of the fairly constant erosion of the asbestos-fiber bond and the
ever-present danger of particles in the normal room air.

LEGAL LIABILITY AND WEST VIRGINIA

The first landmark asbestos case was in 1973. Since that
time, there have been approximately 30,000 additional personal
injury cases filed and, by the year 2010, this figure is expected
to exceed 200,000. Since several courts have found that the
"dangers" of asbestos were known to the manufacturers as early as
the 1930's, it is probable that most of these suits will be
successful. Many courts have also found asbestos-related claims
to fall under the "strict liability theory", it therefore is also
probable that the owners of asbestos-infected buildings, owners
like the State of West Virginia, could be also held liable.
Robert Corey, of the Insurance & Risk Management Board, informs
this office that the state does not maintain insurance coverage
against exposures to toxic substances such as asbestos; see
addendum I for a sample of the exclusions language from such
coverage under the insurance policies maintained by the State.
In insurance terms, the State is going "bear" which means the
taxpayers will have to pay any recoveries against the State
resulting form exposures to asbestos in our buildings. As long
as there is asbestos in State buildings, the potential for the
state's liability continues and increases.

The State has filed a One Hundred Million Dollar
($100,000,000.00) lawsuit filed by the State of West Virginia
against all known manufacturers of asbestos products used in
state facilities. We believe there is a very high probability
that the suit will be successful.

Statute of limitations restrictions mandate that this
massive litigation be undertaken now. However, we cannot wait
for a judgment in favor of the State to begin asbestos removal or
abatement. There is a clear and present danger to the citizens
of West Virginia, regardless of whether they are state employees
or visitors to a state building, a patient in a state hospital,
or a student in a state school. The potential liability of the
state shall continue to increase on a daily basis unless and
until all asbestos contaminants are removed or rendered harmless.

Page 3

## A BRIGHTER NOTE IN CLOSING

There is every likelihood that the state will more than recoup its expenditures on asbestos abatement.  One recent out-of-state case awarded $6.8 Million Dollars for the costs involved (plus punitive damages) in removing asbestos from a city courthouse while several other cases involving asbestos abatement in a single public building have involved awards in excess of Four Million Dollars ($4,000,000.00).

The agencies of West Virginia's government are currently abating asbestos in buildings within their responsibilities. Other abatement projects are being contemplated and planned.  For example:  (1) The Student Union at Marshall University must undergo asbestos-abatement at a cost of approximately Three Million Dollars (2) L. Robert Kimball & Associates, presented the State with (i) a report of the asbestos material in Capitol Complex Buildings A, B & C; and (ii) an estimate in excess of $17 million to abate the asbestos in those three buildings.  (3) The Creative Arts Center at West Virginia University must undergo abatement in excess of $1 million.  (4) The Coliseum at West Virginia University may, one day in the not too distant future, have to be shut-down and abandoned because the technology may not exist to encapsulate the deteriorating asbestos ceiling.  These types of examples abound throughout the State.

It is probable that this suit may be amended to increase the amount of recovery to as much as $400 million.

DWV/cja

FILED: May 5, 1987

CIRCUIT CLERK

# EXHIBIT "C"



**STATE OF WEST VIRGINIA**
## OFFICE OF THE ATTORNEY GENERAL
**CHARLESTON 25305**

**CHARLIE BROWN**
ATTORNEY GENERAL

PROPOSAL TO ESTABLISH A

LEGISLATIVE TASK FORCE ON

ASBESTOS-ABATEMENT



EXHIBIT

C



STATE OF WEST VIRGINIA
OFFICE OF THE ATTORNEY GENERAL
CHARLESTON 25305

CHARLIE BROWN                                              February 23, 1987
ATTORNEY GENERAL

Members
West Virginia Legislature
State Capitol
Charleston, West Virginia  25305

Dear Senators and Delegates:

    The purpose of this letter is to respectfully request that the West Virginia House of Delegates, together with the West Virginia Senate and Governor Moore, establish a joint task force on asbestos-abatement to oversee the orderly abatement of asbestos-containing products from buildings owned by the State of West Virginia.

    The focuses of the proposed task force may be two-fold:

1.    To oversee the development and implementation of a coordinated and organized program providing for the timely abatement, encapsulation and removal of asbestos-containing products from the State buildings before the products become friable and/or pose unreasonable risks of health hazards to users of the State's buildings.

2.    To oversee (through the establishment and monitoring of a revolving account) the litigation brought against members of the asbestos industry by the Attorney General's Office in the name of the State of West Virginia, ex rel. Governor Arch A. Moore, Jr., on behalf of agencies, boards and commissions of the State of West Virginia including:  The Board of Regents; State Building Commission; Department of Health; Department of Highways; Department of Finance & Administration; Board of Vocational Education, Division of Vocational Rehabilitation; Department of Education; Department of Commerce; Department of Public Safety; Department of Human Services; Department of Veterans Affairs; Department of Agriculture; Geological and Economic Survey; Adjutant General; Department of Corrections and others.  The suit seeks the recovery of the cost necessary to fund the above-referenced asbestos-abatement program and any other cost incurred

Page 2

by the State as a result of asbestos-containing prod-
ucts in the State's buildings.

Asbestos-containing products have been identified in over
330 of the State's approximately 400 buildings.  These products
are in constant states of erosion, releasing tiny asbestos fibers
in the air.  These fibers, when inhaled, embed themselves in the
lungs of users of the State's buildings and potentially create an
irreversible/untreatable condition known as "asbestosis" which in
turn leads to "mesothelioma" (a form of lung cancer).  See
"Attachment I" for a brief overview of the need for (i) asbestos-
abatement and (ii) property damage litigation (a) to recover the
cost of a statewide asbestos-abatement program and (b) to indem-
nify the State for any damages the State may suffer as a result
of exposures to asbestos in State buildings.  As long as asbestos-
containing products remain in the State's buildings, the poten-
tial for liability against the State of West Virginia continues
and increases.

This is no fairy tale!  The State of West Virginia must
abate, encapsulate and remove asbestos-containing products from
the State's buildings to ensure that users of the State's build-
ings are no longer subject to unreasonable risks of health
hazards.  Since 1984, at the earliest, the State of West Virginia
has been aware of the inherent and clear dangers posed by asbestos-
containing products.  To ignore these clear and present dangers
of asbestos-containing products in the State's buildings shall
subject the State to millions of dollars in damages resulting
from exposures to asbestos in the State's buildings.  To abate,
encapsulate and remove asbestos-containing products from the
State's buildings, the State shall be required to expend, over
the next 10 to 15 years, sums of money estimated in amounts
between $100 to $400 Million.

In simple terms, the Office of the Attorney General contends
that the asbestos manufacturing industry and its members who manu-
factured these inherently dangerous products, and not the tax-
payers of West Virginia, should be required to (1) fund the cost
of making the State's buildings safe from the potential hazards
associated with the manufacturers' asbestos-containing products
and (2) compensate those who have been injured from exposures to
asbestos in the State's buildings.

I.   Asbestos Litigation

On July 17, 1986, the State of West Virginia filed a $100
Million lawsuit against approximately 70 manufacturers of asbestos-
containing products for the cost of inspecting, removing,
encapsulating and replacing asbestos-containing products in State
buildings; a copy of the complaint is enclosed as "Attach-
ment II."

Page 3

The lawsuit was filed in the Circuit Court of Monongalia County, West Virginia. The defendants have removed the action to the United States District Court for the Northern District of West Virginia (Clarksburg). The State has moved to remand the suit back to State court. On February 18, 1987, United States District Court Judge Kidd granted the State its motion to remand the case back to Monongalia County Circuit Court and denied the defendants' motion to remove the case based on diversity of jurisdiction.

The factual and legal complexities of this case are many and varied.

(A)  Summary of Material Facts Alleged by the State

    (1)  The State has constructed and/or renovated over 400 public buildings in West Virginia which are used on a daily basis;

    (2)  Asbestos-containing products manufactured by the defendants were used in the construction and/or renovation of the State's buildings;

    (3)  Occupational health hazards associated with asbestos fibers were concealed by the defendants, pursuant to a common plan, so that the asbestos-manufacturing industry could continue to place asbestos-containing products in streams of commerce without warning the State of the potential hazards associated with their products;

    (4)  The presence of the defendants' asbestos-containing products in the State's buildings constitutes, and will continue to constitute, potentially serious dangers to the health and welfare of those who enter, occupy or use the State's buildings; and

    (5)  In order to alleviate the potential health hazards and risks of death posed by asbestos-containing products in the State's buildings, the State has expended, and will be required to expend, millions of dollars in public funds to inspect, identify, test, analyze, abate, encapsulate and remove asbestos-containing products in the State's buildings to adequately protect the occupants, employees and visitors of the State's buildings.

(B)  Summary of Legal Theories Argued by the State

    (1)  STRICT LIABILITY -- the asbestos-containing products in the State's buildings are defective and dangerous in that (i) they are not reasonably safe for their ordinary intended uses; (ii) the defendants failed to provide the State with adequate or sufficient warnings of

Page 4

the risks and dangers inherent in exposure to the asbestos-containing products.

(2)  NEGLIGENCE - the defendants knew or should have known of the dangers of asbestos-containing products, yet they created unreasonable risks of harm and foreseeable health hazards to those using the State's buildings by marketing the inherently dangerous products without warning the State of its potential dangers.

(3)  NUISANCE - because of the unreasonable risks of harm posed by asbestos-containing products, the defendants have interfered, and continue to interfere, with the safe use of the State's buildings;

(4)  BREACH OF WARRANTIES and
(5)  MISREPRESENTATION AND FRAUD -- the defendants represented and warranted that asbestos-containing products were safe for their normal and foreseeable uses; the inherently and unreasonable dangers posed by asbestos-containing products were not disclosed and have caused, and continue to cause, the State to incur cost to protect the users of the State's buildings from unreasonable dangers resulting from asbestos exposure;

(6)  INDEMNITY -- declaratory judgment declaring the defendants liable for damages awarded against the State resulting from legal claims brought by persons seeking damages for personal injuries and death caused by exposures to asbestos in the State's buildings;

(7)  MARKET-SHARE LIABILITY -- due to factors beyond the control of the State, the State may not be able to precisely identify the manufacturer of each specific asbestos-containing product in each of the State's buildings; therefore, the respective shares of liability among the defendants should be apportioned according to the approximate market-share of their products;

(8)  ENTERPRISE LIABILITY and
(9)  CONCERT OF ACTION -- defendants, independently and as an industry, developed and followed standards to conceal the relationships linking asbestos to various diseases and refused, individually and as an industry, to provide warnings of the health hazards presented by exposures to asbestos-containing products;

(10)  ALTERNATE LIABILITY -- in that various analyses of hazardous asbestos-containing products in the State's buildings may identify more than one defendant as the potential manufacturer, joint and several liability

Page 5

should be imposed on each of the defendants who have
been identified as potential manufacturers; and

(11) CONSPIRACY -- the defendants, together as an industry,
conspired to maximize profits by denying the State
accurate information as to the health hazards posed by
asbestos-containing products.

(C) Prayer for Relief

(1) Compensatory damages in the amount of $100 Million;
NOTE: this amount may possibly be increased to as much
as $400 Million.

(2) Punitive damages in an amount the court deems fair and
just;

(3) Declaration that defendants indemnify the State for all
claims resulting from disease, injury or death caused
by exposure to asbestos in the State's buildings;

(4) Equitable relief including injuctions requiring defen-
dants, under the supervision of the State of West
Virginia, to (a) perform all necessary asbestos-abatement
remedial action; (b) perform all necessary maintenance,
testing, monitoring and removal of asbestos materials
in the State's buildings; and (c) fund the cost of
training programs for State employees responsible for
the maintenance of the State's buildings;

(5) Cost of the State in bringing this suit, including
reasonable attorney fees.

Because of the "complexities of this mega-litigation," it is
anticipated that it may take 2 to 5 years to conclude this
litigation; NOTE: we have aggressively targeted late 1988-early
1989 as prospective trial dates. The diverse legal issues of
proving our case and the massive number of defendants require
expertise in the multi-defendant property damage litigation. To
ensure continuity of effective legal representation throughout
this specialized litigation, the Office of the Attorney General,
with the authorization of the Governor and certain client
agencies, has retained the law firm of O'Connor & Hannan, a
Washington, DC, and Minneapolis, MN, law firm with a national
reputation for its specialization in multi-defendant, complex
property damage litigation.

The agreement between O'Connor & Hannan, hereinafter refer-
red to as "O&H," and the State provides that:

Page 6

- O&H shall represent the State and (i) pursue the attached complaint to an ultimate conclusion; (ii) file/oppose post-trial motions (appeals) that are necessary to obtain final resolutions; and (iii) pursue legal proceedings that may be required to collect judgments in favor of the State; and

- The State shall pay O&H a monthly retainer of $5,000 per month for the first 24 months (July 1986, through June 1988) and for each month thereafter in which O&H works a minimum of 25 attorney hours representing the State on this case. In addition, O&H shall receive a contingency fee of the "net amount recovered" (total gross amount recovered less (i) amounts of the retainer paid O&H; (ii) the cost incurred by the State in pursuing this litigation; and (iii) certain costs incurred by O&H in pursuing this litigation on behalf of the State) based on the following schedule:

  - 27% of the first $20 Million of the net recovered; then
  - 24% of the next $5 Million; then
  - 21% of the next $5 Million; then
  - 18% of the next $5 million; then
  - 15% of all amounts in excess of $35 Million.

  NOTE : If there are no recoveries, then no contingency fee shall be due O&H.

The State of West Virginia is cooperating and attempting to coordinate litigation activities, through the National Association of Attorneys General, with other states (Minnesota, Maryland, Virginia, Kentucky, Illinois, Wisconsin, and others) that are also pursuing property damage cases against asbestos manufacturers. We shall endeavor to save cost by conducting mutual discovery, sharing non-confidential evidentiary information, retaining the same experts to provide technical advice and testimony in multi-states, etc. We are also encouraging the enactment of the "Asbestos Information Clearinghouse Act" to require the manufacturers of asbestos-containing products to provide the United States Environmental Protection Agency with the formulas of asbestos-containing products which then could be obtained by the State in Freedom of Information Act requests; if this proposed legislation becomes law, the cost of the subject litigation would be reduced and the burdens of proof necessary to succeed in the subject litigation should also be lessened.

II. Proposed Budget for West Virginia Asbestos Litigation

Page 7

    Litigation of this magnitude is expensive to pursue.  It is
estimated that it will cost approximately $1.3 Million to $2
Million to successfully conclude this litigation.  Although these
costs, at first glance, may appear to be outrageous, these costs
are a small price to pay compared to the cost of not pursuing
this litigation; if the State is not successful in winning this
litigation, then the taxpayers of West Virginia must foot the
$100 - $400 Million costs of abating asbestos-containing products
from the State's buildings as well as any awards/judgments
obtained by parties injured from exposures to asbestos in the
State's buildings.  Because of statute of limitations restric-
tions, this litigation must be pursued now or be forever barred.

    Attached as "Attachment III" is a memorandum setting forth a
proposed budget for the undertakings necessary to successfully
pursue this litigation.

    On behalf of the State of West Virginia and client agencies
authorizing this subject litigation, we hereby request (1) a sup-
plemental appropriation of $390,000 to fund this litigation (and
survey) during the remainder of fiscal year 1987; and (2) $530,000
to finance the litigation next year (FY 1988).

    In summary, the following funds shall be necessary to finance
this litigation:

    (1)  SURVEY COST -- At the time of trial, detailed informa-
         tion regarding "priority" State buildings (approximately
         100) must be presented including (a) amounts and loca-
         tions of asbestos-containing products; (b) the condi-
         tions of asbestos-containing products; (c) the identity
         of potential manufacturers of the asbestos-containing
         products; and (d) the methods and cost of asbestos
         abatement, encapsulation and removal.

         A survey, by an independent, credible EPA approved
         firm, of "priority" State buildings should be conducted
         as soon as funding can be appropriated.  This survey is
         also needed to develop an asbestos-abatement program
         and should be undertaken for reasons not necessarily
         associated with this litigation.

         Based upon the cost of the survey of Capitol Complex
         Buildings A, B and C and estimates of surveys conducted
         on behalf of other states and cities similar to that
         survey contemplated for West Virginia's priority build-
         ings, a minimum of $300,000 should be budgeted.  This
         amount would be expended over the remaining 4 months of

Page 8

the current fiscal year (approximately $250,000) and
the first 2-4 months of FY '88 (approximately $50,000).

It is anticipated that some savings may result in
requiring those experts conducting the survey to also
serve as expert witnesses at trial, particularly on
matters designated as 2, 3, and 4 in Section III of
Attachment III.

As noted, this proposed $300,000 (approximate amount)
should be expended for this survey irrespective of this
litigation.

To the extent possible, efforts shall be undertaken to
utilize West Virginia contractors and subcontractors to
perform the subject survey and analyses of asbestos
materials.

(2)   Litigation Support

The State's asbestos litigation team has, since July
1986, identified and reviewed over 500,000 pages of
documents relating to the construction and renovation
of State buildings and the final discovery process with
some 70 defendants has yet to begin.

The only efficient means of controlling and using these
massive amounts of data is through the use of an
automated litigation system.  The system involves (a)
screening and creating an inventory of potentially rel-
evant documents; (b) microfilming relevant documents;
(c) coding documents for useful information; (d) entry
and storage of coded information into the computer
system; and (e) a computer system allowing access to
the relevant data.

The estimated cost of the necessary litigation support
system ranges from $300,000 to $700,000 depending upon
the ultimate number of documents and methods used to
enter the relevant information into the computer system.
We shall attempt to utilize in-house resources, includ-
ing "piggy-backing" onto other State contracts, to
accomplish as much as possible for the least amount of
money.

It is anticipated that (i) at least $75,000 could be
expended during the current fiscal year; and (ii)
$150,000 will need to be expended in FY '88 for this
litigation support system.  The support system should
also be designed to simultaneously support the

Page 9

development and implementation of a statewide asbestos-abatement program.

(3)    Expert Witnesses

To effectively prepare and present the State's case, it is essential to engage expert consultants who can provide technical advice and expert testimony on such subject matters as (a) health hazards associated with exposures to asbestos; (b) assessment of the asbestos-containing products in State buildings; (c) methods and cost of abating/removing asbestos-containing products from State buildings; (d) identification of products and their potential manufacturers from bulk samplings of asbestos materials; (e) evaluation of the significance of air-monitoring tests conducted by defendants and/or the State.

At least (i) $25,000 should be appropriated for the remaining 4 months of FY '87; (ii) $125,000 for FY '88; and (iii) $150,000 for FY '89 and beyond.

As part of the responsibilities of the expert consultants engaged to assist in the preparation of the case, the experts should also be required to provide technical advice in the development and implementation of a statewide asbestos-abatement program. There are several sources of experts right here in West Virginia, including industrial hygienists, medical doctors specializing in occupational health, engineers, and architects associated with State agencies. To the extent feasible, experts already employed by the State shall be used in efforts to hold down costs; however, to ensure credibility at trial, the testimony of such (biased) witnesses will need to be corroborated by independent, objective experts.

(4)    Depositions and Trial Transcripts

It is not unreasonable to estimate that approximately 300 days of depositions will be necessary to depose (a) State employees; (b) custodians of defendants' documents; (c) witnesses knowledgeable as to defendants' knowledge of asbestos hazards; and (d) defendants' experts. Once discovery has ended, trial may last 100 days or more.

Transcripts are estimated to cost approximately $125,000. We anticipate beginning discovery during the fall of 1987; therefore, $50,000 should be budgeted for FY '88 with the balance in FY '89.

Page 10

(5)   <u>Travel Expenses</u>

The defendants are geographically scattered across the country.  The documents relating to State buildings are maintained at various facilities around the State. Because of the travel involved in developing this case, we estimate that, once discovery begins, travel costs could run as high as $60,000 or more per year.  Twenty Thousand Dollars ($20,000) should be appropriated for the balance of FY '87.

(6)   <u>Personnel Cost</u>

The agreement with O&H provides for a $60,000 annual retainer.  The cost of other personnel provided by the Attorney General's Office, Finance & Administration, Board of Regents, Department of Health, Department of Highways and other state agencies shall be provided from the regular budgets of the respective agencies/offices; however, the costs incurred by such other personnel are included elsewhere in the proposed budget hereby requested.  Depending on the methods selected to supervise the survey of the State's priority buildings and the litigation support system, personnel costs may increase by $25,00 to $30,000 per year.

An appropriation of $20,000 is needed for the remainder of FY '87.

(7)   <u>Copying, Postage and Other Costs</u>

Because of the large number of defendants and the massive volumes of documents, copying, postage and other costs are estimated at approximately $35,000 per year.

## III. ASBESTOS-ABATEMENT PROGRAM

A preliminary survey conducted by State employees in 1984 revealed that at least 330 of the 400 State buildings surveyed contained asbestos-containing products.  The 1984 survey provides a good starting point in developing an asbestos-abatement program; however, it has proven inaccurate in some specific circumstances and not as comprehensive as will be needed for trial.  More specifically, some buildings in which the survey

Page 11

failed to identify asbestos-containing products have subsequently
been found to contain asbestos-containing products. For example,
the 1984 survey reported that Old Main Administration Building at
West Virginia Institute of Technology had no detectable asbestos-
containing products; however, in attempting to replace the
heating system in Old Main, it was discovered that asbestos-
abatement, costing in excess of $150,000, would have to be com-
pleted before the new heating system could be installed. (NOTE:
WVIT still uses its old heating system because it could not
afford the cost of abating the asbestos on top of the cost of the
new heating system.) The cost estimates of the 1984 survey have
also proven to be extremely low.

The State has not, is not, and cannot afford to await recov-
eries of damages from the manufacturing defendants to abate
asbestos-containing products from State buildings. Amounts in
excess of $5 Million are currently being spent or will be spent
during the next fiscal year to abate asbestos from State build-
ings; copies of the notifications of on-going and projected
abatement projects which the State has provided to the
defendants. These abatement projects are only the "tip of the
iceberg" because, as the State's buildings age, the state of
deterioration of asbestos-containing products advances.

The costs associated with abating asbestos are astronomical,
even in our newer buildings. For example, L. Robert Kimball &
Associates, in April 1986, recommended the removal of certain
asbestos-containing products from Capitol Complex Buildings A, B
and C (Department of Highways and Motor Vehicles buildings) at a
cost of approximately $17 Million; NOTE: the 1984 survey
estimated abatement cost in the amount of $8,097,384. Other
examples include: (i) asbestos-abatement at the Student Union of
Marshall University at an approximate cost of $3 Million; (ii) a
$1 Million abatement at Creative Arts Center at West Virginia
University; (iii) the cost of abatement at the Science Building
at Marshall University is estimated to exceed $250,000; (iv)
Huttonsville Correctional Center will begin an asbestos-abatement
next month at a cost in excess of $255,000. The examples of
deteriorating asbestos-containing products in need of abatement
from State buildings around the State are many and impact upon
every State agency responsible for the maintenance of one or more
State buildings/facilities.

Page 12

IV.  Conclusion

With this letter, we have attempted to provide a summary of
(1) the hazards of asbestos-containing products in State build-
ings; (2) the need to develop and implement a comprehensive
statewide asbestos-abatement program; and (3) the urgency and
importance of adequately financing litigation to seek the recov-
ery of the cost the State shall incur as a result of (a) the
defendants' conduct in placing asbestos-containing products into
streams of commerce without warning the State of their hazards
and (b) asbestos-containing products being used in the construc-
tion and/or renovation of State buildings.

We respectively request the leadership of the West Virginia
House of Delegates and the Senate to consider the establishment
of a special task force to oversee (i) a statewide asbestos-
abatement program and (ii) litigation to recover the costs of
such statewide asbestos-abatement program.

We are prepared to present testimony from a panel, consist-
ing of state officials and technical experts, on (i) the dangers
of asbestos-containing products in State buildings; (ii) abate-
ment procedures and estimated cost; (iii) the need for pursuing
the subject litigation; and (iv) the undertakings necessary to
successfully pursue this important litigation.

In these times of economical and financial difficulties, the
State of West Virginia is caught in a "Catch 22" situation:
either (1) the Legislature must provide for the adequate funding
of this litigation to require the manufacturers of asbestos-
containing products (a) to finance the abatement of asbestos-
containing products from State buildings and (b) to compensate
those individuals who have developed asbestosis and/or mesothe-
lioma from exposures to asbestos in the State's buildings or (2)
require West Virginia taxpayers to pay for (a) the removal of
asbestos-containing products from the State's buildings and (b)
injuries/deaths caused by exposures to asbestos in the State's
buildings.  As the advertisement for a well-known auto mechanic
conveys, "pay now or pay later", it is up to the Legislature of
West Virginia.

If you or any other members of the Legislature have any
questions concerning asbestos-abatement and/or the subject litiga-
tion, please do not hesitate to contact me at 348-2522.

Page 13


        Please be advised that this same letter has been addressed
to The Honorable Arch A. Moore, Governor; The Honorable Dan R.
Tonkovich, President of the Senate; The Honorable Robert "Chuck"
Chambers, Speaker of the House of Delegates; and to each member
of the West Virginia Legislature.

        Thank you for your consideration.

                                Sincerely,

                                Daniel W. Vannoy
                                Assistant Attorney General
                                Lead Counsel--West Virginia
                                Asbestos Litigation Team

DWV:pkr

cc:  The Honorable Charles G. Brown
     Attorney General

# EXHIBIT "D"

Outlook

---

### Spurling v. Fairmont State University

---

**From** Michael P. Robb <MRobb@baileyglasser.com>

**Date** Thu 7/11/2024 5:43 PM

**To** Jeffery Lilly <jlilly@rpptl.com>

**Cc** Travis A. Prince <tprince@baileyglasser.com>; Timothy C. Leckenby <tleckenby@baileyglasser.com>; Brent M. Madison <bmadison@baileyglasser.com>

📎 2 attachments (6 MB)

Fairmont State - asbestos abatement notificatons.pdf; JM asbestos contamination claims filed by Fairmont General and WVU Hospitals.pdf;

Hi Jeff. Thank you for the call this afternoon where you offered $600,000.00 to resolve our case against your client, Fairmont State University. Our original demand to your client was $750K to resolve this case and we still believe that our original demand is a very fair number given the evidence we have (some of which is attached for your review).

For instance, we know that the partial abatement jobs listed on the attached 79-page PDF did not remove all of the asbestos from your client's buildings. Also, attaching proof that Fairmont General Hospital and WV University Hospitals Inc. (sites where your client sent Donna Spurling for nursing training) each filed an asbestos contamination claim with the Johns Manville Property Damage Trust. We also have similar documents against Mon General and UHC – Bridgeport.

If we begin site inspections and move forward with discovery (starting with subpoenas to all the abatement contractors and landfills) we are certain we will find the contamination at Fairmont State is even greater than what we are already seeing. With that said, we feel the $750K to resolve this case is more than reasonable but we are willing to come down from our original demand and will shut this case down for $700,000.00. Terms as follows:

Release within two weeks. Full confidentiality. No site inspections. Payment made no later than 30 days from the date we provide your office with the executed release. I will also agree to sit down with you and FSU's general counsel and show you all of the evidence we have so your client can be better informed regarding how to protect its employees and students from exposure to asbestos on the FSU campus.

We look forward to your response to our counter demand of $700K. Thank you and please do not hesitate to contact us if you have any questions.
Mickey

---

**Michael P. Robb**
Attorney

### Bailey & Glasser, LLP

Forest View Plaza
180 Swinderman Road
Suite 100
Wexford, PA 15090
T: +1 (412) 430-0391
F: 304-342-1110


EXHIBIT
D

# EXHIBIT "E"

 Outlook

## Re: Spurling v. Fairmont State University

**From** Jeffery Lilly <jlilly@rpptl.com>

**Date** Fri 7/19/2024 11:24 AM

**To**   Michael P. Robb <MRobb@baileyglasser.com>

**Cc**   Travis A. Prince <tprince@baileyglasser.com>; Timothy C. Leckenby <tleckenby@baileyglasser.com>; Brent M. Madison <bmadison@baileyglasser.com>

---

| CAUTION: External Email |
| --- |

Hey, Mickey!

I hope all is well. I have been authorized to increase Fairmont State's settlement offer to $650,000.00 in response to your most recent demand of $700,000.00. Of course, this offer still includes FSU's request of full confidentiality, a fully executed Release of All Claims Against FSU, and a dismissal, with prejudice, of FSU from the Spurling asbestos litigation.

FSU's General Counsel is still trying to determine if the other terms you requested are feasible (Release within 2 weeks and full payment within 30 days from receipt of the executed release). While FSU has no objection to those additional terms in and of themselves, all settlements and corresponding documents must be approved by the Attorney General's Office as well as payment approved by the State Auditor's Office, which is the potential variable as to whether FSU can actually meet those time frames. FSU is trying to obtain assurances from the AG's Office and State Auditor's Office that this would be feasible. I can assure you that, if a settlement is reached, FSU and I will work diligently to meet those time frames and to keep pressure on the AG's Office and Auditor's Office to do the same. What FSU is trying to determine is just how feasible it would be to pull off those time frames with the AG's mandatory involvement in reviewing the settlement and related documents as well as the Auditor's Office approving payment. FSU's General Counsel anticipates having a better idea of the feasibility of these time frames next week. In the meantime, I wanted to keep things moving by advising of my authority to increase the offer to $650,000.00 to hopefully get this matter resolved, pending confirmation of the feasibility of your requested time frames.

We look forward to your response to our increased offer of $650,000.00. Thank you and have a great day!

Jeff

Jeffery W. Lilly, Esquire
Rose Padden Petty Taylor & Lilly, L.C.
Attorneys at Law
P.O. Box 1307
Fairmont, WV 26555-1307
Phone: 304-363-4260
Fax: 304-363-4284
jlilly@rpptl.com


EXHIBIT
E

# EXHIBIT "F"

 Outlook

---

**Re: Spurling v. Fairmont State University**

---

**From** Travis A. Prince <tprince@baileyglasser.com>
**Date** Fri 7/19/2024 12:09 PM
**To** Jeffery Lilly <jlilly@rpptl.com>; Michael P. Robb <MRobb@baileyglasser.com>
**Cc** Timothy C. Leckenby <tleckenby@baileyglasser.com>; Brent M. Madison <bmadison@baileyglasser.com>

Hey Jeff,

Thank you for getting back to us.  Per my voicemail a moment ago, we have authority to meet in the middle and settle with FSU for $675,000.  We are agreeable to confidentiality and executing a Release of All Claims against FSU.  We would ask that any dismissal order or motion be submitted after payment is effectuated.

I look forward to hearing from you.  Have a great weekend!

Travis

---

**Travis A. Prince**

**Bailey & Glasser, LLP**
94 Long Street
Suite 200
Westover, WV  26501
T: 304.594.0087
F: 304.594.9709

tprince@baileyglasser.com
www.baileyglasser.com

This message and any attached documents contain information from the law firm of Bailey & Glasser LLP that may be confidential and/or privileged. If you are not the intended recipient, you may not read, copy, distribute, or use this information. If you have received this transmission in error, please notify the sender immediately by reply e-mail then delete this message.

**From:** Jeffery Lilly <jlilly@rpptl.com>
**Date:** Friday, July 19, 2024 at 11:24 AM
**To:** Michael P. Robb <MRobb@baileyglasser.com>
**Cc:** Travis A. Prince <tprince@baileyglasser.com>, Timothy C. Leckenby <tleckenby@baileyglasser.com>, Brent M. Madison <bmadison@baileyglasser.com>
**Subject:** Re: Spurling v. Fairmont State University

CAUTION: External Email

Hey, Mickey!



# EXHIBIT "G"

 Outlook

---

## Re: Spurling v. Fairmont State University

---

**From** Jeffery Lilly <jlilly@rpptl.com>

**Date** Tue 7/23/2024 7:09 PM

**To**    Travis A. Prince <tprince@baileyglasser.com>; Michael P. Robb <MRobb@baileyglasser.com>

**Cc**    Timothy C. Leckenby <tleckenby@baileyglasser.com>; Brent M. Madison <bmadison@baileyglasser.com>

---

**CAUTION: External Email**

---

Hey, Mickey and Travis!

I hope all is well with you. I'm sorry I missed your call earlier today. I was with a client. I just got off the phone with FSU's General Counsel and I have been instructed to withdraw all of FSU's settlement offers for the time being. FSU has neither accepted nor rejected your most recent demand of $675,000.00, and they are not terminating settlement negotiations. They just have some additional questions. I am now scheduled for a meeting with General Counsel and the President on Friday afternoon to address some questions that have been raised by some Board members. It would be very helpful if you could provide ASAP the following information for me to share during my meeting on Friday:

1. Date of asbestos-related diagnosis;
2. the amount of Past Medical Expenses, to date;
3. the amount of anticipated future medical expenses; and
4. Donna's prognosis and projected life expectancy.

If you could get me that information as soon as possible, I would greatly appreciate it and believe it will be helpful in my meeting on Friday. With a new President, several relatively new Board members and a relatively new General Counsel, there are a lot of questions. I truly appreciate your patience and understanding, as well as your cooperation. I will get back to you as soon as I have my directives following the meeting on Friday afternoon. Thanks again and have a great evening!

Jeff

Jeffery W. Lilly, Esquire
Rose Padden Petty Taylor & Lilly, L.C.
Attorneys at Law
P.O. Box 1307
Fairmont, WV 26555-1307
Phone: 304-363-4260
Fax: 304-363-4284
jlilly@rpptl.com

---

**From:** Travis A. Prince <tprince@baileyglasser.com>
**Sent:** Friday, July 19, 2024 12:09 PM
**To:** Jeffery Lilly <jlilly@rpptl.com>; Michael P. Robb <MRobb@baileyglasser.com>



EXHIBIT
G

# EXHIBIT "H"

## Michael P. Robb

| | |
|---|---|
| **From:** | Michael P. Robb |
| **Sent:** | Wednesday, July 24, 2024 8:27 PM |
| **To:** | Jeffery Lilly |
| **Cc:** | Travis A. Prince |
| **Subject:** | RE: Spurling v. Fairmont State University |
| **Attachments:** | Spurling v. FSU – Robb correspondence to J Lilly Esq with memo and exhibits A-I (7-24-2024).pdf |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Jeff, see attached correspondence (with exhibits). I believe this should be more than sufficient to answer questions 1-4 below. I hope this helps get your client back to the table so we can resolve this. Have a nice evening and call me if you have any questions.
Mickey Robb

**From:** Jeffery Lilly <jlilly@rpptl.com>
**Sent:** Tuesday, July 23, 2024 7:10 PM
**To:** Travis A. Prince <tprince@baileyglasser.com>; Michael P. Robb <MRobb@baileyglasser.com>
**Cc:** Timothy C. Leckenby <tleckenby@baileyglasser.com>; Brent M. Madison <bmadison@baileyglasser.com>
**Subject:** Re: Spurling v. Fairmont State University

---

**CAUTION: External Email**

---

Hey, Mickey and Travis!

I hope all is well with you. I'm sorry I missed your call earlier today. I was with a client. I just got off the phone with FSU's General Counsel and I have been instructed to withdraw all of FSU's settlement offers for the time being. FSU has neither accepted nor rejected your most recent demand of $675,000.00, and they are not terminating settlement negotiations. They just have some additional questions. I am now scheduled for a meeting with General Counsel and the President on Friday afternoon to address some questions that have been raised by some Board members. It would be very helpful if you could provide ASAP the following information for me to share during my meeting on Friday:

1. Date of asbestos-related diagnosis;
2. the amount of Past Medical Expenses, to date;
3. the amount of anticipated future medical expenses; and
4. Donna's prognosis and projected life expectancy.



If you could get me that information as soon as possible, I would greatly appreciate it and believe it will be helpful in my meeting on Friday. With a new President, several relatively new Board members and a relatively new General Counsel, there are a lot of questions. I truly appreciate your patience and understanding, as well as your cooperation. I will get back to you as soon as I have my directives following the meeting on Friday afternoon. Thanks again and have a great evening!

# EXHIBIT "I"

## Michael P. Robb

| | |
|---|---|
| **From:** | Jeffery Lilly <jlilly@rpptl.com> |
| **Sent:** | Friday, July 26, 2024 1:16 PM |
| **To:** | Michael P. Robb |
| **Cc:** | Travis A. Prince |
| **Subject:** | Re: Spurling v. Fairmont State University |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

**CAUTION: External Email**

Hi, Mickey and Travis!

I hope all is well with both of you. This email will confirm the voicemail I just left for Mickey. After meeting with the folks at Fairmont State earlier today, effective immediately, Steptoe and Johnson will now be representing Fairmont State University in the Donna Spurling matter and I will no longer be representing Fairmont State University in the Donna Spurling matter. The lawyers from Steptoe and Johnson will soon file a Notice of Appearance on behalf of FSU. I have provided to FSU's General Counsel the package that you graciously compiled and emailed to me relating to Donna Spurling's diagnosis, treatment, past and future medical expenses, prognosis and medical records as well as your request for dates for the deposition of David Goldberg as a member of the FSU Board of Governors and your request for dates for a walk through of the FSU campus for the purpose of identifying the buildings in which Donna Spurling attended classes.

It was truly a pleasure meeting you and Travis and working with you in this matter. Hopefully our paths will cross again someday soon. Perhaps at Woody's. Thanks again and have a great day!

Jeff

Jeffery W. Lilly, Esquire
Rose Padden Petty Taylor & Lilly, L.C.
Attorneys at Law
P.O. Box 1307
Fairmont, WV 26555-1307
Phone: 304-363-4260
Fax: 304-363-4284
jlilly@rpptl.com

**From:** Michael P. Robb <MRobb@baileyglasser.com>
**Sent:** Wednesday, July 24, 2024 8:26 PM
**To:** Jeffery Lilly <jlilly@rpptl.com>
**Cc:** Travis A. Prince <tprince@baileyglasser.com>
**Subject:** RE: Spurling v. Fairmont State University



EXHIBIT

I

1

# EXHIBIT "J"

IN THE CIRCUIT COURT OF
MONONGALIA COUNTY, WEST VIRGINIA

In Re:

STATE OF WEST VIRGINIA PUBLIC    )    Civil Action No.
BUILDING ASBESTOS LITIGATION     )    No. 86-C-458

---

THE STATE OF WEST VIRGINIA'S MEMORANDUM OF LAW
IN OPPOSITION TO CERTAIN DEFENDANTS'
MOTIONS TO DISMISS COUNTS I – XIII OF THE
AMENDED COMPLAINT FOR FAILURE TO STATE A
CLAIM UPON WHICH RELIEF CAN BE GRANTED

STATE OF WEST VIRGINIA
ex rel. GOVERNOR
ARCH A. MOORE, JR.,
Plaintiff

By Counsel

Charles C. Brown                  O'CONNOR & HANNAN
Attorney General


Daniel W. Vannoy, Esq.            Lawrence A. Moloney, Esq.
Robert D. Pollitt, Esq.          Donald S. Arbour, Esq.
John J. Polak, Esq.              Margaret Van Valkenburg, Esq.
Office of the Attorney General   Robert B. Jaskowiak, Esq.
State Capitol, Room W-435        3800 IDS Tower
Charleston, WV  25305            80 South Eighth Street
(304) 348 2522                   Minneapolis, MN  55402
                                 (612) 341-3800

                                 Counsel to Plaintiff

Dated:  July 10, 1987

July 13, 1987



late court overruled the trial court's dismissal of the
action and remanded the case for judgment.

Similarly, in <u>Riehl v. Travelers Insurance Company</u>, 772
F.2d 19 (3rd Cir. 1985), the plaintiff sought a declaration
under the Federal Declaratory Judgment Act that its insurer
would be liable for the costs of cleaning up toxic wastes
which plaintiff had discovered on its property.  At the time
the plaintiff brought the suit seeking the declaratory judg-
ment, it had not initiated any clean-up activities <u>nor had
any legal actions been taken against plaintiff to compel it
to clean up the site</u>.  The trial court granted plaintiff's
relief and defendant appealed on the ground that the suit
was not justiciable since plaintiff had not incurred any
liability for damages.

The Third Circuit, reversing on other grounds, held that
the issue was justiciable.  The court held that because the
plaintiff's property had already been contaminated and,
therefore, all the facts necessary to establish a right to
relief were present, the controversy was ripe for adjudica-
tion.

In the instant action, the defendants' asbestos-con-
taining materials are present in the State's buildings.  In
the trial of this matter, the State will prove the danger
posed by this presence in State buildings, the wrongful con-
duct of defendants in creating this danger, and the damage
being incurred and to be incurred by the State as a result

of defendants' conduct. The Court will, therefore, have before it all the facts necessary to determine the issue of whether the defendants are obligated to indemnify the State for any liability it has incurred or will incur as a result of the placement of defendants' asbestos-containing materials in State buildings.

> 3. The State is Entitled to Indemnification for, Inter Alia, Sums Paid Out Under the Workers' Compensation Laws.

The Defendants contend that this Court cannot consider the workers' compensation claims that the State has had filed against it alleging injuries due to exposure to defendants' products. At the outset, defendants' ignore that the State is seeking a declaration as to its rights of indemnification for damages it will pay out for injuries, not just to State employees, but others as well, including, students, independent contractors and visitors to State buildings who will come in contact with defendants' hazardous materials. It is a declaration of the State's right to indemnification from all these claims that the State seeks.

Further, defendants' reliance on National Fruit Product Co., Inc. v. Baltimore and Ohio Railroad Co., 329 S.E.2d 125 (W. Va. 1985), is misplaced. National Fruit involved an action by a private employer against an allegedly negligent third-party manufacturer. The court found that no statutory right of subrogation existed in West Virginia's Workers' Compensation Law which would allow the employer to seek in-

- 53 -

demnification from the third-party manufacturer for sums
paid by the employer under the Workers' Compensation Laws.
The court then analysized the common law of indemnity in
West Virginia.  The court concluded that indemnity was not
applicable in that case because the liability of the
employer and the manufacturer were not coextensive, that is,
the employer's liability arose "by virtue of the injuries
suffered by its employees" and the manufacturer's liability
would arise only if the manufacturer was found to have been
negligent.  Id. at 130.  The court held that "a cause of
action for indemnity cannot be implied from the relationship
between an employer and a negligent third party."  Id. at
131 (emphasis added).  In so holding, the Court relied upon
the Fourth Circuit's decision in Crab Orchard Improvement
Co. v. Chesapeake & O. Ry. Co., 115 F.2d 277 (4th Cir.),
cert. denied, 312 U.S. 702, 61 S. Ct. 807, 85 L. Ed. 1135
(1940) interpreting Section 76 of the Restatement of Resti-
tution (1937).

In the first instance, the State's claims are not merely
based on negligence, but also on strict liability, contract,
and nuisance principles.  Moreover, the applicable Restate-
ment of Restitution provisions here are Sections 96 and 93,
not Section 76, the provision construed in National Fruit.
Neither Section 96 nor Section 93 require the common or co-
extensive obligation addressed in its National Fruit case.
Application of the indemnity principles in these Sections

has commonly lead to a recognition of plaintiff's right to indemnification. See e.g., Kelley v. Diesel Const. Div of Carl A. Morse, Inc., 35 N.Y.2d 1, 315 N.E.2d 751 (1974) (general contractor liable under labor law to injured employee, entitled to full indemnity from company which provided a defective hoist).

In fact, public policy supports indemnification of the State by the asbestos manufacturers. Defendants have intentionally placed their products in the State's buildings knowing of the hazardous nature of those products. Defendants concealed this hazardous nature and knowingly allowed State workers and others to come in contact with those products on a day-to-day basis. These actions are of the same nature as those which allow an employer to sue a third-party for intentional injury to the employee. See Nemo Foundations, Inc. v. New River Co., 155 W. Va. 149, 181 S.E.2d 687 (1971). Thus, a right of indemnity in the instant action, where intentional torts are alleged, is analogous to established West Virginia law.

Further, this is not an action wherein the State is asking for subrogation rights vis-a-vis the injured employee. The State's right to indemnification from the defendants in no manner lessens the amount of money the injured employee would receive. Thus, the policy behind the holding in National Fruit that the employee's workers' compensation damages should not be reduced by amounts paid

out by a negligent third party in a subrogation action,
would not be furthered by the grant of defendants' Motion to
Dismiss the State's indemnity claim.

  F. DEFENDANTS' MOTION TO DISMISS THE STATE'S
    CLAIM FOR RESTITUTION SHOULD BE DENIED.

  In Count VII of its Amended Complaint, the State alleges
that due to the defendants' failure to abate the hazards
caused by its products, and due to the imminently dangerous
condition of those products, the State has been required to
begin the removal of asbestos-containing products form State
buildings.  See Paragraphs 139-140 of Amended Complaint.  In
the Amended Complaint, the State further contends that it is
entitled to restitution for the cost of the abatement from
the defendants.  Id. at Paragraph 140.

  Defendants endeavor to evade this claim by arguing that
1) West Virginia does not recognize the theory of restitu-
tion; 2) defendants are not under a duty to remove asbestos
from the State's buildings, and thus are not liable under a
restitution theory; and 3) the State is under no duty to
remove the asbestos from its buildings.  Defendants' argu-
ments fail on all counts.

  In considering the applicability of restitution to as-
bestos cases, the Court should be aware that in 1981, the
Attorney General of the United States issued an exhaustive
report on the legal viability of asbestos property damage
suits brought on a restitution theory and concluded that
property damage "asbestos hazards appear to fit squarely

Dismiss the risk contribution cause of action should be
denied.

### V.  CONCLUSION

For all the above reasons, the defendants' Motion to
Dismiss should be denied.

Dated:  July 10, 1987.                STATE OF WEST VIRGINIA,
                                      ex rel. GOVERNOR
                                      ARCH A. MOORE, JR., Plaintiff


                                      By Counsel,

Charles C. Brown
Attorney General


_Daniel W. Vannoy_
Daniel W. Vannoy, Esq.                        _July 13, 1987_
Robert D. Pollitt, Esq.
John J. Polak, Esq.
Office of the Attorney General
State Capitol, Room W-435
Charleston, West Virginia 25305
(304) 348-2522

Counsel for Plaintiff


O'CONNOR & HANNAN

_Lawrence C M_
Lawrence A. Moloney, Esq.

_Donald S Arbour_
Donald S. Arbour, Esq.

_Margaret Van Valkenburg_
Margaret Van Valkenburg, Esq.

_Robert B. Jaskowiak_
Robert B. Jaskowiak, Esq.
3800 IDS Center
80 South Eighth Street
Minneapolis, MN  55402

Of Counsel to Plaintiff


- 94 -

## VERIFICATION

STATE OF _West Virginia_                )
                                        )
COUNTY OF _Kanawha_                      )

      I, the undersigned, being a party to the instant action, state that the foregoing averments are true and correct based upon my personal knowledge or information and belief and that the facts contained therein are made subject to the penalties of 18 Pa. C.S. Section 4904 relating to unsworn falsification to authorities.

x _____
    **Signature**

## IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

**DONNA R. SPURLING**,

    Plaintiff,

    vs.

**METROPOLITAN LIFE INSURANCE
COMPANY, A/K/A METROPOLITAN
INSURANCE COMPANY**, *et al.*,

    Defendants.

**IN RE:   ASBESTOS PERSONAL
INJURY LITIGATION
MASS LITIGATION
PANEL**

**Civil Action No.: 03-C-9600 KAN
The Honorable Ronald E. Wilson**

**Civil Action No.: 24-C-26 KAN**

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served upon the attorneys of record of all parties via File&ServeXpress on **September 24, 2024**.

By: */s/ Michael P. Robb*
Michael P. Robb, Esquire